**Cembex Revenue Management, LLC**

# Memo

**To:**  Kevin Cook, VP Operations

**From:**  Pamela E. Zipperer-Davis

**CC:**  Jason Wessel, Director, Imaging Services

**Date:**  November 4, 2008

**Re:**  Bullet Points for MAMI Contract

Thank you for meeting with me on October 27, 2008 to discuss the new Westside contract for MAMI. We look forward to having a new contract and continuing to help the current two (2) Westside hospitals and the new Westside hospital, once it is constructed, grow and acquire additional market share.

After we met, I had a meeting with the radiologists. What we discussed, as well as the radiologists' comments, are bulleted below:

- The new exclusive agreement would cover the current two (2) Westside hospitals, automatically transferring to the newly constructed Westside hospital. It would be three (3) years in duration with automatic one (1) year renewals unless terminated by either party 180 days in advance. Termination for cause would be as currently written.
- The President of MAMI, or his designee, would actively participate in the system-wide Radiology Council and appoint a Medical Director for the hospital/hospitals. A fee would be paid to the Medical Director by Mercy for defined duties.
- The radiologists would actively participate in other select committees such as Quality Improvement and the Medical Executive Committee.
- Nuclear and vascular readings need to be discussed.
- MAMI would work with the Radiology Council to expand coverage hours until 10:00 p.m. The expanded coverage would be covered by all radiologists at the five (5) Mercy Hospitals. With a "PACs equivalent" system being installed in each radiologist's home, preliminary electronic reports would be generated. Comparative studies would need to be available on the system, and the radiologist would need to speak to the ordering physician before reports could be generated. The transcription system would need to accommodate remote telephone dictation.
- As a result of the above, Nighthawk would not be used except for third shift. The MAMI radiologists would work with the Credentialing Committee to streamline the credentialing process for Nighthawk radiologists.
- Mercy would provide recruitment assistance to MAMI for one (1) additional radiologist.
- Mercy and the radiologists would aggressively work on additional, outpatient business.

Please let me know if I missed anything. Thank you again for meeting with me, and I look forward to working with you.



PLAINTIFF'S EXHIBIT

13

1

TI. BJ 1228

# HOSPITAL BASED
## PROFESSIONAL SERVICES AGREEMENT
### FOR
### RADIOLOGY SERVICES

This HOSPITAL BASED PROFESSIONAL SERVICES AGREEMENT (the "Agreement") is made and entered into this 14ᵀᴴ day of June_____, 2011 between Mercy Health Partners of Southwest Ohio ("MHP"), Mercy Hospitals West, an Ohio nonprofit corporation d.b.a. Mercy Franciscan Hospital – Mt. Airy ("Mt. Airy") and d.b.a. Mercy Franciscan Hospital – Western Hills ("Western Hills"), (MHP, Mt. Airy and Western Hills are herein collectively referred to as , "Mercy" or "Hospital") and Millennium Radiology, Inc., an Ohio professional corporation ("Group").

W I T N E S S E T H :

WHEREAS, Mt. Airy and Western Hills operate acute care hospitals located in Cincinnati, Hamilton County, Ohio and is affiliated with MHP, an integrated delivery network; and

WHEREAS, Group is an Ohio professional corporation that retains physicians as employees, shareholders, or non-employees contracting with Group who are all duly licensed to practice medicine in Ohio and are (or will become within four (4) years) board certified in the specialty of Radiology, (hereinafter referred to collectively as "Physicians" and individually as a "Physician"); and

WHEREAS, Mercy desires to continue to retain Group which shall provide physicians to be the exclusive provider of radiological services pursuant to this Agreement consistent with Section 1.01 below for patients at: (i) Mt. Airy; (ii) Western Hills; (iii) Harrison Medical Center for so long as such facility is a department of Western Hills; and (iv) Cincinnati PET Scan – Mt. Airy Hospital, Westside CT Scan – Mt. Airy Hospital and Mercy Medical Imaging – White Oak, for so long as such facilities are departments of Mt. Airy (collectively, "Hospital Facilities"); and

WHEREAS, Group desires to accept responsibility for the provision of the professional medical services for Mercy (as described in Section 2.01) at Hospital Facilities; and

WHEREAS, Mercy and Group agree that it is in the best interests of quality patient care and for efficient and effective delivery of health care at Mercy that the parties enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

## I.  EXCLUSIVE AGREEMENT

1.01  <u>Exclusive Agreement.</u> The services described in Section 2.01, shall be provided at the Hospital exclusively by Group pursuant to the terms and conditions of this Agreement, except to the extent: (1) currently permitted pursuant to and consistent with privileges that have

12.

1

EXHIBIT

14

been granted to medical staff members as of the Effective Date of this Agreement; (2) currently permitted pursuant to approved delineation of privilege forms as of the Effective Date of this Agreement; (3) such exceptions to exclusivity that are listed on Exhibit A-1; or (4) consistent with professional services agreements the Hospital has entered into as of the Effective Date of this Agreement that have a radiological component (for both current medical staff members and such replacement/additional medical staff members as needed to provide the service under such professional services agreement), until such time as exclusivity and exceptions are further defined by action of Mercy's Board of Trustees, such actions regarding exclusivity and exceptions may include existing and future Services after consideration of current community practices and standards for clinical privilege delineations

## II.    DUTIES OF GROUP

2.01    Provision of Services. Mercy shall retain Group to perform radiology services at Mercy in a timely and efficient manner and in accordance with the terms and conditions of this Agreement and subject to the exceptions in Section 1.01 (the "Services"), which Services shall include, but are not limited to, the following:

(i)    providing and maintaining a sufficient number of Physicians on Mercy's Medical Staff with appropriate clinical privileges to provide the Services required under this Agreement;

(ii)    providing examinations and interpretations, and other interventional procedures for persons brought to Mercy for treatment, including:

a.    all current and future developments of imaging technology such as radiography (X-Ray), CT, fluoroscopy, Magnetic Resonance, ultrasound, nuclear medicine (including PET, cardiac nuclear medicine studies and radiopharmaceutical therapy), mammography, and DEXA;

b.    current and future developments of image guided interventional procedures related to Radiology procedures; and

c.    current and future Hospital images archived, stored and transferred as well as teleradiology interpretations.

(iii)    providing consultation services to Mercy's Medical staff;

(iv)    ensuring high standard credentials/qualifications of any Physician employed by Group to provide Services under this Agreement with the appropriate certification, specialty training or fellowships in Radiology, and other relevant subspecialty training;

(v)    providing oversight of protocols of Services, quality of Services, and quality control monitoring of equipment used to render Services;

2

(vi)    ensuring that Group's Physicians secure informed consent from the patient or his agent for any and all procedures requiring informed consent;

(vii)    cooperating with other medical, nursing and administrative departments of Mercy and MHP in the delivery of Services and with all matters affecting patient care, personnel, supplies and regulations;

(viii)    providing the services of a Medical Director consistent with Section 2.03 of this Agreement. The Medical Director will be responsible for the quality performance of those Services described in Exhibit A of this Agreement, attached hereto and incorporated herein by reference;

(ix)    designating a Physician to serve as the individual who ensures that for Radiation Protection ("IRRP") and to serve as the Radiation Safety Officer on Mercy's Radiation Safety Committee in accordance with the responsibilities outlined by the Radiation Safety Committee and the rules and regulations set forth by the Ohio Department of Health;

(x)    providing direct or personal supervision for all studies performed at Hospital Facilities, as required by Medicare or other third party payors;

(xi)    actively supporting and participating in Mercy's and MHP's Mission, Values, philosophy, strategic direction and development of an integrated network; and

(xii)    assisting Hospital in reviewing credentials and granting privileges to medical staff members who wish to provide Services at Hospital's Facilities.

All Services shall be performed in accordance with (i) applicable federal, state and local laws, rules and regulations, (ii) generally accepted medical practices, (iii) the Bylaws, rules, regulations, policies and standards of Mercy and the Medical Staff of Mercy, (iv) the standards of The Joint Commission, the Ohio Medical Board, the Ohio Board of Nursing, the Ohio Department of Health, Ohio Department of Job and Family Services, the U.S. Department of Health and Human Services and any other applicable accrediting, regulating or licensing agencies or boards (the "Accrediting and Licensing Agencies"), (v) Mercy's Mission, vision, values and philosophies; (vi) applicable rules, regulations, policies, and standards of Mercy; and (vii) the written Ethical and Religious Directives for Catholic Health Care Services (the "Catholic Directives"), a copy of which is available at **http://www.usccb.org/bishops/directives.shtml**.

In providing Services under this Agreement, neither Group nor any Physician shall discriminate among patients on the basis of race, color, national origin, religion, sex, age, disability or other form of prohibited discrimination.

2.02    Physician Qualifications.

A.    Group hereby agrees to cause all Physicians (i) to be duly licensed to practice medicine in the State of Ohio, (ii) to have all necessary narcotics and controlled

3

substances permit numbers and licenses, and (iii) either individually or through Group, to have a provider number for the Medicare Program, the Ohio Medicaid Program, and the Ohio Workers' Compensation Program. Group hereby further agrees to cause all Physicians to be Board certified in Radiology or to become Board certified within four (4) years after such Physician first begins providing Services pursuant to this Agreement, unless otherwise agreed to.

      B.    Group and Mercy shall identify a core group (the number of and names of Physicians assigned to Mercy) of Physicians to provide the majority of Services hereunder, and Group shall notify Mercy, in writing, within a reasonable amount of time, if any Physician included within such group will no longer be providing Services hereunder.

      C.    Group shall promptly notify Mercy, in writing, upon learning that: (i) any Physician has at any time during the term of this Agreement had his license to practice medicine suspended or revoked, or has been reprimanded, sanctioned or disciplined by any licensing or specialty board or by any state or local medical society; (ii) if any Physician has at any time during the term of this Agreement has been denied membership or reappointment of membership to the medical staff of any hospital or has had clinical privileges at any hospital suspended, curtailed or revoked; or (iii) if any Physician providing Services to Mercy has at any time during the term of this Agreement a final judgment awarded against the Physician in a medical malpractice action in any amount in excess of $25,000.

      D.    Group hereby agrees to cause all Physicians to obtain and/or maintain Medical Staff membership and clinical privileges on Mercy's Medical Staff before providing any Services at Mercy. All applications for appointment or reappointment to Medical Staff and for clinical privileges shall be processed in accordance with Mercy's Medical Staff Bylaws. All Physicians providing Services in Mercy pursuant to this Agreement shall at all times be governed by and shall comply with the Medical Staff Bylaws and all rules, regulations and applicable policies of Mercy, including, without limitation, the Catholic Directives. Physicians shall not be entitled to obtain or maintain membership or clinical privileges on Mercy's Medical Staff simply by virtue of this Agreement.

      In accordance with the Medical Staff Bylaws, Mercy may refuse to grant, or may suspend, curtail or revoke the Medical Staff membership or clinical privileges of any Physician. No Physician who is denied Medical Staff membership or clinical privileges by Mercy, or has such membership or privileges suspended, curtailed, or revoked by Mercy, shall provide Services in Mercy. Services provided by Group and Physicians pursuant to this Agreement are contractual in nature, and nothing contained in the Medical Staff Bylaws or rules or regulations of Mercy, or any Hospital policies applicable to Medical Staff members in general shall give any Physician who is a Medical Staff member providing Services under this Agreement any right to compensation for said Services not included within the terms of this Agreement.

      E.    Recognizing that the Physicians providing Services pursuant to this Agreement must work as a team with other members of Mercy's Medical Staff and Mercy's Administration, it is an express requirement of this Agreement that each Physician rendering Services shall work cooperatively with members Hospital's Medical Staff and Hospital's Administration to assist in identifying and achieving regional and Hospital specific goals and policies. Hospital agrees to work cooperatively with Physicians and Group in the delivery of Services.

F.     When appropriate, Group shall comply with and participate in, and cause all Physicians to comply with and participate in, when appropriate, Mercy's quality assessment/performance improvement, utilization review, risk management, The Joint Commission, hospital and network preparation, and education programs.  Group also agrees, when appropriate, to cause all of its Physicians to comply with requests for external review of Services and to assist with improving customer satisfaction at Mercy.

G.     Quality Programs, Key Measures of Success, and Patient Flow Improvement.     Mercy will develop Key Measures of Success for the Group's Services at Mercy (the "Key Measures of Success").  The Key Measures of Success will be measurable indicators that are consistent with the requirements of Mercy, MHP and Catholic Healthcare Partners, developed in consultation with the MHP Radiology Council,  and can be tracked to measure the success of the Services provided hereunder.  The Key Measures of Success for the initial contract year are attached hereto as Attachment I.  Prior to each anniversary of the Effective Date, Mercy will provide to the Group a copy of the Key Measures of Success to be in effect for the upcoming contract year.

Mercy shall tabulate the Group's performance on the Key Measures of Success on a monthly basis and share the updated results with the Group within fifteen (15) business days of the end of each month.  Representatives of Mercy and the Group shall meet on a quarterly basis to discuss the Group's progress on the Key Measures of Success.  In addition, the Key Measures of Success shall be reported to Mercy's Medical Executive Committee or other Mercy committees from time to time, as determined by Mercy.  The Group shall ensure that its Physicians and the Medical Director are provided with the time to be able to work with Mercy to develop, monitor and track such Key Measures of Success.  Physicians and the Medical Director shall be available to attend meetings on the Key Measures of Success and shall be available to present the outcomes of the Key Measures of Success to committees designated by Mercy and shall be available to present any needed improvement corrective action plans identified by such Key Measures of Success.

In the event that the Group does not achieve all of the Required Metrics of the Key Measures of Success (the "**Required Metrics**") set forth in Attachment I attached hereto for a period of two (2) consecutive calendar quarters, Hospital and the Group shall meet and develop a corrective action plan acceptable to Hospital (the "**Action Plan**") within thirty (30) days of the end of the respective second (2nd) consecutive calendar quarter.  The Action Plan shall include, but not be limited to, a description of what action steps will be taken and/or implemented, who will be responsible for each item and when the items will be completed.  The Action Plan will be shared with Hospital's Medical Executive Committee and such other committees designated by Hospital.   The Action Plan will be considered resolved when all of the Required Metrics have been achieved by the Group for a period of two (2) consecutive calendar quarters following the effective date of the Action Plan.  In the event that the Group does not achieve all of the Required Metrics for four (4) consecutive calendar quarters, in addition to the continuation of the Action Plan Hospital shall have the right to terminate the Agreement upon one hundred and eighty (180) days prior written notice to the Group of its intent to terminate the Agreement. As used herein, "calendar quarter" means each consecutive three-month period beginning on January 1 of that year.

5

2.03    Medical Director of Services.

A.    Group shall provide the services of two Physicians board-certified in Radiology, one to serve as Medical Director of Services for Mt. Airy and one to serve as Medical Director of Services for Western Hills. The Medical Directors shall perform those duties set forth on attached Exhibit A and any additional duties that may be set forth in the Medical Staff Bylaws, Rules & Regulations. The Medical Directors shall be approved by Mercy, which approval shall not be unreasonably withheld, and shall devote a minimum of 50% of their professional time to working at Mt. Airy and Western Hills. The initial Medical Director for Mt. Airy shall be Scott Welton, M.D. and the initial Medical Director for Western Hills shall be Ted Kleimeyer, M.D. The Medical Directors shall each serve a two (2) year term, beginning on the Effective Date (the "Term"). Hospital's designee and the Medical Director for each Hospital shall meet at least quarterly to review the Medical Director's Services. After each Term, the parties may elect to maintain the same initial Medical Directors or select new Medical Directors. Group may, at any time, remove a Medical Director and appoint a new Medical Director, subject the Hospital's approval which shall not be unreasonably withheld.

B.    The tenure of a Medical Director shall terminate automatically upon the happening of any of the following events (i) their death, (ii) their disability, (iii) the suspension or termination of their licensure in radiology, their membership on the Medical Staff of Mercy or their affiliation with the Group, (iv) loss of Board certification in Radiology, or (v) termination of this Agreement. A Medical Director shall be deemed to be "permanently disabled" for purposes of this Agreement when he has been unable to substantially perform the essential functions of the position under this Agreement, due to illness or accident, with or without reasonable accommodations for a period of time in excess of ninety (90) -days within any one hundred eighty (180) -day period.

C.    Upon a Medical Director's death, disability, termination of affiliation with the Group, or termination or resignation of his position as Medical Director, the Group shall promptly appoint as the Medical Director another Physician Board certified in Radiology provided that Mercy must first approve such appointment, which approval shall not be unreasonably withheld.

D.    HIPAA. Hospital and Group acknowledge that Hospital, Group and Physicians are participants in an Organized Health Care Arrangement ("OHCA"), as defined by HIPAA, and that Hospital shall cause its personnel assigned to the Department to offer each patient presented or presenting to the Department for treatment with the Hospital's form of Notice of Privacy Practices, 45 CFR §164.520(d). As a covered entity under HIPAA participating in this organized healthcare arrangement, the Group agrees to abide by the privacy practices summarized in the Hospital's Notice of Privacy Practices. Group agrees to contact Hospital's HIPAA Privacy Officer or Hospital's Corporate Compliance Officer to resolve issues related to patient privacy. Group acknowledges and agrees that Group Physicians and other Group providers will participate in privacy education and/or training provided by Hospital.

6

2.04    Scheduling.

A.      Group shall ensure full coverage of Services at Mt. Airy, Western Hills, and Harrison Medical Center twenty four (24) hours a day, seven (7) days a week so as to ensure consistency of Services, quality control, and patient safety.  Group shall ensure full coverage of Services at Cincinnati PET SCAN – Mt. Airy, Westside CT Scan – Mt Airy, and Mercy Medical Imaging – White Oak for as long as such facilities are departments of Mt. Airy or Western Hills, to ensure consistency of Services, qualify control, and patient safety. Group shall provide written schedules of staffing to Mercy in advance of the commencement date of such schedules, and shall provide written notice of changes to such schedules.  During all hours that Physicians are regularly scheduled to provide Services at Mercy, Group shall provide Physicians who shall remain on the premises of Mercy to perform Services under this Agreement.  Group shall schedule such on-site hours in consultation with Hospital, so as to ensure consistency of Services and quality and safe patient care, During all hours that Physicians are not on-site, they shall be on call for Mercy and Group shall provide Physicians who shall be available to provide Services at Mercy within sixty (60) minutes after notification that Services are needed.

B.      Group shall maintain the availability of back-up Physicians, whose credentials shall have been previously approved by Mercy, to provide Services pursuant to this Agreement, and it shall be Group's sole responsibility to provide such back-up Physician coverage.

C.      Mercy acknowledges that it is aware Group intends to use an off-site teleradiology service company, at Group's sole cost and expense, to provide after hours coverage during hours when Group is not on the premises of Hospital's Facilities.  Nothing in this paragraph 2.04C shall be construed to require the use of off-site teleradiology services for interpretation of plain films when such interpretations are provided by Hospital's on-site Hospitalist providers consistent with the standard of care. Mercy agrees to such use of an off-site teleradiology service company by Group, subject to (i) Mercy's right to approve the company selected, (ii) the company's compliance with the Medical Staff Bylaws, and (iii) ongoing approval of the use of an off-site teleradiology service company by the Medical Executive Committee as required by The Joint Commission standards, to include, without limitation, those related to the credentialing and privileging process for each off-site teleradiologist providing interpretation services to Mercy.


III.      DUTIES OF HOSPITAL

3.01    Space and Office Equipment.  Mercy shall, in consultation with Group, use its reasonable efforts to provide and maintain such clinical, technical and office equipment and facilities, including adequate space, as may be reasonably required and within budgetary constraints for the effective, efficient, and economical operation and the provision of quality Services.  All such equipment and facilities shall be maintained by Mercy in good order and repair and in a satisfactory manner.  Mercy shall furnish at its own expense such materials and other supplies as Group may need to provide Services under this Agreement. Mercy shall consult and collaborate with Group in planning for the purchase and maintenance of Hospital Facilities' radiology department equipment and computer hardware and software.

7

3.02  Maintenance and Utilities.  Mercy shall provide utilities and services such as heat, water, gas, electricity, air conditioning, telephone service, laundry, janitor services, and physical upkeep of the space as may be required for the proper operation and performance of Services.

3.03  Staff.  Mercy shall employ a sufficient number of non-physician personnel to ensure the efficient and effective performance of Services.  Mercy shall ensure the qualifications of all non- physician personnel.  Decisions with respect to the selection and retention of the non-physician personnel in the Radiology Department shall be made by Mercy in consultation with Group.  Hospital rules, regulations and policies shall be followed in hiring, promoting and terminating non-physician personnel.  All non-physician personnel furnished by Mercy shall be considered employees or independent contractors of Mercy and not employees of Group.  The parties shall work together to identify and address opportunities for operational efficiencies.

3.04  Access to Information.  Mercy shall provide Group with such information concerning patients, including information relating to medical history and insurance coverage, as shall be reasonably required by Group in order for Group to render the Services to the patients called for under this Agreement and to prepare bills to patients and accounts receivable follow-up.  Mercy acknowledges that Group does not have an opportunity to obtain patient demographic information from patients and relies on Mercy to provide such information to Group.

3.05  Licenses and Permits.  Mercy shall obtain and maintain all federal, state and local licenses and regulatory permits necessary for the operation of Hospital's Facilities.

3.06  Compliance with Law.  Mercy shall ensure that Hospital's Facilities comply with all federal, state and local laws, regulations and ordinances applicable to Hospital's Facilities.

IV.    BILLINGS AND THIRD PARTY PARTICIPATON AND COMPENSATION

4.01  Billings.

A.    Mercy shall bill for the technical component, and Group shall bill separately for the professional component, of the Services provided under this Agreement.  The parties agree to cooperate with each other by maintaining the necessary records and completing and submitting the necessary reports to enable each party to properly bill patients for medical services, as may be required by the parties, the Accrediting and Licensing Agencies, and the terms of any medical insurance plan or third party agreement under which the parties are providing medical services.  Upon request, the parties shall provide each other with copies of any such records and reports.  The parties shall cooperate with each other to devise billing and other mechanics necessary to support managed care contracts.  Mercy in consultation with Group will develop a plan that could include the writing off of bills and investigations that are reasonable and appropriate to solve problems that arise.

B.    Group shall have the right to fix the professional component fees to be charged for Services rendered by Physicians; provided, however, that such fees shall conform with those customarily charged in the Greater Cincinnati area for comparable services.  Group shall establish uniform fees for all Services performed by Physicians at Mercy and shall submit a fee

8

schedule to Mercy. Group shall notify Mercy thirty (30) days prior to implementation of any change in the amount of fees charged. In the event that Mercy provides evidence to Group that the established fee schedule deviates from customary charges in the Greater Cincinnati area, Group shall promptly make appropriate changes to its fee schedule to remedy any such deviations.

      C.    The parties shall cooperate with each other to defend any audit or complaint by a third party payor or patient relating to Services performed by either of them under this Agreement.

    4.02   <u>Third Party Participation.</u>

      A.    Group and Mercy shall use commercially reasonable efforts to establish and achieve goals for jointly approaching payors. Mercy agrees to use its best efforts to enter into agreements that treat all providers of medical services fairly and equitably. Mercy shall include a representative of Group on any committee of hospital-based physicians. Such representative shall be selected by Group.

      B.    Group agrees to the following:

      1.    Group shall participate in Medicare, Medicaid and Workers' Compensation.

      2.    Group and Physicians shall, at Mercy's request, become members of Mercy's Preferred Provider Organization (PPO), or its successor, and negotiate in good faith to become participating providers under any medical insurance plan or third party agreement under which Mercy will be providing medical services. Group shall not be required to become participating providers under any third party agreement of the PPO which pays less than a competitive community rate.

      3.    Group shall participate in all managed care plans in which Mercy participates so long as such plans pay a competitive community rate, or accept nonparticipating payments and not balance bill patients except for deductibles, copayments, and coinsurance amounts.

      4.    Group shall notify Mercy in the event that the Group determines that a plan is not paying a competitive community rate and Group has decided not to participate in such plan. Following such notification from the Group, Mercy, after consultation with Group, may elect, in Mercy's sole discretion, to: (1) accept the nonparticipating status of Group and Group will agree not to balance bill patients, or (2) terminate this Agreement with Group with one-hundred and eighty (180) days advance written notice.

      5.    In the event that the parties, after good faith efforts, can not agree upon the definition of a competitive community rate as used herein, the parties shall select an independent third party to define the rate of pay that is consistent with a competitive community rate. The independent third party shall be selected within seven (7) days of the written request for such selection by one party to the other party, and the independent third party shall have an additional seven (7) days to provide an opinion to the parties. If the parties cannot agree on an independent third party, such dispute shall be resolved in accordance with Section 9.03 of this Agreement. If

Group fails to participate in a managed care plan offering a rate consistent with the opinion of the independent third party, then Mercy, after consultation with Group, will elect to: (1) accept the nonparticipating status of Group and the Physicians; and Group and Physicians will agree not to balance bill, or (2) terminate this Agreement with Group with one-hundred and eighty (180) days notice.

6.   The parties agree that any further dispute regarding this Section 4.02 shall be subject to the Dispute Resolution process described in Section 9.03 herein.

7.   The parties agree that the terms of this Section are confidential and shall not be disclosed to third parties, including third party payers.

8.   Group agrees that it will not enter into any contract that includes a most favored nation clause.  For purposes of this Agreement, a most favored nation clause means a contract that does any of the following:

(a) Prohibits, or grants a contracting entity an option to prohibit, the Group from contracting with another contracting entity to provide health care services at a lower price than the payment specified in the contract;

(b) Requires, or grants a contracting entity an option to require, the Group to accept a lower payment in the event the Group agrees to provide health care services to any other contracting entity at a lower price;

(c) Requires, or grants a contracting entity an option to require, termination or renegotiation of the existing health care contract in the event the Group agrees to provide health care services to any other contracting entity at a lower price; or

(d) Requires the Group to disclose the Group's contractual reimbursement rates with other contracting entities.

## V.   COMPENSATION

5.01   **Compensation to the Group.**  In at the event Mercy requests the Group to recruit board certified radiologist(s) in order to expand the scope of services offered by the Hospital, consistent with the needs of the community for Services, the Hospital agrees to provide assistance to the Group in its recruitment efforts in an amount to be negotiated by the parties, in accordance with the terms of Mercy's policies and agreements related to recruitment expenses. Any and all re-payment obligations of the recruitment expenses shall be governed by a separate recruitment expense agreement and related security agreement and promissory note signed by the parties.

## VI. INSURANCE, INDEMNIFICATION, RISK MANAGEMENT INITIATIVES, AND CLAIMS

6.01   **Insurance.**

A.   Group, on behalf of itself and each Physician, agrees to carry and maintain professional liability insurance in the amount of at least $1,000,000 per occurrence and

10

$3,000,000 in the aggregate (or in any such other amount as required by the Board of Mercy). Both of the foregoing occurrence and annual aggregate limits must be applicable to each individual Physician providing Services under this Agreement. The insurance company must also be a financially secure and viable professional liability insurance carrier which has been granted an A. M. Best Company rating of B+ or above (or an equivalent rating from a recognized national rating association and/or an appropriate actuarial opinion). This insurance shall be and remain applicable to claims arising from Services provided by a Physician pursuant to this Agreement and must be obtained from an insurance company approved by Mercy. Upon request, current policies, or certificates of insurance evidencing such policies, shall be given to Mercy. Such policies or certificates shall provide that the insurance shall not be canceled or altered without thirty- (30) days prior written notice to Mercy. Group and each of its Physicians further agree not to cancel or alter such insurance without thirty (30)- days prior written notice to Mercy.

B.     Mercy agrees to carry and maintain professional liability insurance through the Catholic Healthcare Partners Liability Self-Insurance Trust in the amount of at least $1,000,000 per occurrence and $3,000,000 in the aggregate. Upon the request of Group, Mercy shall provide Group with a summary of such coverage

6.02    <u>Indemnification</u>.

A.     Group hereby agrees to indemnify and save harmless Mercy, its affiliates and their respective trustees, officers, agents, employees and volunteers from and against any and all claims, actions, awards, judgments, settlements, damages, liabilities and expenses of whatever nature, including attorney's fees and witness' fees, to the extent caused by the negligence or willful misconduct of Group, any of the Physicians or any other employees or agents of Group, provided that such indemnification and hold harmless shall not extend to any matter to the extent caused by the negligence or willful misconduct of Mercy, its affiliates or any of their respective trustees, officers, agents, employees, volunteers or independent contractors, other than Group, the Physicians or other employees or agents of Group.

B.     Mercy shall indemnify and save harmless Group, its affiliates and their respective shareholders, agents, directors, officers and employees from and against any and all claims, actions, awards, judgments, settlements, damages, liabilities and expenses of whatever nature, including attorneys' fees and witness' fees, to the extent caused by the negligence or willful misconduct of Mercy or any employees or agents of Mercy, provided that such indemnification and hold harmless shall not extend to any matter to the extent caused by the negligence or willful misconduct of Group, its Physicians, affiliates or any of their respective shareholders, agents, directors, officers, employees, or independent contractors.

C.     Group shall accept and be responsible for any acts or omissions of a Physician in the professional practice of medicine and nothing in this Agreement shall be interpreted or construed to place any such responsibility for professional acts or omissions onto Mercy.

6.03    <u>Risk Management Initiatives</u>. The Group agrees to comply with and participate in, and cause all Physicians to comply with and participate in the following risk management best practices:

11

- The Group shall have one designee who serves as the Risk Management liaison, and who is responsible for communication regarding Risk Management issues and Loss Prevention efforts between the Group and Mercy.

- 
- The Group shall appoint a designee who will serve as the representative/liaison for the Group with respect to follow up investigations of specific incidents, and will be responsible for participation in patient/family disclosure discussions.
- The Group and its Physicians agree to participate in Risk Management and Patient Safety initiatives as recommended by Mercy, MHP or CHP.

6.04    Notice of Settlement of Claim.    The parties agree to promptly notify the other party, if any claim, demand, or suit is made arising out of or from the provision of Services under the terms of this Agreement.    In a lawsuit where Mercy and Group are defendants, Group and Mercy agree to use its commercially reasonable efforts to cooperate with each other in defense of such lawsuit to develop and achieve a goal for a cooperative defense.    In such a lawsuit, Group agrees to give Mercy written notice of any settlement negotiations and written notice prior to accepting any settlement.    For professional medical acts of Group, Group must obtain a release of Mercy concerning secondary or passive liability for the primary or active liability of Group.

## VII. MEDICAL RECORDS, COMPLIANCE AND DOCUMENTATION

7.01    Medical Records.

A.    Group hereby agrees to cause all Physicians to prepare reports in a timely and complete manner of all Services performed by such Physicians.    All medical records shall be prepared in accordance with the policies of Mercy's Medical Staff, the standards of the Accrediting and Licensing Agencies and the reasonable terms of any medical insurance plan or third party agreement under which Mercy or Group is providing medical services.

B.    All medical records prepared by Physicians pursuant to this Agreement are the property of Mercy and the original records may not be removed from Mercy.

C.    Group hereby agrees to cause all Physicians to prepare and dictate and authenticate any additional or supplementary reports as may reasonably be required by Mercy, and to analyze or interpret such reports upon the request of Mercy in a timely fashion. All reports, including but not limited to those reports generated using the Powerscribe system, should be released, on average, within twelve (12) hours of transcription.

D.    Transcription services and equipment will be provided by Mercy or its contracted vendor at no cost to Group.

7.02    Retention of Documents.

A.    Until the expiration of seven (7) years after the furnishing of Services pursuant to this Agreement, Group and Mercy agree to make available, upon written request of the Ohio Department of Job and Family Services, the Secretary of Health and Human Services, the Comptroller General, any other Licensing or Accrediting Organization, or to any of their duly

12

authorized representatives, this Agreement, and the books, documents and records of Group and Mercy that are necessary to certify the extent of any costs of Group or Mercy arising from this Agreement.

Further, if Group subcontracts any of its duties arising from this Agreement with a value or cost of $10,000 or more over a twelve-month period, with a related party, such subcontract shall contain a clause to the effect of the foregoing sentence. As used herein, "related party" includes any party employed or controlled by Group, any party by whom Group is employed or controlled and any party with whom Group develops a close association or affiliation.

B. Each party shall notify the other immediately of any request received for access to information, as described in this Section 7.02, and shall consult with each other regarding the response to be made thereto prior to providing any such response.

7.03    Corporate Compliance.

A. Group acknowledges that Mercy has established a Corporate Responsibility Program ("CRP") and promotes a culture that fosters prevention, detection and resolution of instances of misconduct. Group shall promptly notify Mercy's Corporate Responsibility Officer of any violation of any applicable law, regulation, third party payor requirement or breach of Mercy's CRP of which Group or its employees or agents become aware of during the term hereof. Group shall instruct its employees and agents working in Mercy of this requirement.

B. Group shall maintain and actively support, at all times during the term of this Agreement, a billing compliance plan that has been reasonably designed, implemented and enforced so that it generally will be effective in preventing and detecting billing errors and other compliance issues, as needed.

C. Group shall cooperate with Mercy in responding to or resolving any complaint, investigation, inquiry or review initiated by a governmental agency or otherwise. Group shall cooperate with any insurance company providing protection to Mercy in connection with the foregoing. An officer of Group shall sign Exhibit B, prior to providing Services under this Agreement.

D. Group represents and warrants to Mercy that neither it, any of its affiliates nor any person providing Services under this Agreement (a) are excluded from participation in any federal health care program, as defined under 42 U.S.C. §1320a-7b (f), for the provision of items or services for which payment may be made under such federal health care programs or (b) have been recently convicted (as that term is defined under 42 U.S.C. §1320a–(7)(i)) of a criminal offense related to health care. Group further represents and warrants to Mercy that it has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that such party or its affiliates know or should know are excluded from participation in any federal health care program, to provide items or services hereunder. Group represents and warrants to Mercy that no final adverse action, as such term is defined under 42 U.S.C. §1320a-7e (g), has occurred or is pending or threatened against such Group or its affiliates or to their knowledge against any employee, contractor or agent engaged to provide items or services under this Agreement.

13

E.       Mercy represents and warrants to Group that neither it, nor any of its affiliates (a) are excluded from participation in any federal health care program, as defined under 42 U.S.C. §1320a-7b (f), for the provision of items or services for which payment may be made under such federal health care programs or (b) have been recently convicted (as that term is defined under 42 U.S.C. §1320a–(7)(i)) of a criminal offense related to health care. Mercy further represents and warrants to Group that it has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that such party or its affiliates know or should know are excluded from participation in any federal health care program, to provide items or services hereunder. Mercy represents and warrants to Group that no final adverse action, as such term is defined under 42 U.S.C. §1320a-7e (g), has occurred or is pending or threatened against Mercy or its affiliates or to their knowledge against any employee, contractor or agent of Mercy or any of its affiliates.

## VIII.  RELATIONSHIP OF THE PARTIES

8.01    Independent Contractor Status.  Group and the Physicians are performing all Services and duties required of them by this Agreement as independent contractors and not as employees, agents, partners of or joint venturers with Mercy. Neither Group nor the Physicians shall have authority to bind or obligate Mercy in any manner. Mercy shall not have authority to bond or obligate Group in any manner.  Mercy shall neither have nor exercise any control over the methods by which any of the Physicians practice medicine, except that Group hereby agrees to cause the Physicians to use currently acceptable methods in their practice of medicine to provide Services in accordance with the standards of the Accrediting and Licensing Agencies and of Mercy's Medical Staff. The sole interest of Mercy is to assure that Services shall be provided the patients in a competent, efficient, and satisfactory manner. Group shall be solely responsible for the payment or withholding of all federal, state or local income taxes, Social Security taxes, unemployment taxes, workers' compensation and other insurance required by law arising from its or the Physicians' compensation hereunder.

## IX.  TERM, TERMINATION AND DISPUTE RESOLUTION

9.01    Term. Subject to Section 9.02, this Agreement shall commence on _____, 2011 (the "Effective Date") and shall continue in effect for an initial period of two (2) years.  After expiration of the initial term, the Agreement may be renewed for an additional two (2) year renewal term upon the parties' mutual written agreement.

9.02    Termination.

A.       In the event either party, with or without cause, desires to terminate this Agreement, such party may do so at any time by providing no less one hundred and eighty (180) days prior written notice of its intent to terminate this Agreement.  In the event that this Agreement is terminated prior to its first anniversary date, Group and Mercy shall not enter into a new agreement for the provision of the same services by Group prior to the first anniversary date.

B.       If either party breaches any term of this Agreement and fails to correct such breach to the satisfaction of the other party within thirty (30) days after receiving written

14

notice of such breach from the other party, such other party may terminate this Agreement by notifying the breaching party in writing of such termination.

        C.    Mercy shall have the right to terminate this Agreement according to the terms and conditions set forth in Section 4.02(B) of this Agreement.

        D.    Notwithstanding anything in this Agreement to the contrary, Mercy shall have the right to immediately terminate this Agreement (i) if Group fails to provide Physicians who are licensed to practice medicine in the State of Ohio, (ii) if the insurance maintained by Group on its own behalf or on behalf of its Physicians has been or will be reduced below the minimum levels set forth in Section 6.01, or has been or will be cancelled and replacement insurance is not obtained which satisfies the requirements in Section 6.01 , (iii) upon the failure of Group to respond, in a reasonably satisfactory manner, to the happening of any act or failure to act by any Physician involving unethical conduct, moral turpitude or gross negligence, including without limitation any violation of the Catholic Directives or any conviction of a felony or act of dishonesty or fraud that Mercy determines, in a reasonable manner, is detrimental to its best interests, whether or not such act or failure to act occurred in the course of Group's or Physician's performance of Services under this Agreement, or (iv) Group attempts to assign or otherwise transfer this Agreement without Mercy's prior written consent, or (v) if Group or a Medical Director breaches Section 2.03(D), the Medical Director as Business Associate under HIPAA Section.

        E.    <u>Suspension or Termination of Individual Physicians for Specific Breaches.</u>  In the event: (i) of any act or failure to act by any Physician involving unprofessional conduct, unethical conduct, moral turpitude or gross negligence, including without limitation any violation of the Catholic Directives or any conviction of a felony or act of dishonesty or fraud that Mercy determines is detrimental to its best interests, whether or not such act or failure to act occurred in the course of the Physician's performance of Services under this Agreement; (ii) a Physician shall fail to comply with Mercy's policies, procedures, rules and regulations; or (iii) a Physician shall fail to maintain malpractice insurance as required under this Agreement, then the Physician shall not be permitted to perform the Services described herein after Mercy notifies Group in writing of the individual's suspension or termination and the reason(s) therefor.

        F.    Upon termination of an individual Physician pursuant to Section 9.02 (E) above or upon termination or expiration of this Agreement, Group and each Physician agree that such individual Physician shall, if requested by Mercy, voluntarily resign his Medical Staff membership and privileges at Mercy and shall not be entitled to a fair hearing process or any due process rights under Mercy's Medical Staff Bylaws to dispute the termination of such membership or privileges.  In addition, upon termination of this Agreement for whatever reason, Group and each Physician agree that each Physician shall, if requested by Mercy, voluntarily resign his Medical Staff membership and privileges at Mercy and shall not be entitled to a fair hearing process or any due process rights under Mercy's Medical Staff Bylaws to dispute the termination of such membership or privileges.  Notwithstanding the foregoing, termination of a Physician's Medical Staff privileges and/or clinical privileges for reasons related to professional competence of the Physician shall give rise to due process rights as set forth in the Medical Staff Bylaws.  Group represents that each of its Physicians are aware of and accepts the limitations set forth in this Section 9.02(F).

9.03    Dispute Resolution.

A.    Group and Mercy shall in good faith first attempt to resolve any controversy, dispute or disagreement arising out of or relating to this Agreement by face-to-face negotiations by the Presidents of Group and Mercy.  If any such controversy, dispute or disagreement is not resolved within thirty (30) days after such negotiations begin, that controversy, dispute or disagreement may be submitted to non-binding mediation or arbitration, subject to the parties' mutual agreement, such process to be held in Cincinnati, Ohio under the Rules of the American Health Lawyers' Association.

9.04    Transition Plan.  Mercy and Group will work together to develop a plan for the transition of the provision of Services at Mercy upon termination of this Agreement, as is necessary to provide quality patient care, ("Transition Plan"), which Transition Plan may provide for the continuation of coverage at Mercy by Physicians for a period of time after any such termination.

## X. COVENANTS

10.01    Noncompetition.  During the term of this Agreement, Group and each of its Physicians shall not within a five (5) mile radius of each of the Hospital Facilities without Mercy's written consent, on Group's own behalf or on the Physician's behalf through any agent or family member in any manner, engage directly or indirectly, as principal, creditor, agent, partner, member, shareholder, officer, director, employee, consultant, advisor, or in any other capacity in any business activity which is directly or indirectly competitive with Mercy or any of its Affiliates or provide any of the Services to any business activity which is directly or indirectly competitive with Mercy or any of its affiliates.  In the event that this Section shall be determined by any Court of competent jurisdiction or any other determining body to be unenforceable by reason of its extending for too long a period of time, too great a geographical area, or over too great a range of activities, it shall be interpreted to extend only over the maximum period of time, area or range of activities as to which it may be enforceable.  Furthermore, Mercy agrees to extend to Group during the term of this Agreement the right of first refusal to provide radiology services for any entity operated or controlled by Mt. Airy or Western Hills within a five (5) mile radius of each of the Hospital Facilities to the extent Mt. Airy or Western Hills has the governance authority to do so and if the Group accepts the same or similar terms and conditions as others offering to provide such radiology services.

10.02    Nondisclosure of Confidential Information.    Each party acknowledges their continuing obligations to hold confidential such information as described in this paragraph.  In the course of this Agreement, Group and each Physician shall have access to certain information of Mercy and its affiliates which information is not generally public knowledge.  Similarly, Mercy and its employees shall have access to certain information of Group which information is not generally public knowledge.  Such information may include, without limitation, financial information, medical record information (including but not limited to identifiable health information), business methods and practices, business and marketing plans, symbols, trademarks, trade names, service marks, copyrights, designs, agreements, procedures and other information (collectively, the

16

"Confidential Information"). During the term of this Agreement and thereafter, Group and each Physician shall hold all Confidential Information of Mercy in the strictest of confidence as a fiduciary, and shall not, voluntarily or involuntarily, use, sell, transfer, publish, disclose, or otherwise make available to others any portion of the Confidential Information or related materials without the prior written consent of Mercy or except as required by law. Similarly, during the term of this Agreement and thereafter, Mercy and its employees shall hold all Confidential Information of Group in the strictest of confidence as a fiduciary, and shall not, voluntarily or involuntarily, use, sell, transfer, publish, disclose, or otherwise make available to others any portion of the Confidential Information or related materials without the prior written consent of Group. Group and each Physician shall not transfer (including, but not limited to electronic transfer) or remove Confidential Information from Mercy premises without the written consent of Mercy. To the extent applicable, Group and its Physicians and Mercy will abide by the Health Insurance Portability and Accountability Act. Upon termination of this Agreement for any reason whatsoever, each party shall return to the other without making or retaining copies thereof, all documents, records, notebooks, computer disks or similar repositories containing Confidential Information of the other party.

10.03 <u>Promotion</u>. Group and its Physicians shall reasonably assist Mercy in the promotion of Services at Mercy. Notwithstanding the foregoing, neither Mercy nor Group (or Physicians) shall use the other's names (including trade names, trademarks or service marks), photographs, pictures or recordings in any promotion, advertising, or in any other manner without prior written consent of the other, which consent shall not be unreasonably withheld.

10.04 <u>Nonsolicitation</u>. During the term of this Agreement, Mercy shall not employ or engage as an independent contractor, directly or indirectly or solicit for employment, on its own behalf or for any other Mercy affiliate, any physician who is employed by Group at any time during the term of this Agreement to perform the type of services provided by Group under this Agreement. Similarly, during the term of this Agreement, Group agrees that Group, nor any of its employees, members, or agents, shall directly or indirectly employ or engage as an independent contractor or solicit for employment or the provision of services in any manner any Mercy employee.

10.05 <u>Remedies</u>. The parties acknowledge and agree that the remedy at law for any breach of obligations under Sections 2.03 D, 10.02, 10.03, or 10.04 of this Agreement would likely be inadequate, and further agree and consent that, notwithstanding any other provision of the Agreement, temporary and permanent injunctive relief may be sought from the courts and granted in any court proceeding to enforce Sections 2.03 D, 10.02, 10.03, or 10.04 without the necessity of proof of actual damage. However, this Section 10.04 shall in no way affect the parties' rights and remedies afforded by law, and they shall retain the right to recover such damaged they may have sustained by reason of any breach of Sections 2.03 D, 10.02, 10.03, or 10.04 or any other provision of this Agreement. The provisions of this Article X shall survive termination of this Agreement.

## XI. MISCELLANEOUS

11.01 <u>Changes in Law</u>. In the event of any legislative or regulatory change or determination, whether federal or state, which has or would have significant adverse impact on

either Mercy or Group in connection with the performance of this Agreement, or in the event that performance by either Mercy or Group of any term, covenant, condition or provision of this Agreement should for any reason be in violation of any statute, regulation (including, but not limited to, IRS Revenue Procedure 97-13, as modified), or otherwise be deemed illegal, then the parties shall immediately and in good faith renegotiate the relevant terms of this Agreement. If such renegotiation is unsuccessful, or if any party fails or refuses to renegotiate this Agreement in good faith, this Agreement may be terminated by any party following fifteen (15) days written notice to the other party or sooner if required by law.

11.02  Assignment; Benefit.  Group shall not assign any portion of its obligations under this Agreement without the prior written consent of Mercy and any such assignment shall be null and void. Mercy may assign any portion of its obligations under this Agreement to any affiliate of Mercy with the consent of Group.  Otherwise, this Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors, assigns, executors, representatives and heirs.

11.03  Enforceability of Remainder of Agreement.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid or void or unenforceable, then that term, provision, covenant or condition shall be reformed or rescinded as ordered by the court.  However, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected.

11.04  Notice.  All notices, demands or other writings shall be deemed sufficiently given if personally delivered or deposited in the United States mail in a properly stamped envelope, certified or registered mail, return receipt requested, or delivered to an overnight mail service addressed to the party to whom it is given at the addresses or numbers set forth below or such other persons or addressees or numbers as shall be given by notice of any party:

If to Mt. Airy to:

> Mercy Franciscan Hospital – Mt. Airy
> 2446 Kipling Avenue
> Cincinnati, Ohio 45239
> Attn:  President & CEO

If to Western Hills to:

> Mercy Franciscan Hospital – Western Hills
> 3131 Queen City Avenue
> Cincinnati, Ohio 45238
> Attn: President & CEO

With a copy to:

> Mercy Health Partners
> 4600 McAuley Place
> Cincinnati, Ohio 45242
> Attn:  Legal Services

18

Facsimile No.: (513) 981-6128

If to Group to:

Millennium Radiology, Inc.
4983 Delhi Avenue, Suite 6
Cincinnati, Ohio 45238
Attn:  Chief Executive Officer

With a copy to:

Michael E. DeFrank, Esq.
Hemmer Pangburn DeFrank PLLC
250 Grandview Drive, Suite 200
Ft. Mitchell, Kentucky 41017

11.05  <u>Miscellaneous</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. This Agreement, including its exhibits which are incorporated herein by reference, constitutes the entire understanding between the parties concerning the subject matter hereof and supersedes any and all previous agreements between the parties relating thereto. This Agreement cannot be amended or modified in any respect, unless such amendment or modification is evidenced by a written instrument executed by Mercy and Group. The failure by Mercy or Group to exercise any right provided for herein shall not be deemed a waiver of any right hereunder. The captions of the various sections of the Agreement are not a part of the context hereof, are inserted merely for convenience in locating the different provisions and shall be ignored in construing this Agreement. Whenever the context of this Agreement requires, words used in the singular shall be construed to mean and include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter genders.

11.06  <u>Agreement of Physicians.</u>  Group shall cause each Physician providing Services under this Agreement to deliver to Mercy a written statement, substantially in the form of attached <u>Exhibit C</u>.  This statement shall be executed by the Physician prior to providing Services and shall state that the Physician agrees to abide by the terms, conditions and obligations of the Physicians under this Agreement.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

19

The parties have hereto executed multiple counterparts of this Agreement as of the day and year first above written. By executing this Agreement, each of the undersigned warrants that the execution of this Agreement is within the authority granted to them by their respective organizations.

**MERCY:**

**MERCY HOSPITALS WEST D.B.A. MERCY FRANCISCAN HOSPITAL – MT. AIRY**

By _____

Its _President_

Date _6/14/11_

**MERCY HOSPITALS WEST D.B.A. MERCY FRANCISCAN HOSPITAL – WESTERN HILLS**

By _____

Its _President_

Date _6/14/11_

**MERCY HEALTH PARTNERS OF SOUTHWEST OHIO**

By _____

Its _CEO_

Date _6/16/11_

**GROUP:**

**MILLENNIUM RADIOLOGY, INC.**

By _____

Its _President_

Date _June 14 2011_

20

EXHIBIT A

**Medical Directors of Radiology Services**
**Description of Duties**

1. The Medical Directors shall be responsible for the professional management of Services at Mercy. The Medical Directors shall supervise and direct Services in accordance with accepted national standards and policies of Mercy and MHP.

2. The Medical Directors shall:

   - Work with the President of Mercy or his designee.

   - Cooperate with other members of Mercy's staff and Medical Staff to promote efficient working relationship and quality Services.

   - Actively support and participate in Mercy's Mission, Values, Philosophy, strategic direction Standards of Behavior and development of an integrated network.

   - Serve as Chair of the Department of Radiology and provide leadership to the department responsible for the operational oversight at Mercy, while ensuring compliance with Mercy's policies and practices.

   - Consult with the President of Mercy or his designee regarding preparation of Mercy's budget for Services and cooperate with Mercy in its preparation of the annual budget for Services and for monitoring compliance with the budget in cooperation with Administration. Also cooperating with Mercy in identifying and assisting Mercy with controlling the costs of providing Services while ensuring high quality Services.

   - Ensure interaction with applicable Hospital departments in the provision of Services.

   - Ensure appropriate staffing levels in order to provide Mercy with high quality Services. Such staffing levels shall be determined based upon the needs of Mercy regardless of the needs of any other facility which Group may staff.

   - Support and participate in customer service initiatives in interactions with Mercy's medical staff, employees, patients, and visitors.

   - Assist in the development, tracking, and reporting of the Key Measures of Success for Services at Mercy, in accordance with the terms of Section 2.02(G).

   - Provide plan/data demonstrating Performance Improvement/Quality Assurance activities, and cooperate with and participate in and support Mercy's Quality Assurance activities and Performance Improvement initiatives.

   - Prepare for and participate in The Joint Commission and state inspections and ensure compliance with prescribed standards to help Mercy meet and maintain standards and requirements necessary to assure at all times the full accreditation of Mercy by The Joint Commission for the continuance of all licenses, certifications and accreditations necessary to operate, and the continuance of Mercy's certification under the Medicare and Medicaid programs.

   - Participate, actively and in a positive manner, in Mercy's physician recruitment efforts in addition to Mercy's efforts to provide local access to otherwise unavailable services.

   - Participate in short and long-range planning for the organization and growth of services at Mercy.

   - Assist Mercy in the development of strategy related services, in achieving operational efficiencies, and in the evaluation and implementation of clinical innovation and emerging technology.

   - Provide consultation services concerning Services to Mercy's Medical staff.

21

- Cooperate fully with other medical, nursing and administration departments of Mercy and cooperate with all matters affecting patient care, personnel, supplies and regulations.
- Develop policies and procedures for Services at Mercy in conjunction with Mercy's administrative personnel.
- Designate a Physician or serve as the individual responsible for Radiation Protection ("IRRP") and to serve as the Radiation Safety Officer on Mercy's Radiation Safety Committee in accordance with the responsibilities outlined by the Radiation Safety Committee and the rules and regulations set forth by the Ohio Department of Health.
- Provide radiological examinations and interpretations and other imaging and interventional procedures for persons brought to Mercy for treatment.
- Conduct regular meetings of Radiology Services with minutes forwarded to the Medical Executive Committee.
- Regularly attend meetings of the surgical Departments to address issues pertaining to the provision of Services.
- Provide consultation services to Mercy's Medical staff.
- Cooperate fully with other medical, nursing and administrative departments of Mercy and MHP and cooperate with all matters affecting patient care, personnel, supplies and regulations.
- Mercy and the Medical Director shall agree upon specific and measurable performance outcomes.
- Actively participate in the MHP Radiology Council.
- Participate on the respective Medical Staff Committees – Radiology Committee and Medical Executive Committee.
- Participate on or designate a Physician to participate on the Quality and Patient Safety Committee.
- Participate on the Hospital's Quality Council.
- Provide input and evaluation to Hospital regarding the performance and evaluation of the Director of the Radiology Department
- In compliance with The Joint Commission standards applicable to services provided through contractual arrangements, Mercy and Group agree that Group's Services will be provided safely and effectively (LD 3.50)   and that Mercy must retain overall responsibility and authority for Services furnished under this Agreement (EP#7).

Exhibit A-1

<u>Exclusions from Sections 1.01 & 2.01 Scope of Exclusivity</u>

I.  Echocardiography and nuclear medicine - cardiology procedures.

23

### Compliance Certification

I hereby certify that I am a duly authorized officer of the independent contractor named below ("Group"). On behalf of Group and its Physicians, officers, directors, employees and agents, I certify that:

1. I have received and read the Corporate Responsibility Program Manual of Mercy Health Partners (the "Hospital") Core Values in Action and fully understand the requirements set forth in that document. Mercy requests that Group specifically references the following section of the Corporate Responsibility Plan: Principal 3, Fraud, Abuse and False Claims Act.

2. Group and each Physician shall act in accordance with all rules and policies of Mercy. These rules and policies include a commitment to comply with all applicable laws and to conduct business in accordance with ethical standards.

Name of Group Officer:_____

Signature:_____

Date:_____

24

**EXHIBIT C**

### Physician Certificate

Mercy Franciscan Hospital – Mt. Airy
2446 Kipling Avenue
Cincinnati, Ohio 45239
Attn: President & CEO

Mercy Franciscan Hospital – Western Hills
3131 Queen City Avenue
Cincinnati, Ohio 45238
Attn: President & CEO

Re:   Professional Services Agreement

Dear Mr. Hiltz and Mr. Kowalski:

     Pursuant to Section 11.06 of the Hospital Based Professional Services Agreement, dated as of _____, 2011, by and between Mercy Hospitals West d.b.a. Mercy Franciscan Hospital – Mt. Airy and d.b.a. Mercy Franciscan Hospital – Western Hills and Millennium Radiology, Inc., I hereby agree to abide by all the terms and conditions applicable to, and obligations of, Physicians under such Agreement.   The provisions of the Hospital Based Professional Services Agreement related to terms and conditions applicable to, and obligations of, Physicians have been shared with me by _____.

                         Sincerely,

                         _____

                         [signature]

                         _____

                         [print name]

Acknowledged By:
**MILLENNIUM RADIOLOGY, INC.:**

_____

[signature]

_____

[print name]

_____

[title]

25

ATTACHMENT I

Key Measures of Success for _____ , 2011

## Attachment I:Key Measures of Success for Calendar Year 2011

| | Baseline | Target* | Goal* | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ER Discrepancy Report Turnaround Time. Discrepancies reported within 24 hours. | TBD Site Specific | 95% | 100% | | | | | | | | | | | | | |
| Critical Results (Note 1). Timeframe between the availability of the radiological image for interpretation and the time the critical result is called to the licensed practitioner is 90 minutes or less. Documentation must include time and date of the contact and the name of the licensed practitioner to whom the result was reported. This applies the following results: | TBD Site Specific | 95% | | | | | | | | | | | | | | |
| 1. Aortic Dissection 441.02 | | | | | | | | | | | | | | | | |
| 2. Intracranial Hemorrhage 431 | | | | | | | | | | | | | | | | |
| 3. Leaking Aortic Aneurysm 441.4 | | | | | | | | | | | | | | | | |
| 4. Occlusive Intracranial Stroke 434.91 | | | | | | | | | | | | | | | | |
| 5. Pulmonary Embolus - previously undiscovered 516 | | | | | | | | | | | | | | | | |
| 6. Pneumothorax - previously undiscovered 512.8 | | | | | | | | | | | | | | | | |
| 7. Pneumoperitoneum - previously undiscovered 568.89 | | | | | | | | | | | | | | | | |
| 8. Secondary malignant spinal cord compression 336.3 | | | | | | | | | | | | | | | | |
| 9. Any other results deemed critical by the radiologist | | | | | | | | | | | | | | | | |

Transcription TAT

| | Baseline | Target* | Goal* | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a) Average release time (Note 4) | TBD Site Specific | 12 hrs. | | | | | | | | | | | | | | |
| Collaboratively work with Hospital to develop and implement action plans in response to Medical Staff Perception Survey (Note 2) results regarding physician satisfaction with radiology services | TBD Site Specific | Note 3 | | | | | | | | | | | | | | |

1) These metrics are directly from the Regional Mercy Critical Test/Critical Results Policy and may change as this policy is updated.

2) Bi-annual survey. Last results will appear each month until a new survey is given.

*Although Corrective Action Plans (as described in Section 2.02(F) of the Agreement) are not required if the parties meet the defined Target, the Group agrees that they will use best faith efforts to achieve the defined Goal

3) (i) Action plans developed within 3 months after Survey Results distributed; and (ii) every quarter thereafter, Group and Hospital meet to review and evaluate action plan implementation and improvement.

4) TAT to be calculated from i) the time the exam is complete and sent to PACS to ii) the time the Radiologist's report is entered into the PACS system

*1) How anxious are up to be our partners?*
*2) We are looking for a LT relationship.*
*3) Bonuses, med. dir. recruitment stipends*

*[margin top right: Redo of Agreement]*

*Mtg. c Pat K. c Paul H.*
*KA, TK, SW on 10/8/*

DRAFT 8-25-2010

Style Definition: Heading 2

Formatted: Tab stops: 3.25", Centered + 3.5", Left + 4", Left + 4.5", Left + 5", Left + 5.5", Left + 6", Left + 6.5", Left

Formatted: Bottom: 0.5", Header distance from edge: 0.5", Footer distance from edge: 0.5"

Formatted: Tab stops: 6.5", Left + Not at 8.44"

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: Tab stops: 6.5", Left

Formatted: Font color: Red

## HOSPITAL BASED
## PROFESSIONAL SERVICES AGREEMENT
## FOR
## RADIOLOGY SERVICES

This HOSPITAL BASED PROFESSIONAL SERVICES AGREEMENT (the "Agreement") is made and entered into this _____ day of _____, 20092010 between Mercy Health Partners of Southwest Ohio ("MHP"), Mercy Hospitals West, an Ohio nonprofit corporation d.b.a. Mercy Franciscan Hospital – Mt. Airy ("Mt. Airy") and d.b.a. Mercy Franciscan Hospital – Western Hills ("Western Hills"), (MHP, Mt. Airy and Western Hills are herein collectively referred to as , "Mercy" or "Hospital") and Millennium Radiology, Inc., an Ohio professional corporation ("Group").

### W I T N E S S E T H:

WHEREAS, Mercy operatesMt. Airy and Western Hills operate acute care hospitals located in Cincinnati, Hamilton County, Ohio and is affiliated with Mercy Health Partners of Southwest Ohio ("MHP"), an integrated delivery network; and

WHEREAS, Group is an Ohio professional corporation that retains physicians as employees, shareholders, or non-employees contracting with Group who are all duly licensed to practice medicine in Ohio and are (or will become within three (3)four (4) years) board certified in the specialty of Radiology, (hereinafter referred to collectively as "Physicians" and individually as a "Physician"); and

WHEREAS, Mercy desires to continue to retain Group which shall provide physicians to be the exclusive provider of radiological services pursuant to this Agreement consistent with Section 1.01 below for patients at: (i) Mt. Airy; (ii) Western Hills; (iii) Harrison Medical Center for so long as such facility is a department of Western Hills; and (iv) Cincinnati PET Scan – Mt. Airy Hospital, Westside CT Scan – Mt. Airy Hospital and Mercy Medical Imaging – White Oak, for so long as such facilities are departments of Mt. Airy; (v) all new imaging facilities operated by Mercy within an eight (8) mile radius of either Mt. Airy or Western Hills; and (vi) the new Mercy hospital being developed on the west side of Cincinnati (collectively, the "Hospital'sAiry (collectively, "Hospital Facilities"); and

*[margin left: Harrison outside 8 mi.]*

WHEREAS, Group desires to accept responsibility for the provision of the professional medical services for Mercy (as described in Section 2.01) at the Hospital'sHospital Facilities; and

WHEREAS, Mercy and Group agree that it is in the best interests of quality patient care and for efficient and effective delivery of health care at Mercy that the parties enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

*[margin bottom left: 5 yr. term]*

EXHIBIT

tabbies

15

4361

DRAFT 8-25-2010

## I.    EXCLUSIVE AGREEMENT

> [Formatted: Don't keep with next, Don't keep lines together, Tab stops:  6.5", Left]

1.01    Exclusive Agreement. The services described in Section 2.01, shall be provided at the Hospital's FacilitiesHospital exclusively by Group pursuant to the terms and conditions of this Agreement, except to the extent: (1) currently permitted pursuant to and consistent with privileges that have been granted to medical staff members as of the Effective Date of this Agreement and listed on Schedule 1.01; (2) currently permitted pursuant to approved delineation of privilege forms as of the Effective Date of this Agreement and listed on Schedule 1.01; (3) services are provided through an under-arrangement agreement with another entity; or (4; (3) consistent with professional services agreements the Hospital has entered into as of the Effective Date of this Agreement that have a radiological component (for both current medical staff members and such replacement/additional medical staff members as needed to provide the service under such professional services agreement) and listed on Schedule 1.01. Group shall be the exclusive provider of professional interpretation services for nuclear medicine studies performed at Hospital and will participate with other appropriately privileged medical staff members in providing the professional interpretation of vascular studies performed at the Hospital.), until such time as exclusivity and exceptions are further defined by action of Mercy's Board of Trustees, such actions regarding exclusivity and exceptions may include existing and future Services after consideration of current community practices and standards for clinical privilege delineations

> [Formatted: Tab stops:  6.5", Left]

## II.    DUTIES OF GROUP

2.01    Provision of Services. Mercy shall retain Group to perform radiology services at Mercy in a timely and efficient manner and in accordance with the terms and conditions of this Agreement and subject to the exceptions in Section 1.01 (the "Services"), which Services shall include, but are not limited to, the following:

(i)    providing and maintaining a sufficient number of Physicians on Mercy's Medical Staff with appropriate clinical privileges to provide the Services required under this Agreement;

(ii)    providing examinations and interpretations, and other interventional procedures for persons brought to Mercy for treatment, including:

a.    all current and future developments of imaging technology such as radiography (X-Ray), CT, fluoroscopy, Magnetic Resonance, ultrasound, nuclear medicine (including PET, cardiac nuclear medicine studies and radiopharmaceutical therapy), mammography, and DEXA;

b.    current and future developments of image guided interventional procedures related to Radiology procedures, including, but not limited to, vascular reading panels; and

c.    current and future images archived, stored and transferred as well as teledradiology interpretations.

2

4362

DRAFT 8-25-2010

(iii)  providing consultation services to Mercy's Medical staff;

(iv)  ensuring high standard credentials/qualifications of any Physician employed by Group to provide Services under this Agreement with the appropriate certification, specialty training or fellowships in Radiology, and other relevant subspecialty training;

(v)  providing oversight of protocols of Services, quality of Services, and quality control monitoring of equipment used to render Services;

(vi)  ensuring that Group's Physicians secure informed consent from the patient or his agent for any and all procedures requiring informed consent;

(vii)  cooperating with other medical, nursing and administrative departments of Mercy and MHP in the delivery of Services, and with all matters affecting patient care, personnel, supplies and regulations;

(viii)  providing the services of a Medical Director consistent with Section 2.03 of this Agreement. The Medical Director will be responsible for the quality performance of those Services described in Exhibit A of this Agreement, attached hereto and incorporated herein by reference;

(ix)  designating a Physician to serve as the individual responsible for Radiation Protection ("IRRP") and to serve as the Radiation Safety Officer on Mercy's Radiation Safety Committee in accordance with the responsibilities outlined by the Radiation Safety Committee and the rules and regulations set forth by the Ohio Department of Health;

(x)  providing direct or personal supervision for all studies performed at Cincinnati PET Scan — Mt. Airy Hospital, Westside CT Scan — Mt. Airy Hospital and Mercy Medical Imaging — White Oak, and the other Hospital facilitiesHospital Facilities, as required by Medicare or other third party payors;

(xi)  actively supporting and participating in Mercy's and MHP's Mission, Values, philosophy, strategic direction and development of an integrated network; and

(xii)  assisting Hospital in reviewing credentials and granting privileges to medical staff members who wish to provide Services at the Hospital's Facilities.

All Services shall be performed in accordance with (i) applicable federal, state and local laws, rules and regulations, (ii) generally accepted medical practices, (iii) the Bylaws, rules, regulations, policies and standards of Mercy and the Medical Staff of Mercy, (iv) the standards of The Joint Commission, the Ohio Medical Board, the Ohio Board of Nursing, the Ohio Department of Health, Ohio Department of Job and Family Services, the U.S. Department of Health and Human Services and any other applicable accrediting, regulating or licensing

3

**Formatted**

Formatted: Normal (Justified), No widow/orphan control, Don't hyphenate, Tab stops: -0.5", Left

DRAFT 8-25-2010

agencies or boards (the "Accrediting and Licensing Agencies"), (v) Mercy's Mission, vision, values and philosophies; (vi) applicable rules, regulations, policies, and standards of Mercy; and (vii) the written Ethical and Religious Directives for Catholic Health Care Services (the "Catholic Directives"), a copy of which is available at **http://www.usccb.org/bishops/directives.shtml.**

In providing Services under this Agreement, neither Group nor any Physician shall discriminate among patients on the basis of race, color, national origin, religion, sex, age, disability or other form of prohibited discrimination.

2.02    Physician Qualifications.

A.    Group hereby agrees to cause all Physicians (i) to be duly licensed to practice medicine in the State of Ohio, (ii) to have all necessary narcotics and controlled substances permit numbers and licenses, and (iii) either individually or through Group, to have a provider number for the Medicare Program, the Ohio Medicaid Program, and the Ohio Workers' Compensation Program. Group hereby further agrees to cause all Physicians to be Board certified in Radiology or to become Board certified within five (5four (4) years after such Physician first begins providing Services pursuant to this Agreement, unless otherwise agreed to.

B.    Group and Mercy shall identify a core group (the number of and names of Physicians assigned to Mercy) of Physicians to provide the majority of Services hereunder, and Group shall notify Mercy, in writing, within a reasonable amount of time, if any Physician included within such group will no longer be providing Services hereunder.

C.    Group shall promptly notify Mercy, in writing, upon learning that: (i) any Physician has at any time during the term of this Agreement had his license to practice medicine suspended or revoked, or has been reprimanded, sanctioned or disciplined by any licensing or specialty board or by any state or local medical society; (ii) if any Physician has at any time during the term of this Agreement has been denied membership or reappointment of membership to the medical staff of any hospital or has had clinical privileges at any hospital suspended, curtailed or revoked; or (iii) if any Physician providing Services to Mercy has at any time during the term of this Agreement a final judgment awarded against the Physician in a medical malpractice action in any amount in excess of $25,000.

D.    Group hereby agrees to cause all Physicians to obtain and/or maintain Medical Staff membership and clinical privileges on Mercy's Medical Staff before providing any Services at Mercy. All applications for appointment or reappointment to Medical Staff and for clinical privileges shall be processed in accordance with Mercy's Medical Staff Bylaws. All Physicians providing Services in Mercy pursuant to this Agreement shall at all times be governed by and shall comply with the Medical Staff Bylaws and all rules, regulations and applicable policies of Mercy, including, without limitation, the Catholic Directives. Physicians shall not be entitled to obtain or maintain membership or clinical privileges on Mercy's Medical Staff simply by virtue of this Agreement.

In accordance with the Medical Staff Bylaws, Mercy may refuse to grant, or may suspend, curtail or revoke the Medical Staff membership or clinical privileges of any Physician. No Physician who is denied Medical Staff membership or clinical privileges by Mercy, or has

4

DRAFT 8-25-2010

such membership or privileges suspended, curtailed, or revoked by Mercy, shall provide Services in Mercy. Services provided by Group and Physicians pursuant to this Agreement are contractual in nature, and nothing contained in the Medical Staff Bylaws or rules or regulations of Mercy, or any Hospital policies applicable to Medical Staff members in general shall give any Physician who is a Medical Staff member providing Services under this Agreement any right to compensation for said Services not included within the terms of this Agreement.

E.    Recognizing that the Physicians providing Services pursuant to this Agreement must work as a team with other members of Mercy's Medical Staff and Mercy's Administration, it is an express requirement of this Agreement that each Physician rendering Services shall work cooperatively with members of Hospital's Medical Staff and Hospital's Administration to assist in identifying and achieving regional and Hospital specific goals and policies (to the extent not inconsistent with the terms of this Agreement), and Mercy shall cause Hospital's Administration and other members of Hospital's Medical Staff. Hospital agrees to work cooperatively with Group and the Physicians and Group in the delivery of Services.

> [Formatted: Space Before: 0 pt]

F.    When appropriate, Group shall comply with and participate in, and cause all Physicians to comply with and participate in, when appropriate, Mercy's quality assessment/performance improvement, utilization review, risk management, The Joint Commission, hospital and network preparation, and education programs. Group also agrees, when appropriate, to cause all of its Physicians to comply with requests for external review of Services and to assist with improving customer satisfaction at Mercy.

G.    Quality Programs, Key Measures of Success, and Patient Flow Improvement.
     Mercy and Group will jointly develop Key Measures of Success for the Group's Services at Mercy (the "Key Measures of Success"). The Key Measures of Success will be measurable indicators that are consistent with the reasonable requirements of Group, Mercy, MHP and Catholic Healthcare Partners and can be tracked by Mercy and Group to measure the success of the Services provided hereunder. The Key Measures of Success for the initial contract year are attached hereto as Attachment 1. Prior to each anniversary of the Effective Date, Mercy and will provide to the Group will agree upon a copy of the Key Measures of Success to be in effect for the upcoming contract year.

MRC?

     Mercy shall timely and accurately tabulate the Group's and Mercy's performance on the Key Measures of Success on a monthly basis and share the updated results with the Group within fifteen (15) business days of the end of each month. Representatives of Mercy and the Group shall meet on a quarterly basis to discuss the Group's and Mercy's progress on the Key Measures of Success. In addition, the Key Measures of Success shall be reported to Mercy's Medical Executive Committee or other Mercy committees from time to time, as determined by Mercy. The Group shall ensure that its Physicians and the Medical Director are provided with the time to be able to work with Mercy to develop, monitor and track such Key Measures of Success. Mercy shall ensure that its personnel timely and accurately track, measure and maintain data related to the Key Measures of Success. Physicians; and the Medical Director and Group's management personnel shall be available to attend meetings on the Key Measures of Success and shall be available to present the outcomes of the Key Measures of Success to committees reasonably designated by Mercy and shall be available to present any needed improvement corrective action plans identified by such Key Measures of Success. Mercy



5

4365

DRAFT 8-25-2010

~~and its personnel shall be available to attend meetings, upon the reasonable request of Group, on the Key Measures of Success.  Mercy agrees and acknowledges that timely and accurate tracking of the Key Measures of Success is material to the usefulness and value of the Key Measures of Success as a tool for measuring the success of the Services hereunder.~~

In the event that the Group does not achieve all of the Required Metrics of the Key Measures of Success (the "**Required Metrics**") set forth in Attachment I attached hereto for a period of two (2) consecutive calendar quarters, Hospital and the Group shall meet and develop a corrective action plan acceptable to Hospital (the "**Action Plan**") within thirty (30) days of the end of the respective second (2nd) consecutive calendar quarter.  The Action Plan shall include, but not be limited to, a description of what action steps will be taken and/or implemented, who will be responsible for each item and when the items will be completed.  The Action Plan will be shared with Hospital's Medical Executive Committee and such other committees designated by Hospital.  The Action Plan will be considered resolved when all of the Required Metrics have been achieved by the Group for a period of two (2) consecutive calendar quarters following the effective date of the Action Plan.  In the event that the Group does not achieve all of the Required Metrics for four (4) consecutive calendar quarters, in addition to the continuation of the Action Plan Hospital shall have the right to terminate the Agreement upon one hundred and eighty (180) days prior written notice to the Group of its intent to terminate the Agreement. As used herein, "calendar quarter" means each consecutive three-month period beginning on January 1 of that year.

[handwritten: Radiologists to develop metrics c Mercy]

2.03  Medical Director of Services

A.  Group shall provide the services of two Physicians board-certified in Radiology, one to serve as Medical Director of Services for Mt. Airy and one to serve as Medical Director of Services for Western Hills.  The Medical Directors shall perform those duties set forth on attached Exhibit A and any additional duties that may be set forth in the Medical Staff Bylaws, Rules & Regulations.  The Medical Directors shall be approved by Mercy, which approval shall not be unreasonably withheld, and shall devote a minimum of 50% of their professional time to working at Mt. Airy and Western Hills.  The initial Medical Director for Mt. Airy shall be Scott Welton, M.D. and the initial Medical Director for Western Hills shall be Ted Kleimeyer, M.D.  The Medical Directors shall each serve a two (2) year term, beginning on the Effective Date (the "Term").  Hospital's designee and the Medical Director for each Hospital shall meet at least quarterly to review the Medical Director's Services.  After each Term, the parties may elect to maintain the same initial Medical Directors or select new Medical Directors.  Group may, at any time, remove a Medical Director and appoint a new Medical Director, subject to the Hospital's approval of Mercy which shall not be unreasonably withheld.

[handwritten: Who's Scott?]

B.  The tenure of a Medical Director shall terminate automatically upon the happening of any of the following events (i) their death, (ii) their disability, (iii) the suspension or termination of their licensure in radiology, their membership on the Medical Staff of Mercy or their affiliation with the Group, (iv) loss of Board certification in Radiology, or (v) termination of this Agreement.  A Medical Director shall be deemed to be "permanently disabled" for purposes of this Agreement when he has been unable to substantially perform the essential functions of the position under this Agreement, due to illness or accident, with or without reasonable accommodations for a period of time in excess of ninety (90) -days within any one hundred eighty (180) -day period.

[Formatted: Don't keep with next, Don't keep lines together]

[Formatted: Tab stops: 6.5", Left]

6

DRAFT 8-25-2010

C. Upon a Medical Director's death, disability, termination of affiliation with the Group, or termination or resignation of his position as Medical Director, the Group shall promptly appoint as the Medical Director another Physician Board certified in Radiology provided that Mercy must first approve such appointment, which approval shall not be unreasonably withheld.

~~D. Medical Directors as Business Associates under HIPAA. In recognition of the fact that the Medical Directors see patient identifiable health information outside the scope of treatment and that as such the Medical Directors would be business associates of Mercy, the Group shall ensure that patient identifiable health information provided by Mercy to the Medical Directors will be treated as confidential and kept secure in accordance with applicable law and the Health Insurance and Portability and Accountability Act of 1996 ("HIPAA"). Specifically, the Group agrees that it and the Medical Directors will comply with the terms and conditions set forth in Exhibit B attached hereto.~~

D. HIPAA. . Hospital and Group acknowledge that Hospital, Group and Physicians are participants in an Organized Health Care Arrangement ("OHCA", as defined by HIPAA, and that Hospital shall cause its personnel assigned to the Department to offer each patient presented or presenting to the Department for treatment with the Hospital's form of Notice of Privacy Practices, 45 CFR §164.520(d). As a covered entity under HIPAA participating in this organized healthcare arrangement, the Group agrees to abide by the privacy practices summarized in the Hospital's Notice of Privacy Practices. Group agrees to contact Hospital's HIPAA Privacy Officer or Hospital's Corporate Compliance Officer to resolve issues related to patient privacy. Group acknowledges and agrees that Group Physicians and other Group providers will participate in privacy education and/or training provided by Hospital.

2.04 Scheduling.

A. Group shall ensure full coverage of Services at ~~Mercy~~ Mt. Airy, Western Hills, and Harrison Medical Center twenty-four (24) hours a day, seven (7) days a week ~~in accordance with the provisions of this paragraph~~ so as to ensure consistency of Services, quality control, and patient safety. Group shall ensure full coverage of Services at Cincinnati PET SCAN, Mt. Airy, Westside CT Scan, Mt Airy, and Mercy Medical Imaging – White Oak for as long as such facilities are departments of Mt. Airy or Western Hills, to ensure consistency of Services, quality control, and patient safety. Group shall provide written schedules of staffing to Mercy in advance of the commencement date of such schedules, and shall provide written notice of changes to such schedules. During all hours that Physicians are regularly scheduled to provide Services at Mercy, Group shall provide Physicians who shall remain on the premises of Mercy to perform Services under this Agreement. Group shall schedule such on-site hours in consultation with Hospital, so as to ensure consistency of Services and quality and safe patient care. During all hours that Physicians are not on-site, they shall be on call for Mercy; and Group shall provide Physicians who shall be available to provide Services at Mercy within sixty (60) minutes after notification that Services are needed. ~~Physicians shall be on the premises of Mt. Airy and Western Hills from 7:00 AM to 5:00 PM Monday through Friday. Physicians shall be on call from 5:00 PM to 10:00 PM Monday through Friday. Physicians shall be on the premises of Mt. Airy and Western Hills from 7:00 AM until all studies are read on Saturdays and Sundays, and on call until 10:00 PM on Saturdays and Sundays. From 10:00 PM to 7:00 AM each day coverage will be provided as described in paragraph C below.~~

7

4367

DRAFT 8-25-2010

B.      Group shall maintain the availability of back-up Physicians, whose credentials shall have been previously approved by Mercy, to provide Services pursuant to this Agreement, and it shall be Group's sole responsibility to provide such back-up Physician coverage.

C.      Mercy acknowledges that it is aware Group intends to use an off-site teleradiology service company, at Group's sole cost and expense, to provide after hours coverage ~~from 10:00 PM until 7:00 AM for all radiology studies other than plain films.  From 10:00 PM to 7:00 AM, the Hospital's emergency room physicians or hospitalist physicians will read all plain films.~~ during hours when Group is not on the premises of Hospital's Facilities.  Mercy agrees to such use of an off-site teleradiology service company by Group, subject to (i) Mercy's right to approve the company selected ~~which approval shall not be unreasonably withheld~~, (ii) the company's compliance with the Medical Staff Bylaws, and (iii) ongoing approval of the use of an off-site teleradiology service company by the Medical Executive Committee as required by The Joint Commission standards, to include, without limitation, those related to the credentialing and privileging process for each off-site teleradiologist providing interpretation services to Mercy.

III.      DUTIES OF HOSPITAL

*Formatted: Font: 12 pt*

3.01      Space and Office Equipment.  Mercy shall, in consultation with Group, use its ~~best~~ reasonable efforts to provide and maintain such clinical, technical and office equipment and facilities, including adequate space, as may be reasonably required and within budgetary constraints for the effective, efficient, and economical operation and the provision of quality Services.  ~~Mercy shall make available to Physicians a full PACs system and full access to Mercy's patient information database system (Healthbridge or similar system).  Mercy shall also provide Physicians with an in-home reading system comparable in quality to that used in Hospital so the Physicians can remote read images from their homes.  Such system shall remain the property of Mercy.~~  All such equipment and facilities shall be maintained by Mercy in good order and repair and in a satisfactory manner.  Mercy shall furnish at its own expense such materials and other supplies as Group may need to provide Services under this Agreement.  Mercy shall consult and collaborate with Group in planning for the purchase and maintenance of Hospital Facilities' radiology department equipment and computer hardware and software.

*Formatted: Normal, Tab stops:  0.5", Left + 1", Left + 1.5", Left + 2", Left + 2.5", Left + 3", Left + 3.5", Left + 4", Left + 4.5", Left + 5", Left + 5.5", Left + 6", Left*

*Formatted: Underline*

*Formatted: Left*

~~3.02      Medical Equipment and Maintenance.  Mercy shall provide all medical and imaging equipment, computer hardware and software, and other ancillary equipment necessary to provide high quality imaging services at the Hospital's Facilities (the "Equipment and Software").  Mercy shall make, or cause to be made, in a timely manner, all proper repairs, replacements, additions, updates and improvements in and to the Equipment and Software utilized at the Hospital's Facilities in order to keep and maintain the same in good repair, working order and condition, and outfitted and equipped for the proper operation thereof in accordance with all applicable standards and comparable to those prevailing in other competitive facilities in the Cincinnati area, and all applicable federal, state or local laws, rules, regulations or ordinances.~~

~~3.03      Licenses and Permits.  Mercy shall obtain and maintain all federal, state and local licenses and regulatory permits necessary for the operation of the Hospital's Facilities.~~

8

DRAFT 8-25-2010

~~3.04    Compliance with Law.  Mercy shall insure that the Hospital's Facilities comply with all federal, state and local laws, regulations and ordinances applicable to the Hospital's Facilities.~~

~~3.05~~ __3.02__    Maintenance and Utilities.  Mercy shall provide utilities and services such as heat, water, gas, electricity, air conditioning, telephone service, laundry, janitor services, and physical upkeep of the space as may be required for the proper operation and performance of Services.

3.06~~03~~ Staff.  Mercy shall employ a sufficient number of non-physician personnel to ensure the efficient and effective performance of Services ~~and to provide Group the resources to accomplish the Key Measures of Success.   Such non-physician personnel shall include transcriptionists.__  Mercy shall ensure the qualifications of all non- physician personnel. Decisions with respect to the selection and retention of the non-physician personnel in the Radiology Department shall be made by Mercy in consultation with Group.  Hospital rules, regulations and policies shall be followed in hiring, promoting and terminating non-physician personnel.  All non-physician personnel furnished by Mercy shall be considered employees or independent contractors of Mercy and not employees of Group.  The parties shall work together to identify and address opportunities for operational efficiencies.

3.07~~04~~ Access to Information.  Mercy shall provide Group with such information concerning patients, including information relating to medical history and insurance coverage, as shall be reasonably required by Group in order for Group to render the Services to the patients called for under this Agreement and to prepare bills to patients and accounts receivable follow-up.  Mercy acknowledges that Group does not have an opportunity to obtain patient demographic information from patients and relies on Mercy to provide such information to Group. ~~Mercy shall provide Group within eight (8) days of a patient's discharge the information listed on Schedule 3.07 with at least ninety-six percent (96%) accuracy.   Mercy acknowledges that providing such information to Group is a material obligation and Group relies on such information to timely and accurately bill for its Services.  Failure by Mercy to provide timely and accurate information will result in material financial damages to Group.   In the event that Group's claim for services rendered is denied due to Mercy's failure to provide accurate, timely or complete information to Group, or due to Mercy's failure to confirm that the service was pre-certified by the referring physician or due to Mercy's failure to pre-certify the services, Mercy shall pay Group the amount to which it should have been paid for such service in accordance with the relevant payer's fee schedule, or if uninsured, at the applicable Medicare rate.~~

__3.05  Licenses and Permits.  Mercy shall obtain and maintain all federal, state and local licenses and regulatory permits necessary for the operation of Hospital's Facilities.__

__3.06  Compliance with Law.  Mercy shall ensure that Hospital's Facilities comply with all federal, state and local laws, regulations and ordinances applicable to Hospital's Facilities.__

IV.    __BILLINGS AND THIRD PARTY PARTICIPATON AND COMPENSATION__

9

4369

DRAFT 8-25-2010

4.01. Billings.

A. Mercy shall bill for the technical component, and Group shall bill separately for the professional component, of the Services provided under this Agreement. The parties agree to cooperate with each other by maintaining the necessary records and completing and submitting the necessary reports to enable each party to properly bill patients for medical services, as may be required by the parties, the Accrediting and Licensing Agencies, and the terms of any medical insurance plan or third party agreement under which the parties are providing medical services. Upon request, the parties shall provide each other with copies of any such records and reports. The parties shall cooperate with each other to devise billing and other mechanics necessary to support managed care contracts. Mercy in consultation with Group will develop a plan that could include the writing off of bills and investigations that are reasonable and appropriate to solve problems that arise.

*Kickback*
*MedPro requirements*

B. Group shall have the right to fix the professional component fees to be charged for Services rendered by Physicians; provided, however, that such fees shall not materially exceed conform with those customarily charged in the Greater Cincinnati area for comparable services. Group shall establish uniform fees for all Services performed by Physicians at Mercy and shall submit a fee schedule to Mercy. Group shall notify Mercy thirty (30) days prior to implementation of any material change in the amount of fees charged. In the event that Mercy provides reasonable, documented evidence to Group that the established fee schedule materially deviates from customary charges in the Greater Cincinnati area, Group shall promptly make appropriate changes to its fee schedule to remedy any such deviations.

C. The parties shall cooperate with each other to defend any audit or complaint by a third party payor or patient relating to Services performed by either of them under this Agreement.

4.02 Third Party Participation.

A. Group and Mercy shall use commercially reasonable best efforts to establish and achieve goals for jointly approaching payors. Mercy agrees to use its best efforts to enter into agreements that treat all providers of medical services fairly and equitably. Mercy shall include a representative of Group on any committee of hospital-based physicians. Such representative shall be selected by Group.

B. Group agrees to the following:

1. Group shall participate in Medicare, Medicaid and Workers' Compensation.

2. Group and Physicians shall, at Mercy's request, become members of Mercy's Preferred Provider Organization (PPO), or its successor, and negotiate in good faith to become participating providers under any medical insurance plan or third party agreement under which Mercy will be providing medical services. Group shall not be required to become participating providers under any third party agreement of the PPO which pays less than a competitive community rate.

*for commercial*
*insurers*
*of the larger 3*
*insurers*

**Formatted:** Tab stops: 6.5", Left

**Formatted:** Don't keep with next, Don't keep lines together, Tab stops: 6.5", Left

**Formatted:** Tab stops: 6.5", Left

DRAFT 8-25-2010

_____3. Group shall participate in all managed care plans in which Mercy participates so long as such plans pay a competitive community rate, or accept nonparticipating payments and not balance bill patients except for deductibles, copayments, and coinsurance amounts so long as such non-participating payments are at least a Competitive Community Rate (as defined herein). A Competitive Community Rate means median of the rates paid by the three (3) commercial payors with the largest market shares in the Greater Cincinnati market.

*[Formatted: Tab stops: 6.5", Left]*

~~3~~4. Group shall notify Mercy in the event that the Group determines that a plan is not paying a ~~Competitive Community Rate~~competitive community rate and Group has decided ~~to not~~ to participate in such plan. Following such notification from the Group, Mercy, after consultation with Group, may elect, in Mercy's sole discretion, to: (1) accept the nonparticipating status of Group and Group will agree not to balance bill patients, or (3) terminate this Agreement with Group with one-hundred and eighty (180) days advance written notice.

*[Formatted: Font: 12 pt]*

*[Formatted: Normal, Tab stops: 0.5", Left + 1", Left + 1.5", Left + 2", Left + 2.5", Left + 3", Left + 3.5", Left + 4", Left + 4.5", Left + 5", Left + 5.5", Left + 6", Left + 6.5", Left]*

*[handwritten: Notify Mercy on non-Participation & why & Mercy makes up difference]*

5. In the event that the parties, after good faith efforts, can not agree upon the definition of a competitive community rate as used herein, the parties shall select an independent third party to define the rate of pay that is consistent with a competitive community rate. The independent third party shall be selected within seven (7) days of the written request for such selection by one party to the other party, and the independent third party shall have an additional seven (7) days to provide an opinion to the parties. If the parties cannot agree on an independent third party, such dispute shall be resolved in accordance with Section 9.03 of this Agreement. If Group fails to participate in a managed care plan offering a rate consistent with the opinion of the independent third party, then Mercy, after consultation with Group, will elect to: (1) accept the nonparticipating status of Group and the ~~Physicians; and allow them~~Group and Physicians will agree not to balance bill, or (2) request that Group ~~remain a participating provider in such plan, and pay~~terminate this Agreement with Group ~~a sum equal to the difference between what the plan pays~~with one-hundred and ~~the Competitive Community Rate.~~ eighty (180) days notice.

*[Formatted: Tab stops: 6", Left + 6.5" ...]*

*[handwritten: top 3 commercial insures & we the avg.]*

*[Formatted: Font: Bold]*

6. The parties agree that any further dispute regarding this Section 4.02 shall be subject to the Dispute Resolution process described in Section 9.03 herein.

7. The parties agree that the terms of this Section are confidential and shall not be disclosed to third parties, including third party payers.

*[Formatted: Tab stops: 6", Left + 6.5", Left]*

8. Group agrees that it will not enter into any contract that includes a most favored nation clause. For purposes of this Agreement, a most favored nation clause means a contract that does any of the following:

(a) Prohibits, or grants a contracting entity an option to prohibit, the Group from contracting with another contracting entity to provide health care services at a lower price than the payment specified in the contract;

(b) Requires, or grants a contracting entity an option to require, the Group to accept a lower payment in the event the Group agrees to provide health care services to any other contracting entity at a lower price;

(c) Requires, or grants a contracting entity an option to require, termination or renegotiation of the existing health care contract in the event the Group agrees to provide health care services to any other contracting entity at a lower price; or

*[handwritten: these are outlawed in Ohio. Should we terminate Contracts?]*

DRAFT 8-25-2010

(d) Requires the Group to disclose the Group's contractual reimbursement rates with other contracting entities.

## V.     COMPENSATION

5.01     Compensation to the Group.   In ~~recognition of~~ at the fact that, at Merey's request,event Mercy requests the Group ~~will be recruiting a~~to recruit board ~~eligible~~certified radiologist ~~in 2010~~(s) in order to expand the scope of services offered by the Hospital, consistent with the needs of the community for ~~imaging services~~Services, the Hospital agrees to provide assistance to the Group in its recruitment efforts in an amount to be negotiated by the parties, in accordance with  the terms of ~~the~~Mercy's policies and agreements related to recruitment expenses.  Any and all re-payment obligations of the recruitment expenses shall be governed by a separate recruitment expense agreement ~~attached hereto as Attachment J~~and related security agreement and promissory note signed by the parties.

~~As compensation for the Medical Director services, Mercy shall pay Group $200.00 per hour for the services of the Medical Directors, subject to maximum annual compensation of $150,000.  Group shall submit monthly invoices to Mercy for the Medical Director services using the format attached as Attachment K.~~

## VI.   INSURANCE, INDEMNIFICATION, RISK MANAGEMENT INITIATIVES, AND CLAIMS

6.01   Insurance.

A.     Group, on behalf of itself and each Physician, agrees to carry and maintain professional liability insurance in the amount of at least $1,000,000 per occurrence and $3,000,000 in the aggregate (or in any such other amount as required by the Board of Mercy).  Both of the foregoing occurrence and annual aggregate limits must be applicable to each individual Physician providing Services under this Agreement.  The insurance company must also ~~be licensed to do business in the State~~a financially secure and viable professional liability insurance carrier which has been granted an A. M. Best Company rating of ~~Ohio.~~B+ or above (or an equivalent rating from a recognized national rating association and/or an appropriate actuarial opinion).  This insurance ~~shall be carried at all times that~~and remain applicable to claims arising from Services ~~provided by a Physician is providing Services~~pursuant to this Agreement and must be obtained from an insurance company approved by Mercy.  In addition, Group and each of its Physicians shall cause Mercy to be named as an additional insured party under the policy or policies providing such insurance.  Upon request, current policies, or certificates of insurance evidencing such policies, shall be given to Mercy.  Such policies or certificates shall provide that the insurance shall not be canceled or altered without thirty ~~(30)~~ (30) days prior written notice to Mercy.  Group and each of its Physicians further agree not to cancel or alter such insurance without thirty ~~(30)~~ days prior written notice to Mercy.

B.     Mercy agrees to carry and maintain professional liability insurance through the Catholic Healthcare Partners Liability Self-Insurance Trust in the amount of at least $1,000,000 per occurrence and $3,000,000 in the aggregate.  Upon the request of Group, Mercy shall provide Group with a summary of such coverage

12

4372

DRAFT 8-25-2010

6.02 <u>Indemnification</u>.

A.     Group hereby agrees to indemnify and save harmless Mercy, its affiliates and their respective trustees, officers, agents, employees and volunteers from and against any and all claims, actions, awards, judgments, settlements, damages, liabilities and expenses of whatever nature, including attorney's fees and witness' fees, to the extent caused by the negligence or willful misconduct of Group, any of the Physicians or any other employees or agents of Group, provided that such indemnification and hold harmless shall not extend to any matter to the extent caused by the negligence or willful misconduct of Mercy, its affiliates or any of their respective trustees, officers, agents, employees, volunteers or independent contractors, other than Group, the Physicians or other employees or agents of Group.

B.     Mercy shall indemnify and save harmless Group, its affiliates and their respective shareholders, agents, directors, officers and employees from and against any and all claims, actions, awards, judgments, settlements, damages, liabilities and expenses of whatever nature, including attorneys' fees and witness' fees, to the extent caused by the negligence or willful misconduct of Mercy or any employees or agents of Mercy, provided that such indemnification and hold harmless shall not extend to any matter to the extent caused by the negligence or willful misconduct of Group, its Physicians, affiliates or any of their respective shareholders, agents, directors, officers, employees, or independent contractors.

C.     Group shall accept and be responsible for any acts or omissions of a Physician in the professional practice of medicine and nothing in this Agreement shall be interpreted or construed to place any such responsibility for professional acts or omissions onto Mercy. ~~Mercy shall accept and be responsible for any acts or omissions of its employees and agents and nothing in this Agreement shall be interpreted or construed to place any such responsibility for such acts or omissions onto Group or any Physician.~~

6.03 <u>Risk Management Initiatives</u>.  The Group agrees to comply with and participate in, and cause all Physicians to comply with and participate in the following risk management best practices:
- The Group shall have one designee who serves as the Risk Management liaison, and who is responsible for communication regarding Risk Management issues and Loss Prevention efforts between the Group and Mercy.
- 
- The Group shall appoint a designee who will serve as the representative/liaison for the Group with respect to follow up investigations of specific incidents, and will be responsible for participation in patient/family disclosure discussions.
- The Group and its Physicians agree to participate in Risk Management and Patient Safety initiatives as recommended by Mercy, MHP or CHP.

6.04 <u>Notice of Settlement of Claim</u>.  The parties agree to promptly notify the other party, if any claim, demand, or suit is made arising out of or from the provision of Services under the terms of this Agreement.  In a lawsuit where Mercy and Group are defendants, Group and Mercy agree to use its commercially reasonable efforts to cooperate with ~~the~~each other in defense of such lawsuit to develop and achieve a goal for a cooperative defense.  In such a lawsuit, Group agrees to give Mercy written notice of any settlement negotiations and written notice prior to

<div style="border:1px solid black; display:inline-block; padding:2px;">Formatted: Tab stops: 6.5", Left</div>

13

DRAFT 8-25-2010

*reciprocal? we don't understand?*

accepting any settlement. For professional medical acts of Group, Group must obtain a release of Mercy concerning secondary or passive liability for the primary or active liability of Group.

<div style="border:1px solid; display:inline-block;">Formatted: Tab stops: 6.5", Left</div>

## VII.  MEDICAL RECORDS, COMPLIANCE AND DOCUMENTATION

7.01  Medical Records.

A.    Group hereby agrees to cause all Physicians to prepare reports in a timely and complete manner of all Services performed by such Physicians. All medical records shall be prepared in accordance with the policies of Mercy's Medical Staff, the standards of the Accrediting and Licensing Agencies and the reasonable terms of any medical insurance plan or third party agreement under which Mercy or Group is providing medical services.

B.    All medical records prepared by Physicians pursuant to this Agreement are the property of Mercy and the original records may not be removed from Mercy.

C.    Group hereby agrees to cause all Physicians to prepare and dictate and authenticate any additional or supplementary reports as may reasonably be required by Mercy, and to analyze or interpret such reports upon the request of Mercy in a timely fashion. ~~Reports~~All reports, including but not limited to those reports generated using the Powerscribe system, should be released, on average, within twelve (12) hours of transcription.

D.    Transcription services and equipment will be provided by Mercy or its contracted vendor at no cost to Group. ~~Mercy shall cause the transcriptionists to transcribe ninety-five percent (95%) of the reports within two (2) hours of the study being completed by the Physician.~~

7.02  Retention of Documents.

<div style="border:1px solid; display:inline-block;">Formatted: Don't keep with next, Don't keep lines together, Tab stops: 6.5", Left</div>

A.    Until the expiration of seven (7) years after the furnishing of Services pursuant to this Agreement, Group and Mercy agree to make available, upon written request of the Ohio Department of Job and Family Services, the Secretary of Health and Human Services, the Comptroller General, any other Licensing or Accrediting Organization, or to any of their duly authorized representatives, this Agreement, and the books, documents and records of Group and Mercy that are necessary to certify the extent of any costs of Group or Mercy arising from this Agreement.

<div style="border:1px solid; display:inline-block;">Formatted: Tab stops: 6.5", Left</div>

Further, if Group subcontracts any of its duties arising from this Agreement with a value or cost of $10,000 or more over a twelve-month period, with a related party, such subcontract shall contain a clause to the effect of the foregoing sentence. As used herein, "related party" includes any party employed or controlled by Group, any party by whom Group is employed or controlled and any party with whom Group develops a close association or affiliation.

B.    Each party shall notify the other immediately of any request received for access to information, as described in this Section 7.02, and shall consult with each other regarding the response to be made thereto prior to providing any such response.

14

4374

DRAFT 8-25-2010

7.03   Corporate Compliance.

A.     Group acknowledges that Mercy has established a Corporate Responsibility Program ("CRP") and promotes a culture that fosters prevention, detection and resolution of instances of misconduct.  Group shall promptly notify Mercy's Corporate Responsibility Officer of any violation of any applicable law, regulation, third party payor requirement or breach of Mercy's CRP of which Group or its employees or agents become aware of during the term hereof.  Group shall instruct its employees and agents working in Mercy of this requirement.

B.     Group shall maintain and actively support, at all times during the term of this Agreement, a billing compliance plan that has been reasonably designed, implemented and enforced so that it generally will be effective in preventing and detecting billing errors: and other compliance issues, as needed.

C.     Group shall cooperate with Mercy in responding to or resolving any complaint, investigation, inquiry or review initiated by a governmental agency or otherwise. Group shall cooperate with any insurance company providing protection to Mercy in connection with the foregoing.  An officer of Group shall sign Exhibit GB, prior to providing Services under this Agreement.

D.     Group represents and warrants to Mercy that neither it, any of its affiliates nor any person providing Services under this Agreement (a) are excluded from participation in any federal health care program, as defined under 42 U.S.C. §1320a-7b (f), for the provision of items or services for which payment may be made under such federal health care programs or (b) have been recently convicted (as that term is defined under 42 U.S.C. §1320a–(7)(i)) of a criminal offense related to health care. Group further represents and warrants to Mercy that it has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that such party or its affiliates know or should know are excluded from participation in any federal health care program to provide items or services hereunder.  Group represents and warrants to Mercy that no final adverse action, as such term is defined under 42 U.S.C. §1320a-7e (g), has occurred or is pending or threatened against such Group or its affiliates or to their knowledge against any employee, contractor or agent engaged to provide items or services under this Agreement.

E.     Mercy represents and warrants to Group that neither it, nor any of its affiliates (a) are excluded from participation in any federal health care program, as defined under 42 U.S.C. §1320a-7b (f), for the provision of items or services for which payment may be made under such federal health care programs or (b) have been recently convicted (as that term is defined under 42 U.S.C. §1320a–(7)(i)) of a criminal offense related to health care. Mercy further represents and warrants to Group that it has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that such party or its affiliates know or should know are excluded from participation in any federal health care program, to provide items or services hereunder.  Mercy represents and warrants to Group that no final adverse action, as such term is defined under 42 U.S.C. §1320a-7e (g), has occurred or is pending or threatened against Mercy or its affiliates or to their knowledge against any employee, contractor or agent of Mercy or any of its affiliates.

15

4375

DRAFT 8-25-2010

## VIII. RELATIONSHIP OF THE PARTIES

[Formatted: Tab stops: 4", Left + 6.5", Left]

8.01 __Independent Contractor Status.__ Group and the Physicians are performing all Services and duties required of them by this Agreement as independent contractors and not as employees, agents, partners of or joint venturers with Mercy. Neither Group nor the Physicians shall have authority to bind or obligate Mercy in any manner. -Mercy shall not have authority to bond or obligate Group in any manner. Mercy shall neither have nor exercise any control over the methods by which any of the Physicians practice medicine, except that Group hereby agrees to cause the Physicians to use currently acceptable methods in their practice of medicine to provide Services in accordance with the standards of the Accrediting and Licensing Agencies and of Mercy's Medical Staff. The sole interest of Mercy is to assure that Services shall be provided the patients in a competent, efficient, and satisfactory manner. Group shall be solely responsible for the payment or withholding of all federal, state or local income taxes, Social Security taxes, unemployment taxes, workers' compensation and other insurance required by law arising from its or the Physicians' compensation hereunder.

## IX. TERM, TERMINATION AND DISPUTE RESOLUTION

[Formatted: Don't keep with next, Don't keep lines together, Tab stops: 4", Left + 6.5", Left]

9.01 __Term.__ Subject to Section 9.02, this Agreement shall commence on _____, 20092010 (the "Effective Date") and shall continue in effect for an initial period of five (5)two (2) years. Thereafter, the term of the Agreement shall automatically renew for additional one (1) year terms, unless otherwise terminated in accordance with Section 9.02.

[Formatted: Tab stops: 4", Left + 6.5", Left]

9.02 __Termination__

_____ A. A. In the event either party, with or without cause, desires to terminate this Agreement, such party may do so at any time by providing no less than one hundred and eighty (180) days prior written notice of its intent to terminate this Agreement. In the event that this Agreement is terminated prior to its first anniversary date, Group and Mercy shall not enter into a new agreement for the provision of the same services by Group prior to the first anniversary date.

_____ B. If either party breaches any term of this Agreement and fails to correct such breach to the satisfaction of the other party within thirty (30) days after receiving written notice of such breach from the other party, such other party may terminate this Agreement by notifying the breaching party in writing of such termination.

[Formatted: Tab stops: 4", Left + 6.5", Left]

_____ B
_____ C. Mercy shall have the right to terminate this Agreement according to the terms and conditions set forth in Section 4.02(B) of this Agreement.

_____ D. Notwithstanding anything in this Agreement to the contrary, Mercy shall have the right to immediately terminate this Agreement (i) if Group fails to provide Physicians who are licensed to practice medicine in the State of Ohio, (ii) if the insurance maintained by Group on its own behalf or on behalf of its Physicians has been or will be reduced below the minimum levels set forth in Section 6.01, or has been or will be cancelled and replacement insurance is not obtained which satisfies the requirements in Section 6.01 , (iii) upon the failure

[Formatted: Tab stops: 4", Left + 6.5", Left]

16

DRAFT 8-25-2010

of Group to respond, in a reasonably satisfactory manner, to the happening of any act or failure to act by any Physician involving unethical conduct, moral turpitude or gross negligence, including without limitation any violation of the Catholic Directives or any conviction of a felony or act of dishonesty or fraud that Mercy determines, in a reasonable manner, is detrimental to its best interests, whether or not such act or failure to act occurred in the course of Group's or Physician's performance of Services under this Agreement, or (iv) Group attempts to assign or otherwise transfer this Agreement without Mercy's prior written consent; or (v) if Group or a Medical Director breaches Section 2.03(D), the Medical Director as Business Associate under HIPAA Section.

~~CE.~~ Suspension or Termination of Individual Physicians for Specific Breaches. In the event: (i) of any act or failure to act by any Physician involving unprofessional conduct, unethical conduct, moral turpitude or gross negligence, including without limitation any violation of the Catholic Directives or any conviction of a felony or act of dishonesty or fraud that Mercy determines is detrimental to its best interests, whether or not such act or failure to act occurred in the course of the Physician's performance of Services under this Agreement; (ii) a Physician shall fail to comply with ~~a material provision of~~ Mercy's policies, procedures, rules and regulations ~~and fails to cure such failure within thirty (30) days of written notice thereof~~; or (iii) a Physician shall fail to maintain malpractice insurance as required under this Agreement, then the Physician shall not be permitted to perform the Services described herein after Mercy notifies Group in writing of the individual's suspension or termination and the reason(s) therefor.

F. Upon termination of an individual Physician pursuant to Section 9.02 (E) above or upon termination or expiration of this Agreement, Group and each Physician agree that such individual Physician shall, if requested by Mercy, voluntarily resign his Medical Staff membership and privileges at Mercy and shall not be entitled to a fair hearing process or any due process rights under Mercy's Medical Staff Bylaws to dispute the termination of such membership or privileges. In addition, upon termination of this Agreement for whatever reason, Group and each Physician agree that each Physician shall, if requested by Mercy, voluntarily resign his Medical Staff membership and privileges at Mercy and shall not be entitled to a fair hearing process or any due process rights under Mercy's Medical Staff Bylaws to dispute the termination of such membership or privileges. Notwithstanding the foregoing, termination of a Physician's Medical Staff privileges and/or clinical privileges for reasons related to professional competence of the Physician shall give rise to due process rights as set forth in the Medical Staff Bylaws. Group represents that each of its Physicians are aware of and accepts the limitations set forth in this Section 9.02(F).

9.03    Dispute Resolution.

A.    Group and Mercy shall in good faith first attempt to resolve any controversy, dispute or disagreement arising out of or relating to this Agreement by face-to-face negotiations by the Presidents of Group and Mercy. If any such controversy, dispute or disagreement is not resolved within thirty (30) days after such negotiations begin, that controversy, dispute or disagreement may be submitted to non-binding mediation or arbitration, subject to the parties' mutual agreement, such process to be held in Cincinnati, Ohio under the Rules of the American Health Lawyers' Association. ~~The parties agree to use a single mediator.~~

17

Formatted: Font: 12 pt

Formatted: Normal, Widow/Orphan control, Hyphenate, Tab stops: 0.5", Left + 1", Left + 1.5", Left + 2", Left + 2.5", Left + 3", Left + 3.5", Left + 4", Left + 4.5", Left + 5", Left + 5.5", Left + 6", Left + 6.5", Left + Not at -0.5" + 1.69"

Formatted: Tab stops: 4", Left + 6.5", Left

Formatted: Body Text 2, Left, Hyphenate, Tab stops: Not at -0.5"

Formatted: Not Expanded by / Condensed by

4377

DRAFT 8-25-2010

9.04  Transition Plan.  Mercy and Group will work together to develop a plan for the transition of the provision of Services at Mercy upon termination of this Agreement, as is necessary to provide quality patient care, ("Transition Plan"), which Transition Plan may provide for the continuation of coverage at Mercy by Physicians for a period of time after any such termination.

## X.  COVENANTS

10.01  Noncompetition.  During the term of this Agreement and for one (1) year thereafter, Group and each of its Physicians shall not within a five (5) mile radius of three (3) miles each of Mt. Airy and a radius of three (3) miles of Western Hills (or within a radius of three (3) miles of any new hospital owned and operated by Mercy which replaces either Mt. Airy or Western Hills and at which Group provides Services pursuant to this Agreement)the Hospital Facilities without Mercy's written consent, on Group's own behalf or on the Physician's behalf through any agent or family member in any manner, engage directly or indirectly, as principal, creditor, agent, partner, member, shareholder, officer, director, employee, consultant, advisor, or in any other capacity in any business activity which is directly or indirectly competitive with Mercy or any of its Affiliates or provide any of the Services to any business activity which is directly or indirectly competitive with Mercy or any of its affiliates.  In the event that this Section shall be determined by any Court of competent jurisdiction or any other determining body to be unenforceable by reason of its extending for too long a period of time, too great a geographical area, or over too great a range of activities, it shall be interpreted to extend only over the maximum period of time, area or range of activities as to which it may be enforceable.  Furthermore, Mercy agrees to extend to Group during the term of this Agreement the right of first refusal to provide radiology services for any entity operated or controlled by Mt. Airy or Western Hills within a five (5) mile radius of each of the Hospital Facilities to the extent Mt. Airy or Western Hills has the governance authority to do so and if the Group accepts the same or similar terms and conditions as others offering to provide such radiology services.

10.02  Nondisclosure of Confidential Information.  Each party acknowledges their continuing obligations to hold confidential such information as described in this paragraph.  In the course of this Agreement, Group and each Physician shall have access to certain information of Mercy and its affiliates which information is not generally public knowledge.  Similarly, Mercy and its employees shall have access to certain information of Group which information is not generally public knowledge.  Such information may include, without limitation, financial information, medical record information (including but not limited to identifiable health information), business methods and practices, business and marketing plans, symbols, trademarks, trade names, service marks, copyrights, designs, agreements, procedures and other information (collectively, the "Confidential Information").  During the term of this Agreement and thereafter, Group and each Physician shall hold all Confidential Information of Mercy in the strictest of confidence as a fiduciary, and shall not, voluntarily or involuntarily, use, sell, transfer, publish, disclose, or otherwise make available to others any portion of the Confidential Information or related materials without the prior written consent of Mercy or except as required by law.  Similarly, during the term of this Agreement and thereafter, Mercy and its employees shall hold all Confidential Information of Group in the strictest of confidence as a fiduciary, and shall not, voluntarily or involuntarily, use, sell, transfer, publish, disclose, or otherwise make available to others any portion of the Confidential

18

DRAFT 8-25-2010

Information or related materials without the prior written consent of Group or except as required by law. Group and each Physician shall not transfer (including, but not limited to electronic transfer) or remove Confidential Information from Mercy premises without the written consent of Mercy. To the extent applicable, Mercy, Group and its Physicians and Mercy will abide by the Health Insurance Portability and Accountability Act. Upon termination of this Agreement for any reason whatsoever, each party shall return to the other without making or retaining copies thereof, all documents, records, notebooks, computer disks or similar repositories containing Confidential Information of the other party.

10.03 Promotion. Group and its Physicians shall reasonably assist Mercy in the promotion of Services at Mercy. Mercy shall promote its radiology services through advertising in print and other media, and develop a commercially reasonable marketing strategy for its services including an annual budget for marketing. Notwithstanding the foregoing, neither Mercy nor Group (or Physicians) shall use the other's names (including trade names, trademarks or service marks), photographs, pictures or recordings in any promotion, advertising, or in any other manner without prior written consent of the other, which consent shall not be unreasonably withheld.

10.04. Nonsolicitation. During the term of this Agreement, and for a period of one (1) year followingafter the termination of this Agreement, Mercy shall not employ or engage as an independent contractor, directly or indirectly, or solicit for employment or such engagement, on its own behalf or for any other personMercy affiliate, any physician who is employed by Group at any time during the term of this Agreement to perform the type of services provided by Group under this Agreement. Similarly, during the term of this Agreement and for one (1) year after the termination of this Agreement, Group agrees that Group, nor any of its employees, members or agents, shall directly or indirectly employ or engage as an independent contractor or solicit for employment or the provision of services in any manner any Mercy employee.

10.05— Remedies. The parties acknowledge and agree that the remedy at law for any breach of obligations under Sections 2.03 D, 10.02, 10.03, or 10.04 of this Agreement would likely be inadequate, and further agree and consent that, notwithstanding any other provision of the Agreement, temporary and permanent injunctive relief may be sought from the courts and granted in any court proceeding to enforce Sections 2.03 D, 10.02, 10.03, or 10.04 without the necessity of proof of actual damage. However, this Section 10.05shall04 shall in no way affect the parties' rights and remedies afforded by law, and they shall retain the right to recover such damaged they may have sustained by reason of any breach of Sections 2.03 D, 10.02, 10.03, or 10.04 or any other provision of this Agreement. The provisions of this Article X shall survive termination of this Agreement.

## XI. MISCELLANEOUS

11.01 Changes in Law. In the event of any legislative or regulatory change or determination, whether federal or state, which has or would have significant adverse impact on either Mercy or Group in connection with the performance of this Agreement, or in the event that performance by either Mercy or Group of any term, covenant, condition or provision of this Agreement should for any reason be in violation of any statute, regulation (including, but not limited to, IRS Revenue Procedure 97-13, as modified), or otherwise be deemed illegal, then the

Formatted: Tab stops: 4", Left + 6.5", Left

Formatted: Left, Tab stops: 4", Left + 6.5", Left

Formatted: Tab stops: 4", Left + 6.5", Left

Formatted: Left, Tab stops: 4", Left + 6.5", Left

Formatted: Tab stops: 4", Left + 6.5", Left

4379

DRAFT 8-25-2010

parties shall immediately and in good faith renegotiate the relevant terms of this Agreement. If such renegotiation is unsuccessful, or if any party fails or refuses to renegotiate this Agreement in good faith, this Agreement may be terminated by any party following ~~one hundred eighty (180)~~fifteen (15) days written notice to the other party or sooner if required by law.

11.02 Assignment; Benefit. ~~Neither party~~Group shall not assign any portion of its obligations ~~or rights~~ under this Agreement without the prior written consent of ~~the other party~~Mercy and any such assignment shall be null and void. Mercy may assign any portion of its obligations under this Agreement to any affiliate of Mercy with the consent of Group. Otherwise, this Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors, assigns, executors, representatives and heirs.

11.03 Enforceability of Remainder of Agreement. If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid or void or unenforceable, then that term, provision, covenant or condition shall be reformed or rescinded as ordered by the court. However, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected.

11.04 Notice. All notices, demands or other writings shall be deemed sufficiently given if personally delivered or deposited in the United States mail in a properly stamped envelope, certified or registered mail, return receipt requested, or delivered to an overnight mail service addressed to the party to whom it is given at the addresses or numbers set forth below or such other persons or addresses or numbers as shall be given by notice of any party:

If to MHP:

If to Mt. Airy to:

Mercy Franciscan Hospital – Mt. Airy
2446 Kipling Avenue
Cincinnati, Ohio 45239
Attn: President & CEO

If to Western Hills to:

Mercy Franciscan Hospital – Western Hills
3131 Queen City Avenue
Cincinnati, Ohio 45238
Attn: President & CEO

With a copy to:

20

4380

DRAFT 8-25-2010

> Mercy Health Partners
> 4600 McAuley Place
> Cincinnati, Ohio 45242
> Attn: Legal Services
> Facsimile No.: (513) 981-6128

If to Group to:

> Millennium Radiology, Inc.
> 4983 Delhi Avenue, Suite 6
> Cincinnati, Ohio -45238
> Attn: Chief Executive Officer

With a copy to:

> Michael E. DeFrank, Esq.
> Hemmer Pangburn DeFrank PLLC
> 250 Grandview Drive, Suite 200
> Ft. Mitchell, Kentucky -41017

**11.05 Miscellaneous.** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. This Agreement, including its exhibits which are incorporated herein by reference, constitutes the entire understanding between the parties concerning the subject matter hereof and supersedes any and all previous agreements between the parties relating thereto. This Agreement cannot be amended or modified in any respect, unless such amendment or modification is evidenced by a written instrument executed by Mercy and Group. The failure by Mercy or Group to exercise any right provided for herein shall not be deemed a waiver of any right hereunder. The captions of the various sections of the Agreement are not a part of the context hereof, are inserted merely for convenience in locating the different provisions and shall be ignored in construing this Agreement. Whenever the context of this Agreement requires, words used in the singular shall be construed to mean and include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter genders.

**11.06 Agreement of Physicians.** Group shall cause each Physician providing Services under this Agreement to deliver to Mercy a written statement, substantially in the form of attached Exhibit DG. This statement shall be executed by the Physician prior to providing Services and shall state that the Physician agrees to abide by the terms, conditions and obligations of the Physicians under this Agreement.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

21

4381

DRAFT 8-25-2010

The parties have hereto executed multiple counterparts of this Agreement as of the day and year first above written. By executing this Agreement, each of the undersigned warrants that the execution of this Agreement is within the authority granted to them by their respective organizations.

**MERCY:**

MERCY HOSPITALS WEST D.B.A. MERCY FRANCISCAN HOSPITAL – MT. AIRY

By_____

Its_____

Date_____

MERCY HOSPITALS WEST D.B.A. MERCY FRANCISCAN HOSPITAL – WESTERN HILLS

By_____

Its_____

Date_____

**MERCY HEALTH PARTNERS OF SOUTHWEST OHIO**

By_____

Its_____

Date_____

**GROUP:**

MILLENNIUM RADIOLOGY, INC.

By_____

Its_____

Date_____

S:\MED 2009\Millennium Radiology\Mercy Contract\Radiologists-Mt-Airy-v3-1-2-10.doc

22

Formatted: Body Text 2, Left, Tab stops: Not at 0.5" + 1" + 1.5" + 2" + 2.5" + 3" + 3.5" + 4.5" + 5" + 5.5" + 6"

Formatted: Left, Tab stops: 4", Left + 6.5", Left

Formatted: Tab stops: 4", Left + 6.5", Left

Formatted: Tab stops: 4", Left + 6.5", Left

Formatted: Font: Bold

Formatted: Tab stops: 4", Left + 6.5", Left

Formatted: Font: Bold

Formatted: Tab stops: 4", Left + 6.5", Left

DRAFT 8-25-2010

_____



**Formatted:** Font: Not Bold, No underline

**Formatted:** Right, Right:  0", Tab stops:  6.5", Left

23

4383

DRAFT 8-25-2010

**EXHIBIT A**

<u>Medical Directors of Radiology Services</u>
<u>Description of Duties</u>

1. The Medical Directors shall be responsible for the professional management of Services at Mercy. The Medical Directors shall supervise and direct Services in accordance with accepted national standards and policies of Mercy and MHP.

2. The Medical Directors shall:

- Work with the President of each HospitalMercy or his designee.
- Cooperate with other members of Mercy's staff and Medical Staff to promote efficient working relationship and quality Services.
- Actively support and participate in Mercy's Mission, Values, Philosophy, strategic direction Standards of Behavior and development of an integrated network.
- Serve as Chair of the Department of Radiology and provide leadership to the department responsible for the operational oversight at Mercy, while ensuring compliance with Mercy's policies and practices.
- Consult with the President of each HospitalMercy or his designee regarding preparation of Mercy's budget for Services and cooperate with Mercy in its preparation of the annual budget for Services and for monitoring compliance with the budget in cooperation with Administration. Also cooperating with Mercy in identifying and assisting Mercy with controlling the costs of providing Services while ensuring high quality Services.
- PromoteEnsure interaction with applicable Hospital departments in the provision of Services.
- Ensure appropriate physician staffing levels in order to provide Mercy with high quality Services. Such staffing levels shall be determined based upon the needs of Mercy regardless of the needs of any other facility which Group may staff.
- Support and participate in customer service initiatives in interactions with Mercy's medical staff, employees, patients and visitors.
- Assist in the development, tracking, and reporting of the Key Measures of Success for Services at Mercy, in accordance with the terms of Section 2.02(G).
- Provide plan/data demonstrating Performance Improvement/Quality Assurance activities, and cooperate with and participate in and support Mercy's Quality Assurance activities and Performance Improvement initiatives.
- Assist Mercy in preparingPrepare for and participate in The Joint Commission and state inspections and ensure compliance with prescribed standards to help Mercy meet and maintain standards and requirements necessary to assure at all times the full accreditation of Mercy by The Joint Commission for the continuance of all licenses, certifications and accreditations necessary to operate, and the continuance of Mercy's certification under the Medicare and Medicaid programs.
- Participate, actively and in a positive manner, in Mercy's physician recruitment efforts in addition to Mercy's efforts to provide local access to otherwise unavailable services.
- Participate in short and long-range planning for the organization and growth of Servicesservices at Mercy.

*take out 2.02 G*
*let's develop*

24

4384

DRAFT 8-25-2010

- Assist Mercy in the development of strategy related services, in achieving operational efficiencies, and in the evaluation and implementation of clinical innovation and emerging technology.
- Provide consultation services concerning Services to Mercy's Medical staff.
- Cooperate _fully_ with other medical, nursing and administration departments of Mercy and cooperate with all matters affecting patient care, personnel, supplies and regulations.
- ~~Assist Mercy in developing~~Develop policies and procedures for Services at Mercy in conjunction with Mercy's administrative personnel.
- Designate a Physician or serve as the individual responsible for Radiation Protection ("IRRP") and to serve as the Radiation Safety Officer on Mercy's Radiation Safety Committee in accordance with the responsibilities outlined by the Radiation Safety Committee and the rules and regulations set forth by the Ohio Department of Health. ~~Designate a Physician to be listed on Mercy's nuclear licenses at the Hospitals.~~
- Provide radiological examinations and interpretations and other imaging and interventional procedures for persons brought to Mercy for treatment.
- Conduct regular meetings of Radiology Services with minutes ~~of such meetings written by the Radiology Department Manager, approved by the Medical Director, and forwarded to the Medical Executive Committee.~~
- ~~Attend~~Regularly attend meetings of the surgical Departments ~~when necessary and requested~~ to address issues pertaining to the provision of Services.
- Provide consultation services to Mercy's Medical staff.
- Cooperate _fully_ with other medical, nursing and administrative departments of Mercy and MHP and cooperate with all matters affecting patient care, personnel, supplies and regulations.
- Mercy and the Medical Director shall agree upon specific and measurable performance outcomes.
- Actively participate in the MHP Radiology Council.
- Participate on the respective Medical Staff Committees – Radiology Committee and Medical Executive Committee.
- Participate on or designate a Physician to participate on the Quality and Patient Safety Committee.
- Participate on the Hospital's Quality Council.
- In compliance with the Joint Commission standards applicable to services provided through contractual arrangements, Mercy and Group agree that Group's Services will be provided safely and effectively (LD 3.50) and that Mercy must retain overall responsibility and authority for Services furnished under this Agreement (EP#7).

*contradicts contract*

25

4385

DRAFT 8-25-2010

<div style="text-align: right">EXHIBIT B</div>

| Formatted: Right, Tab stops: 6.5", Left |
| Formatted: Tab stops: 6.5", Left |

## Medical Directors as Business Associates under HIPAA

**RECITALS**

A. Covered Entity and Business Associate have entered into the above Agreement (the "Agreement").

B. Under the terms of such Agreement, Business Associate will have access to information that includes Protected Health Information ("PHI") [defined in paragraph 1(e)].

C. Covered Entity and Business Associate intend to protect a patient's privacy and provide for the security of the PHI disclosed by Covered Entity or accessed by Business Associate pursuant to the Agreement, in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 and regulations promulgated thereunder by the U.S. Department of Health and Human Services ("HIPAA") and other applicable laws, including HIPAA amendments contained in the American Recovery and Reinvestment Act of 2009, Public Law 111-05 ("The ARRA"). In addition, if applicable, Covered Entity and Business Associate intend to detect, prevent and mitigate the risk of identity theft in compliance with the Fair Credit Reporting Act and regulations promulgated thereunder by the Federal Trade Commission ("Red Flag Rules") set forth in Title 16 of the Code of Federal Regulations ("CFR") Part 681.

D. HIPAA requires the Covered Entity and the Business Associate to enter into a contract (hereinafter, the "Business Associate Amendment" or "Amendment,") containing specific requirements to protect the confidentiality and security of patients' PHI, as set forth in, but not limited to, Title 45, Sections 164.502(e), 164.504(e) and 164.314(a)(2)(i) of the CFR and contained in this Amendment. Sections 13401(a) and 13404(a) of The ARRA require specific additional HIPAA provisions to be included in this Amendment.

In consideration of the foregoing and the mutual promises and the exchange of information pursuant to this Amendment, the parties agree to amend the Agreement by incorporating all of the following into the Agreement:

1. Definitions:

(a) "Business Associate" shall have the meaning given to such term under the Privacy Rule [defined in paragraph 1(d) below] and which includes a third party that performs functions for or on behalf of Covered Entity and has access to Covered Entity's PHI and uses such PHI in the performance of its functions. Such functions may also render Business Associate a "Service Provider" under the Red Flag Rules as such term is defined at 16 CFR 681.2(b)(10).

(b) "Covered Entity" shall have the meaning given to such term under the Privacy Rule [defined in paragraph 1(d)], which includes a hospital, since it provides health care and transmits health information in electronic form in the course of its standard functions.

(c) "Patient" shall have the same meaning as the term "individual" under the Privacy Rule [defined in paragraph 1(d)] and shall include a person who qualifies as a personal representative.

(d) "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR 160 and 164, subparts A and E and amendments thereto.

(e) "Protected Health Information" ("PHI") shall have the same meaning given to such term under HIPAA and shall include any information, whether oral or recorded in any form or medium, limited to the information created or received by Business Associate from or on behalf of Covered Entity: (i) that relates to the past, present or future physical or mental condition of the patient; the provision of health care to patient; or the past, present or future payment of for the provision of health care to patient; and (ii) that identifies the patient or with respect to which there is a reasonable basis to believe the information can be used to identify the patient.

(f) "Facility Data" shall mean PHI and non-PHI, disclosed or made available by or on behalf of Covered Entity to Business Associate, and shall include derivatives thereof created by Business Associate or his/her/its agents.

<div style="text-align: center">26</div>

DRAFT 8-25-2010

(g)   "Designated Record Set" shall have the same meaning given to such term under HIPAA and shall include patients' medical or billing records or any group of records which contains PHI that are used, in whole or in part, by or for Covered Entity to make decisions about patients.

(h)   "Data Aggregation" shall have the same meaning given to such term under HIPAA and shall include the combining of PHI received or created by Business Associate to permit data analyses relating to healthcare operations of Covered Entity.

(i)   "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

(j)   "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 CFR Part 164, Subpart C, and amendments thereto.

(k)   "Red Flag" means a pattern, practice or specific activity that indicates the possible existence of identity theft.

2.   Permitted Uses and Disclosures by Business Associate

(a)   Except as otherwise limited in the Agreement and this Amendment, Business Associate may use or disclose Facility Data only for the benefit of Covered Entity and to perform functions, activities, or services as specified in the Agreement or the minimum necessary policies and procedures of the Covered Entity. Business Associate warrants and represents that each of the data elements of any PHI that it may access or receive from or on behalf of Covered Entity is minimally necessary to permit Business Associate to provide the services under the Agreement.

(b)   Except as otherwise limited in the Agreement and this Amendment, Business Associate may use or disclose Facility Data for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate, provided that (i) the disclosure is required by law, or (ii) the Business Associate obtains reasonable assurances from the person to whom the information is disclosed that such information will remain confidential and used or further disclosed solely as required by law or for the purpose of assisting Business Associate to meet Business Associate's obligations under the Agreement.

(c)   Except as otherwise limited in the Agreement and this Amendment, Business Associate may use PHI to provide data aggregation services only for Covered Entity.

3.   Obligations of Business Associate.

(a)   Business Associate agrees to not use or further disclose Facility Data other than as permitted or required by the Agreement, this Amendment or as required by law. As Covered Entity has not secured individual authorization from the patients whose PHI is contemplated for use under the Agreement, Business Associate is prohibited from directly or indirectly exchanging the Covered Entity's PHI for remuneration with any other person or entity, in accordance with Section 13405(d) of The ARRA.

(b)   Business Associate Protection of PHI

    (i)   Business Associate agrees to implement administrative, physical, technical and policy and documentation safeguards that reasonably and appropriately protect the privacy, security, integrity and availability of the electronic PHI that it creates, receives, maintains and transmits under this Agreement. At a minimum, Business Associate's safeguards will include all "Required" Implementation Specifications contained in sections 164.308, 164.310, 164.312 and 164.316 of title 45 of the Code of Federal Regulations, as required by Section 13401 of The ARRA and any subsequent amendments and regulations promulgated thereunder.

    (ii)   No later than the date that Section 13402 of The ARRA becomes effective, Business Associate agrees to implement and use administrative, physical and/or technical safeguards to protect Covered Entity's PHI that meet or exceed the Secretary's promulgated standards to avoid classification as "unsecured PHI". In the event Business Associate is unable to implement safeguards that avoid the classification as "unsecured PHI", Business Associate will notify Covered Entity and provide Covered Entity thirty (30) days to terminate the Agreement and this Amendment, without penalty. If Covered Entity decides to continue with the Agreement and this Amendment after such notice, Business Associate agrees it will be solely and completely liable and responsible for all notices and notifications of Covered Entity, affected patients, and the Secretary, of any breach of PHI, in

27

DRAFT 8-25-2010

accordance with Section 13402 of ARRA, and agrees to coordinate immediately with Covered Entity in the event that notifications of a breach arising from the Business Associate is required.

(c) Business Associate agrees to promptly mitigate, to the extent practicable, any harmful effect of a use or disclosure of Facility Data by Business Associate in violation of the Agreement and this Amendment.

(d) Business Associate agrees to establish and implement a system of sanctions for any employee, agent or subcontractor who violates this agreement or the HHS Privacy Regulations. (ref. 45 CFR 164.530(e)(1).)

(e) Business Associate Notice to the Covered Entity of Non-Authorized Use, Disclosure Access or Breach of PHI

(i) Business Associate agrees to promptly report to Covered Entity any use or disclosure of Facility Data not provided for by the Agreement and/or this Amendment, including any requests for inspection, copying or amendment of such information and including any security incident involving Facility Data. Business Associate shall maintain a record of all such requests for inspection, copying and amendments of Facility Data not provided for by the Agreement, including those initiated by Patient, Covered Entity or third parties, and to promptly provide such documentation to Covered Entity upon request.

(ii) Business Associate agrees to promptly notify the Covered Entity of any breach of any unsecured PHI of the Covered Entity in its possession, but in any event no later than sixty (60) days of the occurrence of the breach, as required by Section 13402(b) of The ARRA. The content of the Business Associate notice to the Covered Entity shall conform to the requirements of Section 13402(b) of The ARRA and any subsequent amendments and resulting regulations.

(f) Business Associate agrees to ensure, in writing that any agent, including a subcontractor, to whom it provides Facility Data agrees to the same restrictions and conditions that apply to Business Associate with respect to such information, including appropriate and comparable safeguards, as defined in paragraph 3(b), above. Notwithstanding the foregoing or anything to the contrary in the Agreement or this Amendment, Business Associate shall not use any agent or subcontractor to perform any services under the Agreement without the express written consent of an authorized representative of the Covered Entity and only after such agent or subcontractor has agreed in writing to comply with the same restrictions and conditions that apply to Business Associate under the Agreement and this Amendment with respect to such information.

(g) Access to Facility Data held by Business Associate and Business Associate Accounting for Disclosures

(i) Business Associate agrees to provide prompt access to Facility Data in designated record sets to Covered Entity whenever so requested by Covered Entity, or, if directed by Covered Entity, to a Patient in order to meet the requirements of HIPAA. If a patient requests directly from Business Associate (i) to inspect or copy his or her PHI, or (ii) requests its disclosure to a third party, the Business Associate shall promptly notify Covered Entity's facility privacy official of such request and await such official's denial or approval of the request.

(ii) After the date that Covered Entity informs Business Associate that Covered Entity has implemented an Electronic Health Record, Business Associate shall provide, in response to a request from an individual, an accounting of all disclosures the Business Associate made in the past three years of the individual's PHI.

(h) Business Associate agrees to promptly make amendment(s) to Facility Data requested by Covered Entity and shall do so in the time and manner requested by Covered Entity to enable it to comply with HIPAA. If Patient requests an amendment to his or her PHI, directly from Business Associate, the Business Associate shall promptly notify Covered Entity's facility privacy official of such request and await such official's denial or approval of the request.

(i) Business Associate agrees to promptly make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate for or on behalf of, Covered Entity available to the Covered Entity or the Secretary, in a time and manner designated by the Covered Entity or Secretary, to enable the Secretary to determine compliance with HIPAA, and to cooperate fully with any HIPAA audit of the Business Associate that the Secretary may undertake under Section 13411 of The ARRA, or that the Covered Entity undertakes to assure compliance.

28

DRAFT 8-25-2010

(j) Business Associate agrees to document and provide to Covered Entity all disclosures of Facility Data and information related to such disclosures, and shall do so in the time and manner designated by Covered Entity, to enable it to meet HIPAA requirements for an accounting of such disclosures.

(k) Business Associate agrees to cooperate with the Covered Entity and its medical staff to preserve and protect the confidentiality of Facility Data accessed or used pursuant to the Agreement and will not disclose or testify about such information during or after the termination of the Agreement, except as required by law.

(l) To the extent Business Associate is a Service Provider under the Red-Flag Rules, Business Associate will have reasonable policies and procedures to detect relevant Red-Flags that may arise in the performance of the Business Associate's activities, and either report the Red-Flags to Covered Entity, or to take appropriate steps to prevent or mitigate identity theft by or against a Patient.

4. Obligations of Covered Entity

(a) Covered Entity shall notify Business Associate of any limitation in its notice of privacy practices in accordance with 45 CFR 164.520 to the extent that such limitation may affect Business Associate's permitted use or disclosure of PHI.

(b) Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Patient to the use or disclosure of PHI, to the extent such changes affect Business Associate's permitted or required uses and disclosures of PHI.

(c) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to the extent that such restriction may affect Business Associate's permitted use or disclosure of PHI.

(d) Covered Entity shall notify Business Associate of the date it will implement an electronic medical record, to permit Business Associate to implement its accounting for disclosure obligation, per paragraph 3 (g)(2), above.

5. Effect of Breach of Obligations

(a) Should Business Associate breach any of its obligations herein, Covered Entity shall have the option to either:

(i) Provide Business Associate an opportunity to cure the breach and end the violation within the time specified by Covered Entity. If Business Associate does not cure the breach or end the violation as specified by Covered Entity, Covered Entity may terminate its obligations to Business Associate, including, but not limited to, its payment obligations and obligations to provide information, materials, equipment or resources to Business Associate; or

(ii) Immediately terminate this Agreement, without prejudice to other legal remedies available to Covered Entity.

(iii) If neither termination nor cure is feasible, Covered Entity may report the violation to the Secretary.

(b) Separate and apart from any action the Covered Entity may take in the event of a breach, Business Associate understands that the Secretary, or the Department of Justice, may impose civil or criminal penalties directly against a Business Associate for failure to comply with the HIPAA requirements and standards (under 42 USC § 1320d-5) or for wrongful disclosure of individually identifiable health information (under 42 USC §1320d-6), as required by Sections 13401(c) and 13404(c) of The ARRA.

6. Effect of Termination

(a) Upon termination of this Agreement, Business Associate shall promptly return to Covered Entity all Facility Data, including derivatives thereof or, upon Covered Entity's request, destroy such data. This provision shall apply to Facility Data in the possession of subcontractors or agents of Business Associate. Upon destruction of Facility's Data, Business Associate shall certify in writing that such information has been destroyed. Notwithstanding the foregoing, Business Associate shall notify Covered Entity in writing about its intent to destroy data within ten (10) days before such date of destruction. If Covered Entity requests the return of any Facility Data, Business Associate shall comply as requested.

29

4389

DRAFT 8-25-2010

~~(b)     If the return or destruction of Facility Data is infeasible, Business Associate shall promptly notify Covered Entity of the conditions that make such return or destruction infeasible. Upon mutual determination by the parties that return or destruction of Facility Data is infeasible, Business Associate shall extend the protections of this Amendment to such data and shall limit its further use or disclosure to purposes that make its return or destruction infeasible.~~

Formatted: Right, Tab stops: 6.5", Right



30

4390

DRAFT 8-25-2010

EXHIBIT C

Formatted: Tab stops: 6.5", Left

### Compliance Certification

I hereby certify that I am a duly authorized officer of the independent contractor named below ("Group"). On behalf of Group and its Physicians, officers, directors, employees and agents, I certify that:

_____1.  I have received and read the Corporate Responsibility Program Manual of Mercy Health Partners (the "Hospital") Core Values in Action and fully understand the requirements set forth in that document.  Mercy requests that Group specifically references the following section of the Corporate Responsibility Plan: Principal 3, Fraud, Abuse and False Claims Act.

Formatted: Indent: Hanging: 1"

2.  Group and each Physician shall act in accordance with all rules and policies of Mercy.  These rules and policies include a commitment to comply with all applicable laws and to conduct business in accordance with ethical standards.

Formatted: Tab stops: 6.5", Left

Name of Group Officer: _____

Signature: _____

Date: _____

Formatted: Tab stops: 6.5", Right

Formatted: Right, Tab stops: 6.5", Right

31

DRAFT 8-25-2010

EXHIBIT ÐC

Formatted: Tab stops: 6.5", Right

### Physician Certificate

Mercy Franciscan Hospital – Mt. Airy
2446 Kipling Avenue
Cincinnati, Ohio 45239
Attn: President & CEO

Mercy Franciscan Hospital – Western Hills
3131 Queen City Avenue
Cincinnati, Ohio 45238
Attn: President & CEO

Re:   Professional Services Agreement

Dear Mr. Hiltz and Mr. Kowalski:

Pursuant to Section 11.06 of the Hospital Based Professional Services Agreement, dated as of _____, 2009, by and between Mercy Hospitals West d.b.a. Mercy Franciscan Hospital – Mt. Airy and d.b.a. Mercy Franciscan Hospital – Western Hills and Millennium Radiology, Inc., I hereby agree to abide by all the terms and conditions applicable to, and obligations of, Physicians under such Agreement. The provisions of the Hospital Based Professional Services Agreement related to terms and conditions applicable to, and obligations of, Physicians have been shared with me by _____.

Sincerely,

_____
[signature]

_____
[print name]

Acknowledged By:
**MILLENNIUM RADIOLOGY, INC.:**

Formatted: Right: 0", Tab stops: 6.5", Right

_____
[signature]

_____
[print name]

_____
[title]

32

4392

ATTACHMENT I

4393

Formatted: Footer, Right

## Key Measures of Success for _____ 2009 - _____ 2010

| Performance Measure | Target | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ER Discrepancy Report Turnaround Time — Discrepancies reported to ER within 24 hours | 100% | | | | | | | | | | | | | |
| *Critical Result — Timeframe between initial identification of a critical result and the result being called to the licensed practitioner. Documentation must include time and date of the contact and the name of the licensed practitioner to whom the result was reported. This applies to the following results: 1. Aortic Dissection 441.02 2. Intracranial Hemorrhage 431 3. Leaking Aortic Aneurysm 441.4 4. Evolving Intracranial Stroke 434.91 5. Pulmonary Embolus — previously undiscovered 415.19 6. Pneumothorax — previously undiscovered 512.0 7. Pneumoperitoneum — previously undiscovered 568.89 8. Secondary malignant spinal cord compression 336.3 9. Any other result deemed critical by a radiologist | 100% within 30 minutes post procedure | | | | | | | | | | | | | |
| *Critical Test — The timeframe between the critical test being called to the department and the results being called to the licensed practitioner (includes calling normal and abnormal results). Documentation must include time (order is called into the department and date of the contact and the name of the licensed practitioner to whom the result was reported. Applying is the following diagnosis: *CT scan to rule out leaking aortic aneurysm *CT scan to rule out aortic dissection | 100% within 90 minutes after the result is called into the department within 24 hours | | | | | | | | | | | | | |
| Transcription TAT | Reports released within 12 hours on average with no outliers > 24 hours | | | | | | | | | | | | | |
| Physician perception of radiology services | Medical Staff Perception Survey top box 88% Util | | | | | | | | | | | | | |
| Communication feedback with Staff and Radiologists — courteous and professional | 5 Strongly Agree | | | | | | | | | | | | | |
| Patient Satisfaction Survey Results | 50% Up top box | | | | | | | | | | | | | |
| Disruptive Behavior Incidents | 0 Unresolved Incidents | | | | | | | | | | | | | |
| Peer Review | Meet Medical Staff post review accreditation | | | | | | | | | | | | | |

*** These metrics are directly from the Regional Mercy Critical Result Policy and may change as the policy is updated.
**Annual measure. Previous measure will appear each month until a new survey is completed.
*This measure is subjective and determined through dialogue at the monthly meeting. This is measured on a 5 Point Likert Type Scale

4394

Key Measures of Success for _____ 2009 _____ 2010

Schedule 1.01

Exceptions to Exclusivity

35

Formatted: Left: 0.5", Right: 1", Top: 0.3", Bottom: 0.3", Width: 11", Height: 8.5"

Formatted: Normal

Key Measures of Success for _____ 2000 _____ 2010

Schedule 3.07

## Patient Demographic Information Key Measures of Success for _____, 2010

| Performance Measure | Target | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ER Discrepancy Report Turnaround Time Discrepancies reported to ER within 24 hours | 100% | | | | | | | | | | | | |
| "Critical Results."** Timeframe between initial identification of a critical result and the results being called to the licensed practitioner. Documentation must include time and date of the contact and the name of the licensed practitioner to whom the result was reported. This applies to the following results:<br>1. Aortic Dissection 441.02<br>2. Intracranial Hemorrhage 431<br>3. Leaking Aortic Aneurysm 441.4<br>4. Occlusive Intracranial Stroke 434.91<br>5. Pulmonary Embolis – previously undiscovered 518<br>6. Pneumothorax – previously undiscovered 512.8<br>7. Pneumoperitoneum – previously undiscovered 568.89<br>8. Secondary malignant spinal cord compression 336.3<br>9. Any other results deemed critical by a radiologist | 100% within 90 minutes post procedure | | | | | | | | | | | | |
| "Critical Test."**** The timeframe between the critical test being called to the department and the results being called to the licensed practitioner (includes calling normal and abnormal results). Documentation must include time and date of the contact and the name of the licensed practitioner to whom the result was reported. Applying to the following diagnosis:<br>*CT scan to rule out leaking aortic aneurysm<br>*CT scan to rule out aortic dissection | 100% within 90 minutes after the order is called into the department | | | | | | | | | | | | |
| Transcription TAT | Reports released within 12 hours on average with no outliers >24 hours | | | | | | | | | | | | |
| Physicians' perception of radiology services ? | Medical Staff Perception Survey top box 50th% tile | | | | | | | | | | | | |
| Communication/feedback with Staff and Radiologist is courteous and professional* | 5 Strongly Agree | | | | | | | | | | | | |
| Patient Satisfaction Survey Results | 50th%tile top box | | | | | | | | | | | | |
| Disruptive Behavior Incidents | 0 Unresolved Incidents | | | | | | | | | | | | |
| Peer Review | peer review accreditation | | | | | | | | | | | | |

** These metrics are directly from the Regional Mercy Critical Test/ Critical Results Policy and may change as this policy is updated.
* Annual measure: Previous measure will appear each month until a new survey is completed.
? This measure is subjective and determined through dialogue at the monthly meeting. This is measured on a 5 Point Likert-Type Scale.

36

Formatted: Normal

**Formatted:** No underline

**Formatted:** Normal, Right:  0"

**Formatted:** Normal

Key Measures of Success for      2009      2010

37

— 4397

COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

- - -

DR. G. DARYL HALLMAN,    :
                       :
      PLAINTIFF,    :
                       :
 -VS-             :    CASE NO. A1104747
                       :
PAMELA E. ZIPPERER-DAVIS, :
                       :
ET AL.,           :
                       :
      DEFENDANTS.   :

- - -

Deposition of SCOTT WELTON, M.D., a
witness herein, taken by the plaintiff as upon
cross-examination pursuant to the Ohio Rules of
Civil Procedure and pursuant to stipulations
hereinafter set forth at the offices of Jacobs,
Kleinman, Seibel & McNally, 2300 Kroger Building,
1014 Vine Street, Cincinnati, Ohio, at 9:05 a.m. on
Monday, November 28, 2011, before Connie Henson,
RPR, a notary public within and for the State of
Ohio.



EXHIBIT

16

970abc5e-333c-44ec-90be-a775e47cf7ba

Page 34

1  about 23, gets us to 18,3; October 1,700, which
2  gets us to about 20; November is 2,000, which gets
3  us to about 22; and then December is 1,600, which
4  gets us to about between 23 and 24,000
5  approximately?
6      A.   Yes, approximately.
7      Q.   Now, what were these fees for?  Why
8  were you being paid these fees?
9      A.   These are Medical Director
10  compensation.
11      Q.   These are fees that MRI is paying you
12  as compensation for your services as the Medical
13  Director of Mercy Mt. Airy?
14      A.   Correct.
15      Q.   And it's the same with Dr. Kleimeyer,
16  that the fees shown here are the fees that she's
17  being paid as a result of the duties associated
18  with the Medical Director at Mercy Western Hills?
19      A.   Yes.
20      Q.   All right.  And these are the fees
21  I'm talking about when I was talking to you about
22  discussions with Dr. Hallman.  Did anybody ever
23  tell Dr. Hallman that these fees were being paid to
24  you and Dr. Kleimeyer or even Dr. Aukerman?
25      A.   It's a known fact.  These are

Page 35

1  circulated.  Ledgers are circulated at every
2  meeting so everybody is aware of the fact that we
3  are getting compensated for being Medical
4  Directors.
5      Q.   Okay.  So Exhibit 113, at least to
6  your recollection, pages 44 and 45, would have been
7  circulated back in 2007?
8      A.   I don't recall seeing it in this
9  format, but Orcutt does monthly send us financial
10  statements that does have this information
11  included, not laid out like this.
12      Q.   Okay.  Because I've looked at that
13  and I haven't seen any -- do you recall whether
14  there's a specific line item that's designated as
15  Medical Director fees on those financial
16  statements?
17      A.   I don't recall specifically.
18      Q.   All right.  And again, I'm going to
19  show you what's just been marked as Exhibit 114.
20  And again, I will represent to you, as it says
21  there, that this is Millennium Radiology, Inc.
22  General Ledger, pages 43 and 44.  The entire ledger
23  has already been marked as an exhibit, but I just
24  pulled this out.  And there is again an entry for
25  602, Medical Director, do you see that?

Page 36

1      A.   Yes.
2      Q.   Are these the fees you were paid as
3  Medical Director for the year 2008?
4      A.   That's what it states, yes.
5      Q.   Okay.  Well, you're not going to
6  dispute the accuracy of the Orcutt ledger, are you?
7      A.   No.
8      Q.   All right.  So to the best of your
9  knowledge you would have been paid the Medical
10  Director fees that are identified in this document
11  during the year 2008 for the services you performed
12  on behalf of Mercy Mt. Airy?
13      A.   Yes.
14      Q.   I will show you what's been marked as
15  Exhibit 115, and ask you if you can identify this
16  again as the Millennium Radiology, Inc. general
17  ledger identifying the medical fees that were paid
18  to you during the year 2009 for the duties you
19  performed as the Medical Director of Mercy Mt.
20  Airy?
21      A.   Yes.
22      Q.   And then I want to show you what's
23  been marked as Exhibit 116, and ask you if you can
24  identify this as the Millennium Radiology, Inc.
25  general ledger for the year 2010, which identifies

Page 37

1  the Medical Director fees that you were paid for
2  your duties performed as the Medical Director at
3  Mercy Mt. Airy?
4      A.   Yes.
5      Q.   I want to show you what's been marked
6  as Exhibit 117, and again can you identify this as
7  the Millennium Radiology, Inc. general ledger
8  identifying the Medical Director fees that you have
9  been paid for the year 2011 up through August 31st,
10  2011?
11      A.   Yes.
12      Q.   And similar with Dr. Kleimeyer, the
13  medical fees that are identified here in Exhibits
14  113 through 117 are Medical Director fees that
15  she's being paid to perform duties at the Western
16  Hills hospital?
17      A.   Yes.
18      Q.   And Dr. Aukerman, the Medical
19  Director fees identified here, are those the
20  Medical Director fees he's being paid as the
21  Medical Director of MRI?
22      A.   Correct.
23      Q.   Do you know how these fees are
24  calculated?
25      A.   I believe they're a percentage of

10 (Pages 34 to 37)

Page 38

1  collections for each month from each facility.
2      Q.  Is there a written formula somewhere
3  that identifies how these fees are --
4      A.  I'm not sure if there is.
5      Q.  All right.  And so they're a
6  percentage of collections for treatment of -- or
7  for services that are performed relating to
8  radiology services at the hospital?
9      A.  Yes.
10      Q.  All right.  So in other words, so I
11  understand, Millennium Radiology has a contractual
12  relationship with the hospital to perform
13  radiologist services at Western Hills and Mt. Airy?
14      A.  Yes.
15      Q.  And there are all kinds of different
16  patients, I guess, and tests that are undertaken?
17      A.  Yes.
18      Q.  And you and Dr. Kleimeyer are being
19  paid a percentage of the collections on those
20  tests?
21      A.  Yes.
22      Q.  All right.  So for each, I'm trying
23  to understand, for each patient that comes in,
24  there's a bill sent out?
25      A.  Yes.

Page 39

1      Q.  Which is a professional fee?
2      A.  Correct.
3      Q.  All right.  And you are paid as the
4  Medical Director a percentage of the professional
5  fee for each patient that's treated?
6      A.  I believe we're paid by -- based on
7  the total collections for the end of the month for
8  each facility.
9      Q.  All right.  The total collections at
10  the end of the month for the patients that were
11  treated?  In other words, you send out a bill for
12  each patient you treat?
13      A.  That's the only income we derive.
14      Q.  Okay.  The only income you derive is
15  the income that's derived from treatment of
16  patients at Western Hills and Mercy Mt. Airy?
17      A.  Patients paying us for interpreting
18  their scans.
19      Q.  All right.  And so the medical fees
20  that you are paid is based on a percentage of
21  patients that are treated and for which a
22  collection is obtained?
23      A.  Basically.
24      Q.  Okay.  And do you know what that
25  percentage is?

Page 40

1      A.  I believe it's one percent.
2      Q.  So if -- let's say I went to Mercy
3  Mt. Airy, you're the Medical Director there, I have
4  an x-ray taken of my elbow, and I have Medical
5  Mutual of Ohio as an insurance.  You would bill for
6  the treatment that was provided to me to Medical
7  Mutual, you get paid, and then your Medical
8  Director fee would be one percent of the amount
9  that comes in?
10      A.  To perform Medical Director duties,
11  yes.
12      Q.  Okay.  So is it fair to say that the
13  more patients you see, the higher your Medical
14  Director fees are?
15      A.  The more I am compensated, yes.
16      Q.  Yes.  So in other words, the more
17  patients that are treated by MRI, either at Western
18  Hills or at Mercy Mt. Airy, the higher the Medical
19  Director fee is for you?
20      A.  Yes.
21          MR. BURR:  Assuming they pay.
22      Q.  Yes, assuming you get paid.  But I'm
23  saying -- let's just talk about you.  You're Mercy
24  Mt. Airy, the more patients that are treated, and
25  billed, and bills are paid, higher Medical Director

Page 41

1  fees you obtain?
2      A.  Yes.
3      Q.  Do you know who came up with this
4  formula?
5      A.  I believe it was discussed at a
6  meeting in order to incentivise somebody to take
7  the position because it does require extra work,
8  extra time, that it was decided it was a fair
9  compensation for the position.
10      Q.  And we're going to talk about that
11  because you probably -- Miss Zipperer-Davis talked
12  about the extreme demands on the people that are
13  doing the Medical Director duties.  And so -- and
14  she talked about, I think she said, she thought it
15  was probably 60 some thousand a year per Medical
16  Director would be fair compensation.  Do you agree
17  with that?
18      A.  If that's one percent.
19      Q.  Okay.  Why is MRI paying these fees
20  to you?
21      A.  To incentivise me to maintain the
22  position and do the extra work that is required.
23      Q.  But you're performing the services
24  for Mercy Mt. Airy, right?
25      A.  What do you mean?

11 (Pages 38 to 41)

Page 42

1    Q.   Well!, in other words, you have
2  Medical Director duties that are identified in the
3  contract?
4    A.   Correct.
5    Q.   So if you're performing these duties
6  on behalf of Mercy, why is MRI paying you?
7    A.   Because we have to have somebody in
8  that position.  It is required in the contract to
9  have a Medical Director.
10   Q.   Mercy requires in the contract with
11 you guys that you need to supply a Medical
12 Director?
13   A.   Correct.
14   Q.   Then why doesn't Mercy pay for it?
15   A.   I believe that's a -- not knowing the
16 laws, Stark laws, I'm assuming it's considered a
17 kickback.
18   Q.   Mercy paying you is a kickback?
19   A.   That is my understanding.
20   Q.   And who told you that?
21   A.   I don't recall.
22   Q.   Okay.  So you believe -- you know a
23 little bit about Stark laws.  You believe if the
24 hospital were to pay for the Medical Director fees,
25 that it would be a kickback, so that MRI pays --

Page 43

1  tries to pay what the fair market value of the time
2  would be for your Medical Director duties?
3    A.   Correct.  And also it's our position
4  that if we are directly paid by Mercy, they would
5  have a little bit of -- more control over us.  We
6  would prefer to be independent and not receive
7  money from them from that aspect.
8    Q.   Okay.  So it's your position that MRI
9  has not asked for payment of Medical Director fees
10 for the duties associated with the Medical Director
11 for either -- let's just talk about you, for Mt.
12 Airy Mercy?
13   A.   Correct, Mercy does not reimburse us
14 for that.
15   Q.   And it's your understanding that has
16 never been requested by MRI?
17   A.   I believe at one point it was.
18   Q.   When was that?
19   A.   I believe up until Dr. Kruis left.
20   Q.   So up until 2007 -- or actually he
21 left in 2006?
22   A.   Correct, the end of 2006.
23   Q.   So after 2006 Mercy -- or MRI didn't
24 believe it would be appropriate to ask for Medical
25 Director fees because that would place MRI under a

Page 44

1  greater control of Mercy?
2    A.   It was either then or some time the
3  next year.
4    Q.   2007?
5    A.   Correct.
6    Q.   And the reason -- the reason, as I
7  understand it, that MRI didn't want to go ahead and
8  ask for these was because, after 2007, was because
9  MRI did not want to lose its independent status, so
10 to speak?
11   A.   That, and as far as hospital
12 administrators don't like it when you ask them for
13 money obviously, so we try to stay in good graces
14 with the administration.
15   Q.   And why did you try to stay in good
16 graces with them?
17   A.   To maintain our contract in good
18 standing.
19   Q.   Maintaining the contract is
20 important?
21   A.   Very important.
22   Q.   And if it means -- if it means you
23 forfeit the fees that you believe may be
24 applicable, it's worth forfeiting the fees that
25 would be applicable for your time in order to

Page 45

1  maintain the contract?
2    A.   Yes.
3    Q.   Would that be true then from say, for
4  example, 2007 to the present that MRI has not asked
5  for the Medical Director fees in order to maintain
6  the exclusive contract it has with Mercy?
7    A.   That, and I believe that they have
8  said they're not going to pay as well.
9    Q.   Okay.  Well, if they're not going to
10 pay, then you either say we want the fees or we
11 don't want the fees, but my understanding is you
12 haven't asked for the fees because that would be an
13 impediment to keeping the contract with Mercy?
14   A.   And I don't know if part of that was
15 because the Stark laws have changed or not.
16   Q.   Okay.  But that would be true though?
17   A.   Say that again.
18   Q.   Yes.  In other words, you've
19 indicated that you want to keep your independence
20 so you really haven't asked for the fees, but at
21 the same point in time you want to maintain the
22 contract with Mercy?
23   A.   Correct.
24   Q.   And that was my only question.  The
25 follow-up question is the reason you haven't asked

SPANGLER REPORTING SERVICES, INC.
(513)381-3330 PH   (513)381-3342 FAX

970abc5e-333c-44ec-90be-a775e47cf7ba

1  for the fees in part is because you want to
2  maintain that opportunity that you have with Mercy?
3      A.  Yes.
4      Q.  Because Mercy has -- well, strike
5  that.
6          You indicate that almost all of MRI's
7  business is based upon the contracts it has with
8  Mercy?
9      A.  Yes.
10     Q.  And that's providing radiology
11 services to Mercy at its various facilities here on
12 the west side?
13     A.  Correct.
14     Q.  I want to show you -- this previously
15 was marked Exhibit 110 -- or I'm sorry, this was
16 previously marked Exhibit 10.  I'm going to show
17 you what's previously been marked as Exhibit 10 and
18 ask you whether you've ever seen this document?
19     A.  It appears the last page has my
20 signature on it, so I would assume I have seen it
21 before.
22     Q.  Let me identify this for you.  I
23 thought I had another copy.
24         MR. MILLER:  Don't worry about it.
25     Q.  This is the professional services

46

1  agreement for radiology services between Mercy
2  Hospital West, Franciscan-Mt. Airy and MRI,
3  correct?
4      A.  Correct.
5      Q.  And the last two pages is an addendum
6  that you signed?
7      A.  Yes.
8      Q.  All right.  So I'm assuming that
9  since you signed the addendum, you would have seen
10 this contract, at least at some point in time
11 before you signed the addendum?
12     A.  Yes.
13     Q.  Now, this is one of the contracts we
14 talked about relating to the Medical Director
15 duties; is that right?
16     A.  Yes.
17     Q.  And this is for Mercy Mt. Airy?
18     A.  Yes.
19     Q.  And so we've got the 2002 contract
20 that looks like it's an exclusive agreement, right?
21         MR. BURR:  Objection, but you can
22 answer.
23     Q.  I'm sorry.  Roman Numeral I says
24 Exclusive Agreement, correct?
25     A.  Yes.

47

1      Q.  All right.  And duties of the
2  corporation are identified, talks about provision
3  of services, right?
4      A.  Yes.
5      Q.  And there's a method here, the reason
6  I'm going through this is because back in 2011
7  Dr. -- or not doctor, Miss Zipperer-Davis sent a
8  letter to Mercy resigning Dr. Hallman's privileges.
9  So the reason I'm going through this is because
10 this identifies an exclusive contract under the
11 medical bylaws that she relied upon, okay, so I'm
12 going to go through this a little bit.  All right.
13         So in 2002 we've got the provision
14 of services, and it says, "Mercy shall retain the
15 corporation to perform all radiological
16 examinations, interpretations, consultations,
17 imaging and interventional procedures at Mercy in
18 accordance with the terms and conditions in this
19 agreement, which services shall include, but are
20 not limited to the following."  And you turn to
21 page two, Roman Numeral II -- or I'm sorry, small
22 ii says, "providing the services for persons
23 brought to Mercy for treatment," and little iii
24 says, "providing all radiological consultation
25 services to Mercy's medical staff."  Did I read

48

1  that correctly?
2      A.  Yes.
3      Q.  Is there any, as we sit here today,
4  is there any radiological treatment that's provided
5  by anyone other than MRI at Mercy Mt. Airy?
6      A.  Yes.
7      Q.  What is it?
8      A.  Cardiologists perform nuclear
9  medicine interpretations, and vascular surgeons
10 perform arteriograms, angioplasties.
11     Q.  How long have the vascular surgeons
12 performed the angioplasties?
13     A.  I believe ever since I was there.
14     Q.  All right.  And that's an
15 interventional procedure?
16     A.  Correct.
17     Q.  And the cardiologists perform nuclear
18 medicine?
19     A.  Correct.
20     Q.  And what are those procedures
21 identified as?
22     A.  Myocardial profusion studies.
23     Q.  And how is that performed?
24     A.  The patient is injected with a radio
25 tracer and then imaged on a gamma camera to assess

49

13

**SPANGLER REPORTING SERVICES, INC.**
**(513)381-3330 PH  (513)381-3342 FAX**

Page 118

1 technology." What is that?
2 A. Sounds like a bunch of legal ease to
3 me.
4 Q. Well, I don't know. It's your job
5 duty. I'm just trying to figure out if you knew
6 what it is.
7 A. I think basically what we're doing
8 now with regard to the last set of questions, going
9 out into the community, making sure that we have
10 people that are educating referring clinicians, try
11 to grow the practice in that respect.
12 Q. In other words, you and Mercy are
13 really in a partnership to get additional patients
14 and grow the outpatient business for the new
15 hospital?
16 A. Correct.
17 Q. I mean, because I'm looking here at
18 the second page, the first bullet point, "Cooperate
19 fully with other medical, nursing and
20 administration departments of Mercy and cooperate
21 with all matters affecting patient care, personnel,
22 supplies and regulations." I mean, those are
23 duties way beyond what would just be required in
24 radiology; is that fair?
25 A. Yes.

Page 119

1 Q. Farther down, "Cooperate fully with
2 other medical, nursing and administration
3 departments of Mercy and MHP, and cooperate with
4 all matters affecting patient care, personnel,
5 supplies and regulations."
6 A. Yes.
7 Q. Sounds like it's the entire hospital
8 that you're assisting in helping?
9 A. If they ask me to.
10 Q. Yes, okay. Well, that's because it's
11 a description of your duties now?
12 A. Right.
13 Q. So there's no -- there's no -- even
14 though it looks like your duties have expanded
15 greatly, there's no fee that's going to be paid by
16 Mercy for you for these Medical Director duties?
17 A. Correct.
18 Q. And it looks like the only way that
19 you're going to get paid additional monies for
20 these duties is if you bring in additional
21 inpatient business?
22 A. Or outpatient.
23 Q. Or, I'm sorry, outpatient business,
24 right?
25 A. (Nodding head.)

Page 120

1 Q. You've got to answer --
2 A. Patients, all patients, any type of
3 imaging, anything that would increase our imaging
4 volume whether it be outpatient, inpatient.
5 Q. But really that's the way -- I mean,
6 with these additional duties, and I'm thinking from
7 Dr. Hallman's standpoint is as a percentage of
8 what -- the compensation you make, Dr. Hallman is
9 going to make -- would have made additional monies,
10 based upon overall compensation that you would make
11 as a full shareholder in the event the Medical
12 Director duties are included, by increasing the
13 compensation that you're going to get by increasing
14 the volume of patients at the hospital outpatient
15 wise?
16 A. Is that a question?
17 Q. Let me break it down. In other
18 words, you told me what your understanding was of
19 Dr. Hallman's compensation was, that he was suppose
20 to get 75 percent of what a full shareholder
21 physician would make?
22 A. Correct.
23 Q. And part of that 75 percent -- or
24 part of your compensation was the Medical Director
25 duties stipends that were paid to you by MRI?

Page 121

1 A. That wasn't part of the 75 percent.
2 Q. It's not part of the 75?
3 A. I guess I still don't understand your
4 question.
5 Q. Well, when you're looking at the X
6 factor, 75 percent of X?
7 A. Yes.
8 Q. Okay. X being the amount of
9 compensation that you compare against Dr. Hallman's
10 75 percent, the X factor would be salary for a
11 full-time shareholder?
12 A. Correct.
13 Q. Bonus?
14 A. Correct.
15 Q. And with regard to you, does it or
16 does it not include the Medical Director fees that
17 are paid to you by MRI?
18 A. I don't believe it does.
19 Q. Did anybody ever ask Dr. Hallman if
20 he wanted to be the Medical Director?
21 A. I believe we did have a vote at
22 the -- it was a meeting at Western Hills, a board
23 meeting, probably two or three years ago that it
24 was voted on.
25 Q. Okay. Was Dr. Hallman one of the

31 (Pages 118 to 121)

Page 242

1 between Dr. Zeff and Dr. Getachew?
2     A.   I was aware of it.
3     Q.   And what did you know about it?
4     A.   My recollection is Dr. Zeff performed
5 a procedure in the operating room that he was
6 not -- not credentialed to perform.  Dr. Getachew
7 apparently saw the case on the PAC system.  There
8 was a complication involved based on the image and
9 he took it to, I believe it was, Heather Davis --
10 or not Heather Davis, whoever the equivalent of
11 Heather Davis is at Western Hills, brought it to
12 her attention.  And it was basically not taking the
13 appropriate route of reporting this complication.
14     Q.   In other words, not going up the
15 chain of command?
16     A.   Correct.
17     Q.   All right.  And then if you turn to
18 1599 there's a discussion about Mercy Health
19 Partners, the MRI contract is still work in
20 progress, correct?
21     A.   Correct.
22     Q.   And it says, "Our group must work
23 together to show Mercy we are the radiologists they
24 want to work with in the new hospital and for many
25 years to come," that's the person responsible to

Page 243

1 follow up, right?
2     A.   Right.
3     Q.   In terms of indicating to the
4 hospital that you're the group, that would include
5 doing the marketing with the oncology, following up
6 with the primary care physicians with Mercy,
7 waiving the Medical Director fees, would you agree?
8     A.   That would be part of it, yes.
9     Q.   Okay.  Because it's important to have
10 the opportunity to go ahead and treat those
11 patients that are being referred by Mercy in order
12 to maintain the viability of Millennium at this
13 time?
14     A.   Sure.
15          MR. BURR:  Can we take a break, Mark?
16 I've got to feed the meter.
17          MR. BYRNE:  Yes.
18          (Brief recess.)
19     Q.   Okay.  Turn to 1600, page 1600, it
20 looks like there's still a discussion here with
21 Kowalski.  Let's see, it says, "Mercy will use the
22 connector space," I'm down at the bottom here,
23 "between the buildings on the campus for the
24 Women's Center.  More space was envisioned, but the
25 space for the center is being challenged by the

Page 244

1 demand for space in the MOB."  That's medical
2 office building?
3     A.   Correct.
4     Q.   "Dr. Aukerman informed Mr. Kowalski
5 of his visit, as well as Ms. Zipperer-Davis to the
6 St. Elizabeth's Women Center."  Have you ever been
7 over there?
8     A.   No.
9     Q.   "The center had financing from an
10 outside source (Fisher Homes).  Dr. Aukerman
11 offered Millennium's assistance with eliciting
12 donations for the Mercy Women's Center."
13     A.   Yes.
14     Q.   Do you know anything about that?
15     A.   I think he was referring to the fact
16 that he was willing to go out and solicit donations
17 from people in the community on the westside, such
18 as Jack LaRosa -- I don't know if his first name is
19 Jack.
20     Q.   Mike?
21     A.   Mike LaRosa of LaRosa Pizza, various
22 other connections that he might have had.
23     Q.   St. E's has a women's center
24 apparently?
25     A.   Apparently.

Page 245

1     Q.   And Mercy has a women's center?
2     A.   Correct.
3     Q.   Is there something wrong with the
4 women's center?
5     A.   Where?
6     Q.   At Mercy.  I'm sorry.
7     A.   At which Mercy?
8     Q.   The one that Dr. Aukerman is going to
9 be eliciting donations for.
10     A.   I believe that's for the new --
11     Q.   The new hospital?
12     A.   The new hospital.
13     Q.   So actually at this time he was
14 telling Mr. Kowalski, hey, I'll go out and get
15 donations for the new women's center that's going
16 to be built at the new hospital?
17     A.   Correct.
18     Q.   And that's part of the group working
19 together to show Mercy, MRI is the radiologists
20 they want to work with in the new hospital for many
21 years to come?
22     A.   Correct.
23     Q.   That's just part of the thing that
24 you've got to do, you've got to go ahead and raise
25 money for Mercy in order to get the contract?

62 (Pages 242 to 245)

970abc5e-333c-44ec-90be-a775e47cf7ba

Page 270

1    Q.   Right.  Well, the entire process?
2    A.   Not to my understanding.
3    Q.   So it's your understanding that you
4  can talk about a case that you have reviewed as
5  part of the peer review process with anyone outside
6  of the hospital as long as the name of the patient
7  isn't identified?
8    A.   Correct.
9    Q.   Okay.  And I guess -- so we've talked
10  about the joint marketing efforts between MRI and
11  Mercy.  And then we've talked about the waiver of
12  the medical fees.  We've talked about some possible
13  fundraising efforts.  And then we've talked about
14  the traveling to physicians offices that have
15  occurred over the last few years.
16    A.   Yes.
17    Q.   Correct?  And the reason that's being
18  done is in order to go ahead and ensure that MRI
19  obtain the exclusive contract not only from '09 to
20  '11, but with the new hospital?
21    A.   To put us in a position, yes.
22    Q.   To put you in a position in order to
23  go ahead and have the opportunity to bill for those
24  physician services that are provided based upon the
25  directive -- the referrals from Mercy?

Page 271

1    A.   Correct.
2    Q.   Did anybody ever talk to you about
3  what the fair market value of the -- the fair
4  market value of the Medical Directorships were that
5  were being performed by you?
6    A.   No.
7    Q.   Do you know what the reasonable value
8  of those services are for Mercy?
9    A.   I do not.
10    Q.   Has there ever been any type of --
11  oh, any type of survey that's done as to what the
12  value of the services were?
13    A.   Not to my knowledge.
14    Q.   I'm going to show you what's been
15  marked as Exhibit 124.  Have you seen this document
16  before?
17    A.   I believe I have.
18    Q.   Okay.  When did you see this
19  document?
20    A.   I can't recall the exact date.  I
21  believe it was around some time at the end of last
22  year.
23    Q.   Okay.  It's bates stamped 4361
24  through 4397?
25    A.   Yes.

Page 272

1    Q.   All right.  And it looks like this is
2  a draft, 8/25/2010?
3    A.   Yes.
4    Q.   This is a document that was produced
5  in discovery by you guys, okay?
6    A.   Okay.
7    Q.   And it looks like -- it looks like
8  it's a draft of 8/25/2010.  And then there's a
9  meeting with Pat Kowalski, Paul Hiltz.  KA is Kevin
10  Aukerman?
11    A.   Correct.
12    Q.   TK is Ted Kleimeyer?
13    A.   Yes.
14    Q.   SW is Scott Welton?
15    A.   Yes.
16    Q.   Looks like on 8/11/2010.  It's cut
17  off.
18    A.   Or 10/8/2011.
19    Q.   Well, I don't think it would be
20  10/8/2011 because the new contract was signed.
21    A.   Or '10, I'm sorry.
22    Q.   '10.  And the draft is 2010?
23    A.   Okay.
24    Q.   And it looks like -- do you remember
25  attending a meeting?

Page 273

1    A.   I believe so, at Western Hills.
2    Q.   Okay.  Were the five of you there?
3    A.   Yes.
4    Q.   And you guys had submitted a draft of
5  the contract to Mercy for them to look at as to
6  what you believe should have been included in the
7  exclusive arrangement between the two of you,
8  right?
9    A.   I believe we did.
10    Q.   All right.  Now, this is
11  Miss Zipperer-Davis's handwriting?
12    A.   I'll take your word for it.
13    Q.   Well, it's not your handwriting?
14    A.   Correct.
15    Q.   And Miss Zipperer-Davis was taking
16  notes during the meeting, right?
17    A.   I believe so.
18    Q.   Okay.  And have you seen
19  Miss Zipperer-Davis's handwriting before?
20    A.   Yes.
21    Q.   This looks to be her handwriting,
22  does it not?
23    A.   I have no reason to doubt that it's
24  not.
25    Q.   Okay.  Now, with regard to this, she

69  (Pages 270 to 273)

970abc5e-333c-44ec-90be-a775e47cf7ba

| 01/01/07 - 12/31/07 | | MILLENNIUM RADIOLOGY, INC. General Ledger | | | | MTAIRY Page 44 |

| Date | Reference T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|---|---|---|---|---|---|---|
| | 601 Doctors' Salaries (cont.) | | | | | |
| 12/01/07 | 1115 | KEVIN AUKERMAN | | 6,944.00 | | |
| 12/01/07 | 1116 | SCOTT WELTON | | 20,833.00 | | |
| 12/01/07 | 1117 | G. DARYL HALLMAN | | 20,833.00 | | |
| 12/01/07 | 1118 | GARY L. MERHAR | | 25,000.00 | | |
| 12/01/07 | 1119 | AURORA GONZALEZ | | 18,750.00 | | |
| 12/01/07 | 1120 | GEORGE G. WAGNER | | 20,833.00 | | |
| 12/01/07 | 1121 | PETER KANISTROS | | 25,000.00 | | |
| 12/01/07 | 1122 | TED A. KLEIMEYER | | 20,833.00 | | |
| 12/01/07 | 1123 | MAMEHDRA J. PANCHAL | | 25,000.00 | | |
| 12/01/07 | 1124 | MEKASHA M. GETACHEW | | 20,833.00 | | |
| 12/31/07 | 1137 | KEVIN AUKERMAN | | 15,937.39 | | |
| 12/31/07 | 1138 | SCOTT WELTON | | 20,833.00 | | |
| 12/31/07 | 1139 | G. DARYL HALLMAN | | 20,833.00 | | |
| 12/31/07 | 1140 | GARY L. MERHAR | | 25,000.00 | | |
| 12/31/07 | 1141 | AURORA GONZALEZ | | 18,750.00 | | |
| 12/31/07 | 1142 | GEORGE G. WAGNER | | 22,433.00 | | |
| 12/31/07 | 1143 | PETER KANISTROS | | 21,800.00 | | |
| 12/31/07 | 1144 | TED A. KLEIMEYER | | 20,833.00 | | |
| 12/31/07 | 1145 | MAMEHDRA J. PANCHAL | | 25,000.00 | | |
| 12/31/07 | 1146 | MEKASHA M. GETACHEW | | 20,833.00 | | |
| 12/31/07 | 1151 | KEVIN AUKERMAN | | 8,497.37 | | |
| 12/31/07 | 1152 | SCOTT WELTON | | 45,367.33 | | |
| 12/31/07 | 1153 | G. DARYL HALLMAN | | 8,576.02 | | |
| 12/31/07 | 1154 | GEORGE G. WAGNER | | 48,151.74 | | |
| 12/31/07 | 1155 | TED A. KLEIMEYER | | 43,157.09 | | |
| 12/31/07 | 1156 | MEKASHA M. GETACHEW | | 44,951.01 | | |
| | | December | | 615,811.95 | 4,129,381.44 | |
| | | | | 4,129,381.44 | | 4,129,381.44 |
| | | | | | | |
| | 602 Medical Director | | 0.00 | | | |
| 01/18/07 | 861 | KEVIN AUKERMAN | | 1,404.28 | | |
| 01/18/07 | 862 | SCOTT WELTON | | 706.32 | | |
| 01/18/07 | 863 | TED A. KLEIMEYER | | 697.96 | | |
| | | January | | 2,808.56 | 2,808.56 | |
| 02/15/07 | 879 | KEVIN AUKERMAN | | 4,865.67 | | |
| 02/15/07 | 880 | SCOTT WELTON | | 2,343.12 | | |
| 02/15/07 | 881 | TED A. KLEIMEYER | | 2,522.55 | | |
| | | February | | 9,731.34 | 12,539.90 | |
| 03/13/07 | 897 | KEVIN AUKERMAN | | 4,167.74 | | |
| 03/13/07 | 898 | SCOTT WELTON | | 2,164.25 | | |
| 03/13/07 | 899 | TED A. KLEIMEYER | | 2,003.50 | | |
| | | March | | 8,335.49 | 20,875.39 | |
| 04/04/07 | 919 | KEVIN AUKERMAN | | 4,193.94 | | |
| 04/04/07 | 920 | SCOTT WELTON | | 2,003.18 | | |
| 04/04/07 | 921 | TED A. KLEIMEYER | | 2,190.76 | | |
| | | April | | 8,387.88 | 29,263.27 | |
| 05/08/07 | 947 | KEVIN AUKERMAN | | 4,202.20 | | |
| 05/08/07 | 948 | SCOTT WELTON | | 2,257.38 | | |
| 05/08/07 | 949 | TED A. KLEIMEYER | | 1,944.82 | | |
| | | May | | 8,404.40 | 37,667.67 | |
| 06/07/07 | 969 | KEVIN AUKERMAN | | 6,172.99 | | |

EXHIBIT
17

| 01/01/07 - 12/31/07 | | | MILLENNIUM RADIOLOGY, INC.<br>General Ledger | | | | MTAIRY<br>Page 45 |

**MILLENNIUM RADIOLOGY, INC.**
**General Ledger**

| Date | Reference | T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|------|-----------|---|-------------|-------------------|----------------|-------------------|-------------|
| | | | **602 Medical Director (cont.)** | | | | |
| 06/07/07 | 970 | | SCOTT WELTON | | 3,181.77 | | |
| 06/07/07 | 971 | | TED A. KLEIMEYER | | 2,991.22 | | |
| | | | | June | 12,345.98 | 50,013.65 | |
| 07/10/07 | 994 | | KEVIN AUKERMAN | | 4,548.70 | | |
| 07/10/07 | 995 | | SCOTT WELTON | | 2,173.95 | | |
| 07/10/07 | 996 | | TED A. KLEIMEYER | | 2,374.75 | | |
| | | | | July | 9,097.40 | 59,111.05 | |
| 08/09/07 | 1025 | | KEVIN AUKERMAN | | 5,342.26 | | |
| 08/09/07 | 1026 | | SCOTT WELTON | | 2,071.95 | | |
| | | | | August | 7,414.21 | 66,525.26 | |
| 09/17/07 | 1047 | | KEVIN AUKERMAN | | 4,973.37 | | |
| 09/17/07 | 1048 | | SCOTT WELTON | | 2,373.50 | | |
| 09/17/07 | 1049 | | TED A. KLEIMEYER | | 2,599.87 | | |
| | | | | September | 9,946.74 | 76,472.00 | |
| 10/06/07 | 1070 | | KEVIN AUKERMAN | | 3,397.93 | | |
| 10/06/07 | 1071 | | SCOTT WELTON | | 1,772.01 | | |
| 10/06/07 | 1072 | | TED A. KLEIMEYER | | 1,625.92 | | |
| | | | | October | 6,795.86 | 83,267.86 | |
| 11/12/07 | 1105 | | KEVIN AUKERMAN | | 4,649.19 | | |
| 11/12/07 | 1106 | | SCOTT WELTON | | 2,011.27 | | |
| 11/12/07 | 1107 | | TED A. KLEIMEYER | | 2,637.92 | | |
| | | | | November | 9,298.38 | 92,566.24 | |
| 12/11/07 | 1131 | | KEVIN AUKERMAN | | 4,057.99 | | |
| 12/11/07 | 1132 | | SCOTT WELTON | | 1,641.98 | | |
| 12/11/07 | 1133 | | TED A. KLEIMEYER | | 2,416.01 | | |
| | | | | December | 8,115.98 | 100,682.22 | |
| | | | | | 100,682.22 | | 100,682.22 |
| | | | **603 Profit Sharing** | 0.00 | | | |
| 06/26/07 | 985 | V | Futures Planning Group, Inc. | | 1,115.00 | | |
| | | | | June | 1,115.00 | 1,115.00 | |
| | | | | | 1,115.00 | | 1,115.00 |
| | | | **611 Employer FICA Expense** | 0.00 | | | |
| 01/18/07 | 861 | | KEVIN AUKERMAN | | 107.43 | | |
| 01/18/07 | 862 | | SCOTT WELTON | | 54.03 | | |
| 01/18/07 | 863 | | TED A. KLEIMEYER | | 53.39 | | |
| | | | | January | 214.85 | 214.85 | |
| 02/01/07 | 864 | | KEVIN AUKERMAN | | 1,532.52 | | |
| 02/01/07 | 865 | | SCOTT WELTON | | 1,593.72 | | |
| 02/01/07 | 866 | | G. DARYL HALLMAN | | 1,593.72 | | |
| 02/01/07 | 867 | | GARY L. MERHAR | | 1,912.50 | | |
| 02/01/07 | 868 | | AURORA GONZALEZ | | 763.09 | | |
| 02/01/07 | 869 | | GEORGE G. WAGNER | | 1,593.72 | | |
| 02/01/07 | 870 | | TED A. KLEIMEYER | | 1,593.72 | | |
| 02/01/07 | 871 | | MAMEHDRA J. PANCHAL | | 1,503.23 | | |
| 02/01/07 | 872 | | MEKASHA M. GETACHEW | | 2,039.95 | | |
| 02/15/07 | 879 | | KEVIN AUKERMAN | | 372.22 | | |

| 01/01/08 - 12/31/08 | | MILLENNIUM RADIOLOGY, INC.<br>General Ledger | | | | MTAIRY<br>Page 43 |
|---|---|---|---|---|---|---|

| Date | Reference T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|---|---|---|---|---|---|---|
| | 601 Doctors' Salaries (cont.) | | | | | |
| 11/01/08 | 1535 | G. DARYL HALLMAN | | 20,833.00 | | |
| 11/01/08 | 1536 | GARY L. MERHAR | | 20,833.00 | | |
| 11/01/08 | 1537 | GEORGE G. WAGNER | | 20,833.00 | | |
| 11/01/08 | 1538 | PETER KANISTROS | | 20,833.00 | | |
| 11/01/08 | 1539 | TED A. KLEIMEYER | | 20,833.00 | | |
| 11/01/08 | 1540 | MEKASHA M. GETACHEW | | 20,833.00 | | |
| 11/01/08 | 1541 | CHRISTIAN M. FISHER | | 25,000.00 | | |
| 11/01/08 | 1542 | JEREMY D. GILLIAM | | 22,500.00 | | |
| | | | November | 214,164.00 | 3,242,901.17 | |
| 12/01/08 | 1562 | KEVIN AUKERMAN | | 21,333.00 | | |
| 12/01/08 | 1563 | SCOTT WELTON | | 20,833.00 | | |
| 12/01/08 | 1564 | G. DARYL HALLMAN | | 20,333.00 | | |
| 12/01/08 | 1565 | GARY L. MERHAR | | 20,833.00 | | |
| 12/01/08 | 1566 | GEORGE G. WAGNER | | 20,833.00 | | |
| 12/01/08 | 1567 | PETER KANISTROS | | 20,833.00 | | |
| 12/01/08 | 1568 | TED A. KLEIMEYER | | 20,833.00 | | |
| 12/01/08 | 1569 | MEKASHA M. GETACHEW | | 20,833.00 | | |
| 12/01/08 | 1570 | CHRISTIAN M. FISHER | | 25,000.00 | | |
| 12/01/08 | 1571 | JEREMY D. GILLIAM | | 22,500.00 | | |
| 12/31/08 | 1602 | KEVIN AUKERMAN | | 22,333.00 | | |
| 12/31/08 | 1603 | SCOTT WELTON | | 20,833.00 | | |
| 12/31/08 | 1604 | G. DARYL HALLMAN | | 18,333.00 | | |
| 12/31/08 | 1605 | GARY L. MERHAR | | 20,833.00 | | |
| 12/31/08 | 1606 | GEORGE G. WAGNER | | 21,833.00 | | |
| 12/31/08 | 1607 | PETER KANISTROS | | 20,833.00 | | |
| 12/31/08 | 1608 | TED A. KLEIMEYER | | 20,833.00 | | |
| 12/31/08 | 1609 | MEKASHA M. GETACHEW | | 20,833.00 | | |
| 12/31/08 | 1610 | CHRISTIAN M. FISHER | | 25,000.00 | | |
| 12/31/08 | 1611 | JEREMY D. GILLIAM | | 22,500.00 | | |
| | | | December | 428,328.00 | 3,671,229.17 | |
| | | | | 3,671,229.17 | | 3,671,229.17 |
| | 602 Medical Director | | 0.00 | | | |
| 01/11/08 | 1166 | KEVIN AUKERMAN | | 2,668.08 | | |
| 01/11/08 | 1167 | SCOTT WELTON | | 1,244.92 | | |
| 01/11/08 | 1168 | TED A. KLEIMEYER | | 1,423.16 | | |
| | | | January | 5,336.16 | 5,336.16 | |
| 02/16/08 | 1208 | KEVIN AUKERMAN | | 7,701.61 | | |
| 02/16/08 | 1209 | SCOTT WELTON | | 3,830.77 | | |
| 02/16/08 | 1210 | TED A. KLEIMEYER | | 3,870.84 | | |
| | | | February | 15,403.22 | 20,739.38 | |
| 03/11/08 | 1241 | KEVIN AUKERMAN | | 5,306.76 | | |
| 03/11/08 | 1242 | SCOTT WELTON | | 2,747.64 | | |
| 03/11/08 | 1243 | TED A. KLEIMEYER | | 2,559.12 | | |
| | | | March | 10,613.52 | 31,352.90 | |
| 04/21/08 | 1286 | KEVIN AUKERMAN | | 3,891.67 | | |
| 04/21/08 | 1288 | SCOTT WELTON | | 1,598.67 | | |
| 04/21/08 | 1292 | TED A. KLEIMEYER | | 2,293.00 | | |
| | | | April | 7,783.34 | 39,136.24 | |
| 05/14/08 | 1311 | KEVIN AUKERMAN | | 5,167.91 | | |
| 05/14/08 | 1312 | SCOTT WELTON | | 2,432.43 | | |
| 05/14/08 | 1313 | TED A. KLEIMEYER | | 2,735.48 | | |

EXHIBIT
tabbies
18

01/01/08 - 12/31/08

## MILLENNIUM RADIOLOGY, INC.
### General Ledger

MTAIRY
Page 44

| Date | Reference | T | Description | | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|------|-----------|---|-------------|---|-------------------|----------------|-------------------|-------------|
| | | | **602 Medical Director (cont.)** | | | | | |
| | | | | May | 10,335.82 | | 49,472.06 | |
| 06/10/08 | 1349 | | KEVIN AUKERMAN | | | 4,285.69 | | |
| 06/10/08 | 1350 | | SCOTT WELTON | | | 1,917.60 | | |
| 06/10/08 | 1351 | | TED A. KLEIMEYER | | | 2,368.09 | | |
| | | | | June | 8,571.38 | | 58,043.44 | |
| 07/08/08 | 1390 | | KEVIN AUKERMAN | | | 4,271.66 | | |
| 07/08/08 | 1391 | | SCOTT WELTON | | | 2,006.47 | | |
| 07/08/08 | 1392 | | TED A. KLEIMEYER | | | 2,265.19 | | |
| | | | | July | 8,543.32 | | 66,586.76 | |
| 08/12/08 | 1432 | | KEVIN AUKERMAN | | | 4,901.42 | | |
| 08/12/08 | 1433 | | SCOTT WELTON | | | 2,295.66 | | |
| 08/12/08 | 1434 | | TED A. KLEIMEYER | | | 2,605.76 | | |
| | | | | August | 9,802.84 | | 76,389.60 | |
| 09/10/08 | 1469 | | KEVIN AUKERMAN | | | 4,120.19 | | |
| 09/10/08 | 1470 | | SCOTT WELTON | | | 2,141.80 | | |
| 09/10/08 | 1471 | | TED A. KLEIMEYER | | | 1,978.40 | | |
| | | | | September | 8,240.39 | | 84,629.99 | |
| 10/14/08 | 1507 | | KEVIN AUKERMAN | | | 4,377.54 | | |
| 10/14/08 | 1508 | | SCOTT WELTON | | | 2,027.15 | | |
| 10/14/08 | 1509 | | TED A. KLEIMEYER | | | 2,350.39 | | |
| | | | | October | 8,755.08 | | 93,385.07 | |
| 11/13/08 | 1556 | | KEVIN AUKERMAN | | | 4,444.08 | | |
| 11/13/08 | 1557 | | SCOTT WELTON | | | 2,136.69 | | |
| 11/13/08 | 1558 | | TED A. KLEIMEYER | | | 2,307.39 | | |
| | | | | November | 8,888.16 | | 102,273.23 | |
| 12/09/08 | 1585 | | KEVIN AUKERMAN | | | 3,540.38 | | |
| 12/09/08 | 1586 | | SCOTT WELTON | | | 1,690.87 | | |
| 12/09/08 | 1587 | | TED A. KLEIMEYER | | | 1,849.51 | | |
| | | | | December | 7,080.76 | | 109,353.99 | |
| | | | | | | 109,353.99 | | 109,353.99 |
| | | | **603 Profit Sharing** | | 0.00 | | | |
| 07/08/08 | 1387 | V | CHARLES SCHWAB & CO | | | 122,000.00 | | |
| | | | | July | 122,000.00 | | 122,000.00 | |
| 08/14/08 | 1438 | V | Futures Planning Group, Inc. | | | 1,155.00 | | |
| | | | | August | 1,155.00 | | 123,155.00 | |
| 10/15/08 | 1510 | V | CHARLES SCHWAB & CO | | | 76,250.00 | | |
| | | | | October | 76,250.00 | | 199,405.00 | |
| 12/31/08 | PENSION | | Accrue for balance of 08 company contribution | | | 22,453.00 | | |
| | | | | December | 22,453.00 | | 221,858.00 | |
| | | | | | | 221,858.00 | | 221,858.00 |
| | | | **604 Other Compensation** | | 0.00 | | | |
| 12/31/08 | 1640 | V | Steven Kruis | | | 100,000.00 | | |

| 01/31/09 - 12/31/09 | | | MILLENNIUM RADIOLOGY, INC.<br>General Ledger | | | | MTAIRY<br>Page 109 |
|---|---|---|---|---|---|---|---|

| Date | Reference | T | Description | Beginning<br>Balance | Current<br>Amount | Period End<br>Amount | YTD<br>Balance |
|---|---|---|---|---|---|---|---|
| | **602 Medical Director** | | | 0.00 | | | |
| 01/19/09 | 1632 | | KEVIN AUKERMAN | | 3,514.76 | | |
| 01/19/09 | 1633 | | SCOTT WELTON | | 1,805.59 | | |
| 01/19/09 | 1634 | | TED A. KLEIMEYER | | 1,709.17 | | |
| | | | January | | 7,029.52 | 7,029.52 | |
| 02/20/09 | 1687 | | KEVIN AUKERMAN | | 5,520.87 | | |
| 02/20/09 | 1688 | | SCOTT WELTON | | 2,690.52 | | |
| 02/20/09 | 1689 | | TED A. KLEIMEYER | | 2,830.35 | | |
| | | | February | | 11,041.74 | 18,071.26 | |
| 03/07/09 | 1725 | | KEVIN AUKERMAN | | 4,116.21 | | |
| 03/07/09 | 1727 | | SCOTT WELTON | | 1,905.84 | | |
| 03/07/09 | 1728 | | TED A. KLEIMEYER | | 2,210.37 | | |
| | | | March | | 8,232.42 | 26,303.68 | |
| 04/10/09 | 1763 | | KEVIN AUKERMAN | | 4,585.91 | | |
| 04/10/09 | 1764 | | SCOTT WELTON | | 2,114.02 | | |
| 04/10/09 | 1765 | | TED A. KLEIMEYER | | 2,471.88 | | |
| | | | April | | 9,171.81 | 35,475.49 | |
| 05/15/09 | 1816 | | KEVIN AUKERMAN | | 4,961.22 | | |
| 05/15/09 | 1817 | | SCOTT WELTON | | 2,441.14 | | |
| 05/15/09 | 1818 | | TED A. KLEIMEYER | | 2,520.07 | | |
| | | | May | | 9,922.43 | 45,397.92 | |
| 06/12/09 | 1860 | | KEVIN AUKERMAN | | 3,402.22 | | |
| 06/12/09 | 1861 | | SCOTT WELTON | | 1,604.65 | | |
| 06/12/09 | 1862 | | TED A. KLEIMEYER | | 1,797.57 | | |
| | | | June | | 6,804.44 | 52,202.36 | |
| 07/15/09 | 1902 | | KEVIN AUKERMAN | | 5,688.54 | | |
| 07/15/09 | 1903 | | SCOTT WELTON | | 2,955.52 | | |
| 07/15/09 | 1904 | | TED A. KLEIMEYER | | 2,733.03 | | |
| | | | July | | 11,377.09 | 63,579.45 | |
| 08/14/09 | 1936 | | KEVIN AUKERMAN | | 4,960.10 | | |
| 08/14/09 | 1937 | | SCOTT WELTON | | 2,405.51 | | |
| 08/14/09 | 1938 | | TED A. KLEIMEYER | | 2,554.59 | | |
| | | | August | | 9,920.20 | 73,499.65 | |
| 09/15/09 | 2022 | | KEVIN AUKERMAN | | 4,502.79 | | |
| 09/15/09 | 2023 | | SCOTT WELTON | | 2,199.46 | | |
| 09/15/09 | 2024 | | TED A. KLEIMEYER | | 2,303.33 | | |
| | | | September | | 9,005.58 | 82,505.23 | |
| 10/30/09 | 2115 | | KEVIN AUKERMAN | | 3,810.79 | | |
| 10/30/09 | 2116 | | SCOTT WELTON | | 1,854.35 | | |
| 10/30/09 | 2117 | | TED A. KLEIMEYER | | 1,956.43 | | |
| | | | October | | 7,621.57 | 90,126.80 | |
| 11/13/09 | 2161 | | KEVIN AUKERMAN | | 3,313.40 | | |
| 11/13/09 | 2163 | | SCOTT WELTON | | 1,550.53 | | |
| 11/13/09 | 2168 | | TED A. KLEIMEYER | | 1,762.87 | | |
| | | | November | | 6,626.80 | 96,753.60 | |
| 12/15/09 | 2238 | | KEVIN AUKERMAN | | 4,234.05 | | |
| 12/15/09 | 2239 | | SCOTT WELTON | | 2,006.20 | | |
| 12/15/09 | 2240 | | TED A. KLEIMEYER | | 2,227.84 | | |
| | | | December | | 8,468.09 | 105,221.69 | |

EXHIBIT

19

01/31/09 - 12/31/09

## MILLENNIUM RADIOLOGY, INC.
### General Ledger

MTAIRY
Page 110

| Date | Reference T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|------|-------------|-------------|-------------------|----------------|-------------------|-------------|
| | 602 Medical Director (cont.) | | | | | |
| | | | | 105,221.69 | | 105,221.69 |
| | 603 Profit Sharing | | 0.00 | | | |
| 02/26/09 | 1692 V | Futures Planning Group, Inc. | | 1,290.00 | | |
| | | February | | 1,290.00 | 1,290.00 | |
| 05/01/09 | 1806 V | Futures Planning Group, Inc. | | 1,000.00 | | |
| | | May | | 1,000.00 | 2,290.00 | |
| 07/01/09 | 1894 V | | | 57,289.28 | | |
| | | July | | 57,289.28 | 59,579.28 | |
| 10/29/09 | 2151 V | Futures Planning Group, Inc. | | 962.50 | | |
| | | October | | 962.50 | 60,541.78 | |
| 11/03/09 | 2156 V | CHARLES SCHWAB & CO | | 17,942.80 | | |
| | | November | | 17,942.80 | 78,484.58 | |
| 12/31/09 | ADJ | ACCRUED PROFIT SHARING | | 270,257.61 | | |
| | | December | | 270,257.61 | 348,742.19 | |
| | | | | 348,742.19 | | 348,742.19 |
| | 604 Other Compensation | | 0.00 | | | |
| 04/15/09 | 1756 V | Steven Kruis | | 25,000.00 | | |
| | | April | | 25,000.00 | 25,000.00 | |
| 07/15/09 | 1900 V | Steven Kruis | | 25,000.00 | | |
| | | July | | 25,000.00 | 50,000.00 | |
| 10/15/09 | 2089 V | Steven Kruis | | 25,000.00 | | |
| | | October | | 25,000.00 | 75,000.00 | |
| 12/31/09 | 2296 V | Steven Kruis | | 25,000.00 | | |
| | | December | | 25,000.00 | 100,000.00 | |
| | | | | 100,000.00 | | 100,000.00 |
| | 611 Employer FICA Expense | | 0.00 | | | |
| 01/19/09 | 1632 | KEVIN AUKERMAN | | 268.88 | | |
| 01/19/09 | 1633 | SCOTT WELTON | | 138.13 | | |
| 01/19/09 | 1634 | TED A. KLEIMEYER | | 130.75 | | |
| 01/30/09 | 1639 | SCOTT WELTON | | 1,561.85 | | |
| 01/30/09 | 1640 | G. DARYL HALLMAN | | 1,570.77 | | |
| 01/30/09 | 1641 | GEORGE G. WAGNER | | 1,570.77 | | |
| 01/30/09 | 1642 | PETER KANISTROS | | 1,593.72 | | |
| 01/30/09 | 1643 | TED A. KLEIMEYER | | 1,584.54 | | |
| 01/30/09 | 1644 | MEKASHA M. GETACHEW | | 1,538.26 | | |
| 01/30/09 | 1645 | CHRISTIAN M. FISHER | | 1,889.55 | | |
| 01/30/09 | 1646 | JEREMY D. GILLIAM | | 1,721.25 | | |
| 01/30/09 | 1647 | KEVIN AUKERMAN | | 1,558.66 | | |
| 01/30/09 | 1648 | GARY L. MERHAR | | 1,561.85 | | |
| | | January | | 16,688.98 | 16,688.98 | |
| 02/07/09 | 1670 | KEVIN AUKERMAN | | 1,331.25 | | |

01/01/10 - 12/31/10

## MILLENNIUM RADIOLOGY, INC.
### General Ledger

MTAIRY
Page 74

| Date | Reference | T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|------|-----------|---|-------------|-------------------|----------------|-------------------|-------------|
| | 601.5 Administrative Salary (cont.) | | | | | | |
| 10/01/10 | 2941 | | DENISE M. MILLER | | 1,588.03 | | |
| 10/01/10 | 2942 | | SHERRY L. WEBER | | 1,789.38 | | |
| 10/01/10 | 2943 | | JESSICA L. WITT | | 1,721.40 | | |
| 10/01/10 | 2944 | | PAMELA E. ZIPPERER-DAVIS | | 7,881.77 | | |
| 10/15/10 | 2956 | | DENISE M. MILLER | | 1,588.03 | | |
| 10/15/10 | 2957 | | SHERRY L. WEBER | | 1,789.38 | | |
| 10/15/10 | 2958 | | JESSICA L. WITT | | 1,577.95 | | |
| 10/15/10 | 2960 | | PAMELA E. ZIPPERER-DAVIS | | 7,881.77 | | |
| | | | October | | 25,817.71 | 239,281.23 | |
| 11/01/10 | 2993 | | DENISE M. MILLER | | 1,588.03 | | |
| 11/01/10 | 2994 | | SHERRY L. WEBER | | 1,789.38 | | |
| 11/01/10 | 2995 | | JESSICA L. WITT | | 1,426.95 | | |
| 11/01/10 | 2996 | | PAMELA E. ZIPPERER-DAVIS | | 7,881.77 | | |
| 11/15/10 | 3043 | | DENISE M. MILLER | | 1,588.03 | | |
| 11/15/10 | 3044 | | SHERRY L. WEBER | | 1,789.38 | | |
| 11/15/10 | 3045 | | JESSICA L. WITT | | 1,577.95 | | |
| 11/15/10 | 3046 | | PAMELA E. ZIPPERER-DAVIS | | 7,881.77 | | |
| | | | November | | 25,523.26 | 264,804.49 | |
| 12/01/10 | 3078 | | DENISE M. MILLER | | 1,588.03 | | |
| 12/01/10 | 3079 | | SHERRY L. WEBER | | 1,789.38 | | |
| 12/01/10 | 3080 | | JESSICA L. WITT | | 1,510.00 | | |
| 12/01/10 | 3081 | | PAMELA E. ZIPPERER-DAVIS | | 7,881.77 | | |
| 12/01/10 | 3082 | | JULIE A. DURSO | | 250.00 | | |
| 12/15/10 | 3122 | | JULIE A. DURSO | | 350.00 | | |
| 12/15/10 | 3123 | | DENISE M. MILLER | | 1,588.03 | | |
| 12/15/10 | 3124 | | DENISE.M. MILLER | | 1,000.00 | | |
| 12/15/10 | 3125 | | SHERRY L. WEBER | | 1,789.38 | | |
| 12/15/10 | 3126 | | SHERRY L. WEBER | | 1,000.00 | | |
| 12/15/10 | 3127 | | JESSICA L. WITT | | 1,570.40 | | |
| 12/15/10 | 3128 | | JESSICA L. WITT | | 1,000.00 | | |
| 12/15/10 | 3129 | | PAMELA E. ZIPPERER-DAVIS | | 10,913.22 | | |
| 12/15/10 | 3130 | | PAMELA E. ZIPPERER-DAVIS | | 8,881.77 | | |
| 12/30/10 | 3149 | | JULIE A. DURSO | | 300.00 | | |
| 12/30/10 | 3150 | | DENISE M. MILLER | | 1,588.03 | | |
| 12/30/10 | 3151 | | SHERRY L. WEBER | | 1,789.38 | | |
| 12/30/10 | 3152 | | JESSICA L. WITT | | 1,676.10 | | |
| 12/30/10 | 3153 | | PAMELA E. ZIPPERER-DAVIS | | 7,881.77 | | |
| | | | December | | 54,347.26 | 319,151.75 | |
| | | | | | 319,151.75 | | 319,151.75 |
| | 602 Medical Director | | | 0.00 | | | |
| 01/15/10 | 2342 | | KEVIN AUKERMAN | | 4,273.60 | | |
| 01/15/10 | 2343 | | SCOTT WELTON | | 2,161.49 | | |
| 01/15/10 | 2344 | | TED A. KLEIMEYER | | 2,112.13 | | |
| | | | January | | 8,547.22 | 8,547.22 | |
| 02/12/10 | 2407 | | KEVIN AUKERMAN | | 5,589.75 | | |
| 02/12/10 | 2408 | | TED A. KLEIMEYER | | 2,906.51 | | |
| 02/12/10 | 2409 | | SCOTT WELTON | | 2,683.24 | | |
| | | | February | | 11,179.50 | 19,726.72 | |
| 03/15/10 | 2470 | | KEVIN AUKERMAN | | 3,629.58 | | |
| 03/15/10 | 2471 | | SCOTT WELTON | | 1,679.13 | | |
| 3/15/10 | 2472 | | TED A. KLEIMEYER | | 1,950.45 | | |

EXHIBIT

20

01/01/10 - 12/31/10

## MILLENNIUM RADIOLOGY, INC.
### General Ledger

MTAIRY
Page 75

| Date | Reference | T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|------|-----------|---|-------------|-------------------|----------------|-------------------|-------------|
| | | | 602 Medical Director (cont.) | | | | |
| | | | March | 7,259.16 | | 26,985.88 | |
| 04/15/10 | 2535 | | KEVIN AUKERMAN | | 3,787.22 | | |
| 04/15/10 | 2536 | | SCOTT WELTON | | 1,776.76 | | |
| 04/15/10 | 2537 | | TED A. KLEIMEYER | | 2,010.46 | | |
| | | | April | 7,574.44 | | 34,560.32 | |
| 05/14/10 | 2613 | | KEVIN AUKERMAN | | 3,769.68 | | |
| 05/14/10 | 2614 | | TED A. KLEIMEYER | | 1,938.43 | | |
| 05/14/10 | 2615 | | SCOTT WELTON | | 1,831.25 | | |
| | | | May | 7,539.36 | | 42,099.68 | |
| 06/15/10 | 2675 | | KEVIN AUKERMAN | | 3,691.04 | | |
| 06/15/10 | 2676 | | TED A. KLEIMEYER | | 2,060.83 | | |
| 06/15/10 | 2677 | | SCOTT WELTON | | 1,630.21 | | |
| | | | June | 7,382.08 | | 49,481.76 | |
| 07/15/10 | 2733 | | KEVIN AUKERMAN | | 4,552.42 | | |
| 07/15/10 | 2734 | | TED A. KLEIMEYER | | 2,514.37 | | |
| 07/15/10 | 2735 | | SCOTT WELTON | | 2,038.05 | | |
| | | | July | 9,104.84 | | 58,586.60 | |
| 08/13/10 | 2812 | | KEVIN AUKERMAN | | 4,125.74 | | |
| 08/13/10 | 2813 | | TED A. KLEIMEYER | | 2,176.83 | | |
| 08/13/10 | 2814 | | SCOTT WELTON | | 1,948.91 | | |
| | | | August | 8,251.48 | | 66,838.08 | |
| 09/15/10 | 2873 | | KEVIN AUKERMAN | | 3,954.34 | | |
| 09/15/10 | 2874 | | TED A. KLEIMEYER | | 2,180.82 | | |
| 09/15/10 | 2875 | | SCOTT WELTON | | 1,773.52 | | |
| | | | September | 7,908.68 | | 74,746.76 | |
| 10/15/10 | 2953 | | KEVIN AUKERMAN | | 3,973.34 | | |
| 10/15/10 | 2954 | | TED A. KLEIMEYER | | 2,165.98 | | |
| 10/15/10 | 2955 | | SCOTT WELTON | | 1,807.36 | | |
| | | | October | 7,946.68 | | 82,693.44 | |
| 11/15/10 | 3040 | | KEVIN AUKERMAN | | 4,026.78 | | |
| 11/15/10 | 3041 | | TED A. KLEIMEYER | | 2,145.11 | | |
| 11/15/10 | 3042 | | SCOTT WELTON | | 1,881.67 | | |
| | | | November | 8,053.56 | | 90,747.00 | |
| 12/15/10 | 3131 | | KEVIN AUKERMAN | | 4,172.76 | | |
| 12/15/10 | 3132 | | TED A. KLEIMEYER | | 2,282.16 | | |
| 12/15/10 | 3133 | | SCOTT WELTON | | 1,890.60 | | |
| | | | December | 8,345.52 | | 99,092.52 | |
| | | | | | 99,092.52 | | 99,092.52 |
| | | | 603 Profit Sharing | 0.00 | | | |
| 01/18/10 | 2359 | V | Thor Investment Management, Inc. | | 2,155.62 | | |
| 01/22/10 | 2363 | V | Futures Planning Group, Inc. | | 887.50 | | |
| | | | January | 3,043.12 | | 3,043.12 | |
| 04/08/10 | 2534 | V | Thor Investment Management, Inc. | | 2,472.14 | | |
| 04/16/10 | 2549 | V | CHARLES SCHWAB & CO | | 17,442.18 | | |
| | | | April | 19,914.32 | | 22,957.44 | |

01/31/11 - 08/31/11

# MILLENNIUM RADIOLOGY, INC.
## General Ledger

MTAIRY
Page 52

| Date | Reference | T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|------|-----------|---|-------------|-------------------|----------------|-------------------|-------------|
| | | | **601.5 Administrative Salary (cont.)** | | | | |
| 03/15/11 | 3335 | | SHERRY L. WEBER | | 1,789.38 | | |
| 03/15/11 | 3336 | | JESSICA L. WITT | | 1,577.95 | | |
| | | | March | | 10,223.82 | 26,031.35 | |
| 04/01/11 | 3370 | | JULIE A. DURSO | | 350.00 | | |
| 04/01/11 | 3371 | | DENISE M. MILLER | | 1,588.03 | | |
| 04/01/11 | 3372 | | SHERRY L. WEBER | | 1,789.38 | | |
| 04/01/11 | 3373 | | JESSICA L. WITT | | 1,721.40 | | |
| 04/15/11 | 3387 | | JULIE A. DURSO | | 300.00 | | |
| 04/15/11 | 3388 | | DENISE M. MILLER | | 1,588.03 | | |
| 04/15/11 | 3389 | | SHERRY L. WEBER | | 1,789.38 | | |
| 04/15/11 | 3390 | | JESSICA L. WITT | | 1,577.95 | | |
| 04/29/11 | 3427 | | JULIE A. DURSO | | 300.00 | | |
| 04/29/11 | 3428 | | DENISE M. MILLER | | 1,588.03 | | |
| 04/29/11 | 3429 | | SHERRY L. WEBER | | 1,789.38 | | |
| 04/29/11 | 3430 | | JESSICA L. WITT | | 1,404.30 | | |
| | | | April | | 15,785.88 | 41,817.23 | |
| 05/13/11 | 3455 | | JULIE A. DURSO | | 300.00 | | |
| 05/13/11 | 3456 | | DENISE M. MILLER | | 1,588.03 | | |
| 05/13/11 | 3457 | | SHERRY L. WEBER | | 1,789.38 | | |
| 05/13/11 | 3458 | | JESSICA L. WITT | | 1,426.95 | | |
| | | | May | | 5,104.36 | 46,921.59 | |
| 06/01/11 | 3492 | | JULIE A. DURSO | | 350.00 | | |
| 06/01/11 | 3493 | | DENISE M. MILLER | | 1,588.03 | | |
| 06/01/11 | 3494 | | SHERRY L. WEBER | | 1,789.38 | | |
| 06/01/11 | 3495 | | JESSICA L. WITT | | 1,864.85 | | |
| 06/15/11 | 3517 | | JULIE A. DURSO | | 350.00 | | |
| 06/15/11 | 3518 | | DENISE M. MILLER | | 1,588.03 | | |
| 06/15/11 | 3519 | | SHERRY L. WEBER | | 1,789.38 | | |
| 06/15/11 | 3520 | | JESSICA L. WITT | | 1,434.50 | | |
| | | | June | | 10,754.17 | 57,675.76 | |
| 07/01/11 | 3557 | | JULIE A. DURSO | | 350.00 | | |
| 07/01/11 | 3558 | | DENISE M. MILLER | | 1,588.03 | | |
| 07/01/11 | 3559 | | SHERRY L. WEBER | | 1,789.38 | | |
| 07/01/11 | 3560 | | JESSICA L. WITT | | 1,713.85 | | |
| 07/15/11 | 3584 | | JULIE A. DURSO | | 260.00 | | |
| 07/15/11 | 3585 | | DENISE M. MILLER | | 1,635.67 | | |
| 07/15/11 | 3586 | | SHERRY L. WEBER | | 1,843.06 | | |
| 07/15/11 | 3587 | | JESSICA L. WITT | | 1,453.93 | | |
| | | | July | | 10,633.92 | 68,309.68 | |
| 08/01/11 | 3620 | | JULIE A. DURSO | | 300.00 | | |
| 08/01/11 | 3621 | | DENISE M. MILLER | | 1,635.67 | | |
| 08/01/11 | 3622 | | SHERRY L. WEBER | | 1,843.06 | | |
| 08/01/11 | 3623 | | JESSICA L. WITT | | 1,624.98 | | |
| 08/15/11 | 3635 | | JULIE A. DURSO | | 300.00 | | |
| 08/15/11 | 3636 | | DENISE M. MILLER | | 1,635.67 | | |
| 08/15/11 | 3637 | | SHERRY L. WEBER | | 1,843.06 | | |
| 08/15/11 | 3638 | | JESSICA L. WITT | | 1,461.70 | | |
| | | | August | | 10,644.14 | 78,953.82 | |
| | | | | | 78,953.82 | | 78,953.82 |
| | | | **602 Medical Director** | 0.00 | | | |
| 01/14/11 | 3195 | | KEVIN AUKERMAN | | 4,322.82 | | |

**EXHIBIT**

21

| 01/31/11 - 08/31/11 | | MILLENNIUM RADIOLOGY, INC.<br>General Ledger | | | | | MTAIRY<br>Page 53 |
|---|---|---|---|---|---|---|---|

| Date | Reference | T | Description | Beginning Balance | Current Amount | Period End Amount | YTD Balance |
|---|---|---|---|---|---|---|---|
| | | | **602 Medical Director (cont.)** | | | | |
| 01/14/11 | 3196 | | TED A. KLEIMEYER | | 2,370.82 | | |
| 01/14/11 | 3197 | | SCOTT WELTON | | 1,952.00 | | |
| | | | | January | 8,645.64 | 8,645.64 | |
| 02/15/11 | 3269 | | KEVIN AUKERMAN | | 3,253.96 | | |
| 02/15/11 | 3270 | | TED A. KLEIMEYER | | 1,737.50 | | |
| 02/15/11 | 3271 | | SCOTT WELTON | | 1,516.46 | | |
| | | | | February | 6,507.92 | 15,153.56 | |
| 03/15/11 | 3330 | | KEVIN AUKERMAN | | 3,833.15 | | |
| 03/15/11 | 3331 | | TED A. KLEIMEYER | | 2,115.84 | | |
| 03/15/11 | 3332 | | SCOTT WELTON | | 1,717.31 | | |
| | | | | March | 7,666.30 | 22,819.86 | |
| 04/15/11 | 3391 | | KEVIN AUKERMAN | | 3,910.27 | | |
| 04/15/11 | 3392 | | TED A. KLEIMEYER | | 2,184.76 | | |
| 04/15/11 | 3393 | | SCOTT WELTON | | 1,725.51 | | |
| | | | | April | 7,820.54 | 30,640.40 | |
| 05/13/11 | 3459 | | KEVIN AUKERMAN | | 3,642.70 | | |
| 05/13/11 | 3460 | | SCOTT WELTON | | 1,640.35 | | |
| 05/13/11 | 3461 | | TED A. KLEIMEYER | | 2,002.35 | | |
| | | | | May | 7,285.40 | 37,925.80 | |
| 06/15/11 | 3521 | | KEVIN AUKERMAN | | 3,677.38 | | |
| 06/15/11 | 3522 | | TED A. KLEIMEYER | | 2,028.66 | | |
| 06/15/11 | 3523 | | SCOTT WELTON | | 1,649.21 | | |
| | | | | June | 7,355.25 | 45,281.05 | |
| 07/15/11 | 3588 | | KEVIN AUKERMAN | | 3,403.43 | | |
| 07/15/11 | 3589 | | TED A. KLEIMEYER | | 1,716.51 | | |
| 07/15/11 | 3590 | | SCOTT WELTON | | 1,686.92 | | |
| | | | | July | 6,806.86 | 52,087.91 | |
| 08/15/11 | 3639 | | KEVIN AUKERMAN | | 3,184.62 | | |
| 08/15/11 | 3640 | | TED A. KLEIMEYER | | 1,731.63 | | |
| 08/15/11 | 3641 | | SCOTT WELTON | | 1,452.99 | | |
| | | | | August | 6,369.24 | 58,457.15 | |
| | | | | | 58,457.15 | | 58,457.15 |
| | | | **603 Profit Sharing** | 0.00 | | | |
| 01/22/11 | 3225 | V | Thor Investment Management, Inc. | | 3,258.86 | | |
| | | | | January | 3,258.86 | 3,258.86 | |
| 04/18/11 | 3407 | V | Thor Investment Management, Inc. | | 3,436.90 | | |
| 04/19/11 | 3409 | V | CHARLES SCHWAB & CO | | 16,223.87 | | |
| | | | | April | 19,660.77 | 22,919.63 | |
| 07/15/11 | 3596 | V | CHARLES SCHWAB & CO | | 20,485.48 | | |
| 07/19/11 | 3607 | V | Thor Investment Management, Inc. | | 3,516.23 | | |
| | | | | July | 24,001.71 | 46,921.34 | |
| 08/12/11 | 3652 | V | Futures Planning Group, Inc. | | 1,301.25 | | |
| | | | | August | 1,301.25 | 48,222.59 | |
| | | | | | 48,222.59 | | 48,222.59 |