UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America, *et al.*,

    Plaintiffs,

v.

Millennium Radiology, Inc., *et al.*,

    Defendants.

Case No. 1:11cv825

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court upon Defendants Mercy Health Partners of Southwest Ohio and Mercy Hospitals West's Motion to Dismiss (Doc. 33) and Defendant Millennium Radiology, Inc.'s Motion to Dismiss (Doc. 36). These motions are fully briefed. (Docs. 42, 43, 47, 48). In addition to these briefs, the United States filed a Statement of Interest in response to Defendants' Motions to Dismiss. (Doc. 49). Plaintiff/Relator Dr. G. Daryl Hallman ("Hallman") filed a Response to the Government's Statement (Doc. 51), to which Defendants Mercy Health Partners of Southwest Ohio, Mercy Hospitals West ("Mercy") then responded (Doc. 58).

In addition, Plaintiff-Relator filed a Notice of Additional Authority (Doc. 56), to which Defendant Millennium Radiology filed a Response (Doc. 59).

Also pending before the Court is Defendant Millennium Radiology, Inc.'s ("MRI") Motion to Strike Document No. 50. (Doc. 52). Hallman filed a Memorandum in Opposition to that Motion. (Doc. 53).

### I. BACKGROUND

Plaintiff/Relator Dr. G. Daryl Hallman ("Hallman") is a former employee of

Millennium Radiology, Inc. ("MRI"). In his Second Amended Complaint, Hallman claims that MRI has participated in an exclusive referral and marketing system with Defendants Mercy Health Partners of Southwest Ohio, Mercy Hospitals West's ("Mercy") which violates the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b and the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*.

As part of its participation in Medicare, Mercy is required to provide radiology services to its patients. Between 2002 and 2011, Mercy and MRI entered into three agreements which required MRI to be the exclusive provider of radiology services for patients at Mercy's hospital facilities. (Doc. 24-4 Exs. 5 & 11; Doc. 24-5, Ex. 14). The parties agreed that Mercy would bill for the technical component of the services and MRI would bill for the professional component. (See, e.g., Doc. 24-4, PAGEID # 1030). Under all three of the agreements, Mercy agreed to provide the space and equipment that MRI needed to perform its services under the contract. (See, e.g. Doc. 24-4, PAGEID # 1027).

The first agreement was entered into in 2002 and required MRI to provide radiology services at Mercy's Mt. Airy Hospital. MRI also agreed to provide a Medical Director of Radiology Services. Mercy agreed to make a one-time payment of $150,000 to cover MRI's start-up costs, to pay a monthly advance to cover operating losses, and to pay $40,000 per year for the cost of the medical director services. In 2007, the 2002 agreement was amended to reduce the compensation for the medical director services to $12,000.

In 2006, Mercy and MRI entered into the second agreement, which required MRI to provide radiology services at Mercy's Western Hills Hospital. Mercy agreed to pay

MRI an initial advance of $150,000 and a recruiting allowance of up to $25,000 per physician to recruit two physicians to join MRI.  MRI agreed to provide a Medical Director of Radiology Services, but at no additional compensation.

In 2011, Mercy and MRI entered into the third agreement, which was a consolidated exclusive services agreement for MRI to provide radiology services at both the Mt. Airy and Western Hills Hospitals.  As part of the agreement, MRI was required to provide a medical director at both facilities, but the agreement did not include compensation for the medical director services.

Beginning in 2010, MRI has assisted in marketing Mercy's services to other physicians in the area.  Hallman claims that MRI performed these marketing services and provided a medical director for free in exchange for the referral of patients from Mercy.  Hallman claims that this kickback scheme resulted in the submission of false claims for payment to the United States under its Medicare program.

Defendants move to dismiss Hallman's claims, arguing that he failed to particularly allege violations of the AKS or the FCA.

## II.  ANALYSIS

### A.  Motion to Strike

Before addressing Defendants' Motions to Dismiss, the Court must address Defendant MRI's Motion to Strike Document No. 50.  (Doc. 52).  In that Motion, MRI asks this Court to strike Hallman's Memorandum in Opposition to MRI's request that its attorney's advice be stricken from the record.  In response, Hallman asks that its Memorandum in Opposition be deemed a Sur-Reply to MRI's Motion to Dismiss.  The Court finds that good cause to do so exists, and therefore Hallman's Memorandum in

Opposition (Doc. 50) will be deemed a Sur-reply to MRI's Motion to Dismiss (Doc. 36). Accordingly, MRI's Motion to Strike is DENIED as MOOT.

### B. Motion to Dismiss Standard

"In assessing a motion to dismiss under Rule 12(b)(6), this court construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alteration in original). To properly state a claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level." "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### C. False Claims Act

The FCA "is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Bledsoe v. Community Health Sys.*, Inc., 501 F.3d 493, 502-503 (2007). The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. No. 111–21, 123 Stat. 1617 (May 20,

4

2009), amended and renumbered certain provisions of the FCA. The Second Amended Complaint sets forth claims under the FCA's provisions both before and after FERA's enactment.[1] The applicable pre-FERA provisions of the FCA provide that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid.
>
> . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729. The applicable post-FERA provisions of the FCA create civil liability for any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

---

[1]As this Court has recently explained:

> FERA explicitly states that amended § 3729(a)(1)(B) applies retroactively to claims pending on or before June 7, 2008. The other relevant amendments to § 3729(a) are not retroactive. *See* 2009 Acts. Pub.L. 111–21, § 4(f), May 20, 2009, 123 Stat. 1625. On November 2, 2012, the Sixth Circuit held that the term "claim" in the retroactivity provision "refers to a civil action or case." *U.S. ex rel. Sanders v. Allison Eng. Co. Inc.*, 703 F.3d 930, 942 (6th Cir. 2012).

*United States ex rel. Howard v. Lockheed Martin Corp.*, 1:99-CV-285, 2014 WL 1612165 *4 (S.D. Ohio Mar. 25, 2014). The other FERA amendments take effect on the date of enactment and apply to all conduct on or after the date of enactment: May 20, 2009. FERA § 4(f).

> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, . . .

31 U.S.C. § 3729(a)(1). Under the statute, "the terms 'knowing' and 'knowingly'—(A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

As this Court has explained:

> FCA claims must comply with Fed.R.Civ.P. 9(b). *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 502 (6th Cir. 2008). Rule 9(b) adds additional pleading requirements for allegations of fraud or mistake. *Id.* at 503. Thus, under Rule 9(b), a plaintiff must allege the time, place and content of the alleged misrepresentation, the fraudulent scheme, the fraudulent intent of the defendants and the injury resulting from the fraud. *Id.* at 504. Therefore, a *qui tam* case may proceed to discovery if the relator's complaint pleads a complex and far-reaching fraudulent scheme with particularity and provides examples of specific false claims submitted to the Government pursuant to that scheme. *Id.* at 507. However, Rule 9(b) exempts allegations of malice, intent, knowledge and other conditions of a person's mind from its heightened pleading standards. *Id.* at 509.

*United States ex rel. Antoon v. Cleveland Clinic Found.*, 978 F. Supp. 2d 880, 891 (S.D. Ohio 2013).

### D. Anti-Kickback Statute

To be eligible for payment under the Medicare program, providers and suppliers must certify that they understand that payments of claims are conditioned on the claims and the underlying transactions complying with applicable laws, including the AKS.

6

*United States ex rel. Antoon v. Cleveland Clinic Found.*, 978 F. Supp. 2d 880, 890 (S.D. Ohio 2013) (citing *United States ex rel. McDonough v. Symphony Diagnostic Services, Inc.*, No. 2:08–CV–114, 2012 WL 628515 at *1 (S.D.Ohio Feb. 27, 2012) (citing 42 U.S.C. § 1320a–7b(b)(1)(A)).

The AKS is a criminal statute which makes it a felony for a person to "knowingly and willfully offer[ ] or pay[ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(2)(B). The AKS does not criminalize referrals; rather, it criminalizes "knowing and willful acceptance of remuneration in return for such referrals." *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 2:08-CV-00114, 2014 WL 3906461, *4 (S.D. Ohio Aug. 12, 2014) (quoting *Klaczak v. Consol. Med. Transp.*, 458 F.Supp.2d 622, 678 (N.D.Ill. 2006)). To prove a violation of the AKS, Realtor must show: (1) remuneration offered or paid; (2) in order to induce the referral of government healthcare business; (3) done "knowingly and willfully." *Id.* (citing 42 U.S.C. § 1320a–7b(b)(2)(B)).

### E. Remuneration under the AKS

Defendants argue that Hallman has not stated a claim under the AKS because Hallman has not particularly or plausibly alleged that Mercy received "remuneration" from MRI.

This Court has interpreted "remuneration" broadly as meaning "anything of value

in any form whatsoever." *United States v. The Health Alliance of Greater Cincinnati*, 1:03-CV-00167, 2008 WL 5282139,*7 (S.D. Ohio Dec. 18, 2008). This Court has explained that "[t]he Anti–Kickback Statute uses the term 'any remuneration,' which suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading." *Id.* (citing 42 U.S.C. § 1320a-7b (b)(1 & 2)(A)). For example, this Court found that scheduling time for doctors to work at a hospital's "heart station," whereby they are provided with a "stream of patients," was something of value since "[g]iving a person an opportunity to earn money may well be an inducement." *United States ex rel. Fry v. Health Alliance*, No. 1:03–CV–00167, 2008 WL 5282139, at *7–8 (S.D.Ohio Dec. 18, 2008) In another case, this Court found that "not having to do the work of the professional component of the test and not having to set up and maintain the infrastructure in order to do the test and, instead, merely reviewing work that is already complete and signing one's name is certainly something of value." *U.S. ex rel. Daugherty v. Bostwick Labs.*, 1:08-CV-00354, 2012 WL 6593804, *11 (S.D. Ohio Dec. 18, 2012).

Here, Hallman alleges that Mercy received medical director and marketing services in exchange for patient referrals. However, Defendant argues that Hallman did not plead any facts that show that MRI provided these services to Mercy for less than fair market value.

In *U.S. ex rel. Dennis v. Health Mgmt. Associates, Inc.*, the district court found that the relator had not adequately pled remuneration:

> the relator also makes numerous conclusory allegations about arrangements between Dr. McKinney and LIMC, but he offers no detail to establish AKS or Stark law violations. For example, he alleges that LIMC pays Dr. McKinney $60,000 per year to serve as a "Group Director." (FAC

8

> ¶ 99.) He concludes that the compensation "is far in excess of the fair market value for Dr. McKinney's duties as a Group Director" (id. ¶ 100), but says nothing about what Dr. McKinney's duties were or why $60,000 per year would exceed fair market value compensation for those duties. *Cf. United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 1:09–cv–22253, 2012 WL 2871264, at *7 (S.D.Fla. July 12, 2012) (dismissing claims where the relator did not "allege a benchmark of fair market value against which Defendants' rents to physician-tenants can be tested," without which it was impossible to "infer whether Defendants' rents to physician-tenants fall sufficiently below the benchmark so as to constitute remuneration"). Besides this conclusory claim, the relator does not plead sufficient facts to permit the Court to draw the reasonable inference that LIMC was paying Dr. McKinney for referrals instead of for legitimate services. The relator's allegations regarding LIMC's providing "free office space" and use of a LIMC employee "free of charge" to McKinney are similarly devoid of any meaningful detail.

3:09-CV-00484, 2013 WL 146048, *13 (M.D. Tenn. Jan. 14, 2013). In contrast, this Court in *U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, denied the defendants' motion to dismiss, rejecting the argument that the relator failed to allege sufficient details of "remuneration" received by the defendant under the alleged swapping scheme. 2:08-CV-00114, 2012 WL 628515, *5 (S.D. Ohio Feb. 27, 2012). This Court found that the relator had sufficiently alleged facts regarding the fair market value of mobile x-ray services. *Id.* This Court explained that:

> Whatever the precise market rate might have been for specific x-ray services at any specific time, the Court is comfortable in assuming it was higher than zero. Providing the x-ray services for free would necessarily be providing them at below market rates and below cost.

*Id.* In this instance, Hallman has alleged that MRI provided medical director and marketing services to Mercy for free. As this Court observed in *McDonough*, providing these services for free would necessarily be providing them at below market rates and below cost.[2]

---

[2] Defendants also argue that they meet the "Personal Services Arrangement Safe Harbor." However, as Defendants tacitly admit, the determination of whether the agreements

9

However, Defendants argue that Hallman has failed to take into account the overall arrangement between Mercy and MRI. Defendants argue that Hallman has tried to value the medical director services that MRI provided separately from the rest of the exclusive relationship. The Court agrees that it should look at the overall arrangement to make a determination regarding "remuneration," but the Court disagrees that Hallman has failed to state a claim under this analysis.[3]

The Department of Health & Human Services Office of Inspector General ("OIG") has explained that "arrangements that require physicians to provide Medicare Part A supervision and management services for token or no payment in exchange for the ability to provide physician-billable Medicare Part B services at the hospital *potentially* violate the anti-kickback statute and should be closely scrutinized." OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4867 (Jan. 31, 2005) (emphasis added). The OIG explains that:

> Depending on the circumstances, an exclusive contract can have substantial value to the hospital-based physician or group, as well as to the hospital, that may well have nothing to do with the value or volume of business flowing between the hospital and the physicians. By way of example only, an exclusive arrangement may reduce the costs a physician or group would otherwise incur for business development and may eliminate administrative costs otherwise incurred by the hospital. In an appropriate context, an exclusive arrangement that requires a hospital-

---

between MRI and Mercy meet this safe harbor should be made at the summary judgment stage, or even at trial, and not on a motion to dismiss. *Accord United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) ("Once the United States has demonstrated proof of each element of a violation of the Anti-Kickback and/or Stark Statutes, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception.") (citing *United States v. Shaw*, 106 F.Supp.2d 103, 122 (D.Mass. 2000)).

[3] For this reason, the Court finds that it is not necessary to address Mercy's argument that Hallman has not provided any details as to how MRI's marketing efforts resulted in a patient being referred to a Mercy facility. Instead of being a separate AKS violation, the marketing services are to be viewed as part of the overall arrangement between Mercy and MRI.

> based physician or physician group to perform reasonable administrative or limited clinical duties directly related to the hospital-based professional services at no or a reduced charge would not violate the anti-kickback statute, provided that the overall arrangement is consistent with fair market value in an arm's-length transaction, taking into account the value attributable to the exclusivity. Depending on the circumstances, examples of directly-related administrative or clinical duties include, without limitation: participation on hospital committees, tumor boards, or similar hospital entities; participation in on-call rotation; and performance of quality assurance and oversight activities. Notwithstanding, whether the scope and volume of the required services in a particular arrangement reasonably reflect the value of the exclusivity will depend on the facts and circumstances of the arrangement.

*Id.*

In the Second Amended Complaint, Hallman alleges that MRI provided Mercy with radiological services and medical director services. (Doc. 24, ¶¶78, 81, 108). In addition, Hallman alleges that MRI employees have prepared marketing materials and given lectures relating to the services provided by MRI at Mt. Airy and Western Hills Hospitals. (Id., ¶ 16). Hallman alleges that Mercy provided MRI with (1) the right to be the exclusive provider of radiology services at Mt. Airy and Western Hills (Id. at ¶¶78, 107); (2) "all equipment and staff" needed for MRI to perform its radiology duties (Id. at ¶ 79); (3) cash payments toward the medical director services provided by MRI and for MRI to recruit physicians (Id. at ¶ 99, 103); and (4) the opportunity for MRI to participate on a panel that read and billed for cardiology nuclear tests performed at Mercy's Mount Airy facility (Id. at ¶143). These allegations are sufficient to show that the arrangement between Mercy and MRI *potentially* violates the anti-kickback statute. However, for Hallman to succeed on his claims, the evidence must show that based on the facts and circumstances of the arrangement between Mercy and MRI, the scope and volume of MRI's required services did not reasonably reflect the value of the exclusivity of the

11

arrangement.

### F. Intent under the AKS

Defendants also argue that it is not enough for Hallman to allege that Mercy received remuneration "in return for" referrals.  Instead, Defendants argue, Hallman must allege that Mercy solicited or received remuneration with the intent to allow the remuneration to influence the reason and judgment behind one's patient referral decisions.

This is not an incorrect statement of the law.  However, the Court rejects Defendants' argument that Hallman must plead facts negating plausible alternative motives for the parties' agreement that MRI would provide medical director services at no charge.  As one district court has recently observed, the AKS "has been broadly interpreted to cover any arrangement where one purpose of the remuneration is to obtain money for the referral of services or to induce future referrals." *United States ex rel. Bartlett v. Ashcroft*, CIV.A. 3:04-57, 2014 WL 4179862 (W.D. Pa. Aug. 21, 2014) (citing *United States v. Greber*, 760 F.2d 68, 72 (3d Cir.1985) ("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services."); *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir.1998); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989)); *see also* OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed.Reg. 4858, 4864 (Jan. 31, 2005) ("Importantly, under the anti-kickback statute,

neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal purpose (*i.e.*, inducing Federal health care program business)).

Here, Hallman has alleged that one purpose of the arrangement between MRI and Mercy was to induce referrals:

> From at least August 4, 2006 through the present MHP and MRI have participated, and continue to participate, in an exclusive referral and marketing system in violation of the AKS in which MHP allowed MRI to present claims to the United States for Part B radiology services for illegal patient referrals directed to MRI by MHP. In return for the continuous flow of patient referrals at various MHP hospital facilities, MRI agreed to provide to MHP free physician administrative services in excess of a million dollars to MHP and solicited third party physicians for referrals of patients to MHP. MHP, in turn, presented thousands of claims for payment to the United States for Part A facility and outpatient fees associated with the treatment of the patients generated by MHP's and MRI's marketing and solicitation of referrals. This relationship encouraged MRI to order unnecessary procedures to compensate it for the unpaid administrative and solicitation services and encouraged MHP to develop practices that increased the greater utilization of services of hospital-based physicians payable under Medicare Part B.

(Doc. 24, ¶ 2). The Court finds that these allegations are sufficient to satisfy the requirement that Hallman plead that MRI paid remuneration to Mercy in order to induce the referral of government healthcare business.

### G. "Knowingly and willfully" under the AKS

Defendants argue that Hallman has not provided sufficient factual allegations to show that Mercy knowingly or willfully solicited remuneration from MRI.

This Court has explained that it is not necessary to prove specific intent to violate the AKS. *McDonnell v. Cardiothoracic & Vascular Surgical Associates, Inc.*, No. C2-03-79, 2004 WL 3733402 *8 (S.D.Ohio, July 28, 2004). Instead "a violation of the statute may be shown without establishing that the defendant(s) acted 'with knowledge of

13

illegality.'" *Id.* (citing *United States v. Neufeld*, 908 F.Supp. 491, 497 (S.D. Ohio 1995)). However, there must be an allegation that the defendant acted with the "purpose to commit a wrongful act." *Id.* at *8.

Hallman has alleged that in 2010, MRI's CEO, Pamela Zipperer-Davis, was advised by MRI's attorney that was illegal for MHP to require MRI to perform medical director services at no cost. (Doc. 24, ¶ 131). Hallman alleges that as part of the negotiation of the 2011 Agreement between MRI and Mercy, Zipperer-Davis informed Mercy's CEOs, Patrick Kowalski and Paul Hiltz, that MRI's attorney had advised MRI "that the nonpayment of the medical director fees by Mercy may be illegal." (Id., ¶ 135).

Courts have found that ignoring warnings from counsel regarding potential violations of the AKS fulfills the scienter requirement for purposes of surviving a motion to dismiss. *United States ex rel. Decesare v. Americare in Home Nursing*, 1:05CV696, 2011 WL 607390, *6 (E.D. Va. Feb. 10, 2011) (attorney's letter put home healthcare agency on notice that it may be violating AKS, such that the home healthcare agency's continuing in the same course of action after receiving the letter demonstrates reckless disregard for that possibility); *see also U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, CIV.A 1:05-CV-2184, 2010 WL 1390661, *11 (M.D. Pa. Mar. 31, 2010) (scienter shown at the summary judgment stage where compliance officers warned that hospital's arrangement with anesthesiology group was intended to induce ever-greater numbers of physician referrals). Here, Hallman alleges that counsel for MRI advised MRI that the nonpayment of medical director fees may be illegal, and this information was shared with Mercy. These allegations are sufficient to demonstrate that Defendants acted with the purpose to commit a wrongful act.

### H. False claim under the FCA

Defendants argue that Hallman has failed to allege with particularity that Defendants submitted a claim to the government for payment in violation of the FCA.

The Sixth Circuit has explained that under the FCA, a relator "must include an averment that a false or fraudulent claim for payment or approval has been submitted to the government—or, in the locution of our recent decision of *Sanderson*, 'the fraudulent claim is 'the *sine qua non* of a False Claims Act violation.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) and citing *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004) ("[Relator's] failure to identify with particularity any actual false claims that the defendants submitted to the government is, ultimately, fatal to his complaint.")); *see also United States ex rel. Winkler v. BAE Sys., Inc.*, 957 F. Supp. 2d 856, 865 (E.D. Mich. 2013) ("Because the 'false claim' itself is a requirement of the cause of action, it is not sufficient that the complaint allege the underlying fraudulent conduct with particularity—the complaint must also allege the presentation of a false claim for payment to the government with the same particularity.").

However, the Sixth Circuit has also explained that:

> the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted. Such an inference may arise when the relator has "personal knowledge that the claims were submitted by Defendants . . . for payment."

*Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir. 2011) (quoting *United States ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07–cv–4, 2010 U.S. Dist.

LEXIS 46847, at *5, 2010 WL 1926131 (E.D.Tenn. May 12, 2010)). The Sixth Circuit explained, by way of example, the relaxed standard could be applied where the personal knowledge was acquired by being a member of a billing department or personal discussions with an office administrator. *Id.*

Defendants recognize that courts have applied a relaxed version of Rule (9)(b) where the relator has personal knowledge that the claims were submitted by the defendant for payment. However, Defendants argue that Hallman has not alleged that he had personal knowledge of MRI's claims process. Hallman does little to rebut this argument. Instead, Hallman relies on nine monthly "aging reports" from 2010 that identify charges made by MRI to the Medicare and Medicaid programs. (Doc. 24-6, PageID #1242-68).

While establishing "personal knowledge" is one way to create an inference that a claim was submitted, it is not the only means.[4] "'[W]here a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme,' those examples may suffice where they are 'representative samples of the broader class of claims.'" *United States ex rel. SNAPP, Inc. v. Ford Motor Co.,* 532 F.3d 496, 503 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 510 (6th Cir. 2007). Here, the aging reports show that MRI submitted claims for payment to the government, the amounts submitted and the times submitted. The Court finds in this instance, these examples are sufficient to allege the presentation of a false claim for payment to the government. *See United States ex rel. Repko v. Guthrie*

---

[4]However, the Court notes that Hallman was an employee of MRI from April 2005 until April of 2011. (Doc. 24, ¶ 12).

*Clinic*, 557 F.Supp.2d 522, 527 (M.D.Pa. 2008) ("attachment of some or all of the allegedly fraudulent claims would serve no further purpose consistent with Rule 9(b) because defendants are on notice that the basis of the alleged fraud in each claim is the relationship between the defendants, not anything unique to a particular claim, that has caused these claims to be allegedly fraudulent").

Mercy argues that while the aging reports may be sufficient to identify claims submitted for payment by MRI, Hallman cannot rely on MRI's submission of claims to infer that Mercy also submitted false claims. However, Hallman has alleged that ninety-eight percent of MRI's overall revenue is received from patients it treats at Mercy facilities. (Doc. 24, ¶ 182). In addition, Hallman has identified nineteen patients by their initials who underwent surgery on certain dates between August and September of 2010. (Id., ¶ 220). Hallman alleges that this represents a sample of procedures performed at Mercy's facilities by MRI physicians. (Id.) Hallman alleges that these procedures were billed to Medicare by MHP for the Part A facility fees. (Id., ¶ 225).

Based on the foregoing, the Court concludes that Hallman has pled facts which support a strong inference that a claim was submitted.

### I. False certification under the FCA

Defendants argue that Hallman has failed to allege the submission of false certifications with the necessary particularity.

The Sixth Circuit has explained:

> In addition to obvious cases of fraud, as where a provider bills for procedures or services that were not rendered or not necessary, a claim may be false under a "false certification" theory, as "when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305

17

(3d Cir.2011); *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir.2011).  The success of a false certification claim depends on whether it is based on "conditions of participation" in the Medicare program (which do not support an FCA claim) or on "conditions of payment" from Medicare funds (which do support FCA claims).  *Wilkins*, 659 F.3d at 309; *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008); *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701–02 (2d Cir. 2001).

*United States ex rel. Hobbs v. MedQuest Associates, Inc.*, 711 F.3d 707, 714 (6th Cir. 2013).  A false certification may be express or implied.  *Id.* (citing *Wilkins*, 659 F.3d at 305).  Hallman explains that he is proceeding under an implied certification theory:

> Under an implied certification theory, a facially truthful claim can be construed as false if the claimant "violates its continuing duty to comply with the regulations on which payment is conditioned.'  *Chesbrough*, 655 F.3d at 468 (quoting *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002)).  Courts do not look to the claimant's actual statements; rather, the analysis focuses on "the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment."  *Conner*, 543 F.3d at 1218.  A false-certification theory only applies where the underlying regulation is a "condition of payment," meaning that the government would not have paid the claim had it known the provider was not in compliance.  *See Chesbrough*, 655 F.3d at 468.  Of course, a regulation may in some cases be both a condition of payment and a condition of participation.  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006).

*Id.*[5]  Hallman has alleged that MRI and MHP have certified under the terms of their provider agreements that they would comply with all laws and regulations governing the Medicare program, including the AKS and the FCA.  (Doc. 24, ¶ 44-45).  Hallman has also alleged that each time Defendants submitted claims to the government for payment, they were certifying that the claim was made in compliance with the AKS and

---

[5]Hallman explains that it is not necessary to allege certification for his cause of action under the FCA based on claims submitted after March 23, 2010.  Hallman explains that as of that date, the AKS was amended to provided that a claim that includes items or services resulting from a violation of the AKS is a false or fraudulent claim for purposes of the FCA.  *See* 42 U.S.C. 1320a-7b(g).  Defendants do not dispute this point.

FCA. (Id., ¶ 51). Finally, Hallman has alleged that Mercy has an obligation to submit Medicare cost reports and reconcile payments made to Mercy by the government. (Id., ¶ 243).

This Court has held that similar allegations of certifications of compliance with the AKS as a condition of government payment survive a motion to dismiss. *United States v. The Health Alliance of Greater Cincinnati*, 1:03-CV-00167, 2008 WL 5282139, *12 (S.D. Ohio Dec. 18, 2008) ("False claims to Medicare, including Medicare cost reports (CMS-2552's) and claims for payment, (UB-92's) (also known as form HCFA-1450), are actionable under the FCA."); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (holding that a false certification of compliance with the AKS and Stark Law in a Medicare cost report is actionable under the FCA). Therefore, the Court concludes that Hallman has adequately alleged false certification under the FCA.

### J. Conspiracy under the FCA

Under the pre-FERA FCA, to plead a conspiracy under the FCA, a relator must allege: "(1) that there was a single plan to get a false claim paid, (2) that the alleged coconspirators shared in the general conspiratorial objective to get a false claim paid, and (3) that one or more conspirators performed an overt act in furtherance of the conspiracy to get a false claim paid." *United States ex rel. Judd v. Maloy*, No. 3:03–cv–241, 2006 WL 2583318 at *9 (S.D.Ohio Sep. 6, 2006) (citing *United States v. Murphy*, 937 F.2d 1032, 1038–39 (6th Cir. 1991)). Post-FERA, a violation occurs if one conspires to commit a violation of Sections 3729(a)(A), (B), or (G). The Court concludes that Hallman has sufficiently alleged that Mercy and MRI conspired to violate

19

subsections (A) or (B) and the Second Amended Complaint includes allegations of what acts were taken in furtherance of the conspiracy and when the conspiracy occurred. *Cf. United States ex rel. Dennis v. Health Mgmt. Associates, Inc.*, 3:09-CV-00484, 2013 WL 146048, *17 (M.D. Tenn. Jan. 14, 2013) ("Under Rule 9(b), general allegations of a conspiracy, without supporting facts to show when, where or how the alleged conspiracy occurred, amount to only a legal conclusion and are insufficient to state a cause of action.").

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1. Defendant Mercy Health Partners of Southwest Ohio and Mercy Hospitals West's Motion to Dismiss (Doc. 33) is **DENIED**;

2. Defendant Millennium Radiology, Inc.'s Motion to Dismiss (Doc. 36) is **DENIED**; and

3. Defendant MRI's Motion to Strike Document No. 50 (Doc. 52) is **DENIED as MOOT**.

**IT IS SO ORDERED.**

                                          */s/ Michael R. Barrett*
                                        JUDGE MICHAEL R. BARRETT